[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 11-11021 & 11-11067
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 12, 2011
JOHN LEY
CLERK

D.C. Docket No. 3:10-cv-00091-RV-EMT

STATE OF FLORIDA, by and through Attorney General, STATE OF SOUTH
CAROLINA, by and through Attorney General, STATE OF NEBRASKA, by and
through Attorney General, STATE OF TEXAS, by and through Attorney General,
STATE OF UTAH, by and through Attorney General, et. al.,

Plaintiffs - Appellees - Cross-Appellants,

versus

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY,
SECRETARY OF THE UNITED STATES DEPARTMENT OF TREASURY,
UNITED STATES DEPARTMENT OF LABOR, SECRETARY OF THE
UNITED STATES DEPARTMENT OF LABOR,

Defendants - Appellants - Cross-Appellees.
_____

Appeals from the United States District Court
for the Northern District of Florida
_____

(August 12, 2011)

Before DUBINA, Chief Judge, and HULL and MARCUS, Circuit Judges.

DUBINA, Chief Judge, and HULL, Circuit Judge:[1]

Soon after Congress passed the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), *amended by* Health Care and Education Reconciliation Act of 2010 ("HCERA"), Pub. L. No. 111-152, 124 Stat. 1029 (2010) (the "Act"), the plaintiffs brought this action challenging the Act's constitutionality. The plaintiffs are 26 states, private individuals Mary Brown and Kaj Ahlburg, and the National Federation of Independent Business ("NFIB") (collectively the "plaintiffs").[2] The defendants are the federal Health and Human Services ("HHS"), Treasury, and Labor Departments and their Secretaries (collectively the "government").

The district court granted summary judgment (1) to the government on the state plaintiffs' claim that the Act's expansion of Medicaid is unconstitutional and (2) to the plaintiffs on their claim that the Act's individual mandate—that

---

[1] This opinion was written jointly by Judges Dubina and Hull. *Cf. Waters v. Thomas*, 46 F.3d 1506, 1509 (11th Cir. 1995) (authored by Anderson and Carnes, J.J.) (citing *Peek v. Kemp*, 784 F.2d 1479 (11th Cir.) (en banc) (authored by Vance and Anderson, J.J.), *cert. denied*, 479 U.S. 939, 107 S. Ct. 421 (1986)).

[2] The 26 state plaintiffs are Alabama, Alaska, Arizona, Colorado, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Maine, Michigan, Mississippi, Nebraska, Nevada, North Dakota, Ohio, Pennsylvania, South Carolina, South Dakota, Texas, Utah, Washington, Wisconsin, and Wyoming.

individuals purchase and continuously maintain health insurance from private companies[3]—is unconstitutional. The district court concluded that the individual mandate exceeded congressional authority under Article I of the Constitution because it was not enacted pursuant to Congress's tax power and it exceeded Congress's power under the Commerce Clause and the Necessary and Proper Clause. The district court also concluded that the individual mandate provision was not severable from the rest of the Act and declared the entire Act invalid.

The government appeals the district court's ruling that the individual mandate is unconstitutional and its severability holding. The state plaintiffs cross-appeal the district court's ruling on their Medicaid expansion claim. For the reasons that follow, we affirm in part and reverse in part.[4]

## INTRODUCTION

Legal issues concerning the constitutionality of a legislative act present important but difficult questions for the courts. Here, that importance and

---

[3]As explained later, unless the person is covered by a government-funded health program, such as Medicare, Medicaid, and others, the mandate is to purchase insurance from a private insurer.

[4]We review the district court's grant of summary judgment *de novo*. *Sammy's of Mobile, Ltd. v. City of Mobile*, 140 F.3d 993, 995 (11th Cir. 1998). We review *de novo* a constitutional challenge to a statute. *United States v. Cunningham*, 607 F.3d 1264, 1266 (11th Cir.), *cert. denied*, 131 S. Ct. 482 (2010).

3

difficulty are heightened because (1) the Act itself is 975 pages in the format published in the Public Laws;[5] (2) the district court, agreeing with the plaintiffs, held *all* of the Act was unconstitutional; and (3) on appeal, the government argues *all* of the Act is constitutional.

We, as all federal courts, must begin with a presumption of constitutionality, meaning that "we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607, 120 S. Ct. 1740, 1748 (2000).

As an initial matter, to know whether a legislative act is constitutional requires knowing what is in the Act. Accordingly, our task is to figure out what this sweeping and comprehensive Act actually says and does. To do that, we outline the congressional findings that identify the problems the Act addresses, and the Act's legislative response and overall structure, encompassing nine Titles and hundreds of laws on a diverse array of subjects. Next, we set forth in greater depth the contents of the Act's five components most relevant to this appeal: the insurance industry reforms, the new state-run Exchanges, the individual mandate,

---

[5]Pub. L. No. 111-148, 124 Stat. 119 (2010), Pub. L. No. 111-152, 124 Stat. 1029 (2010). Some of the sections of the Act have not yet been codified in the U.S. Code, and for those sections we cite to the future U.S. Code provision, along with the effective date if applicable.

the employer penalties, and the Medicaid expansion.

After that, we analyze the constitutionality of the Medicaid expansion and explain why we conclude that the Act's Medicaid expansion is constitutional.

We then review the Supreme Court's decisions on Congress's commerce power, discuss the individual mandate—which requires Americans to purchase an expensive product from a private insurance company from birth to death—and explicate how Congress exceeded its commerce power in enacting its individual mandate. We next outline why Congress's tax power does not provide an alternative constitutional basis for upholding this unprecedented individual mandate. Lastly, because of the Supreme Court's strong presumption of severability and as a matter of judicial restraint, we conclude that the individual mandate is severable from the remainder of the Act. Our opinion is organized as follows:

   I.  STANDING

  II.  THE ACT

      A.  Congressional Findings
      B.  Overall Structure of Nine Titles
      C.  Terms and Definitions
      D.  Health Insurance Reforms
      E.  Health Benefit Exchanges
      F.  Individual Mandate

G. Employer Penalty
H. Medicaid Expansion

III. CONSTITUTIONALITY OF MEDICAID EXPANSION

A. History of the Medicaid Program
B. Congress's Power under the Spending Clause

IV. SUPREME COURT'S COMMERCE CLAUSE DECISIONS

V. CONSTITUTIONALITY OF INDIVIDUAL MANDATE UNDER THE COMMERCE POWER

A. First Principles
B. Dichotomies and Nomenclature
C. Unprecedented Nature of the Individual Mandate
D. *Wickard* and Aggregation
E. Broad Scope of Congress's Regulation
F. Government's Proposed Limiting Principles
G. Congressional Findings
H. Areas of Traditional State Concern
I. Essential to a Larger Regulatory Scheme
J. Conclusion

VI. CONSTITUTIONALITY OF INDIVIDUAL MANDATE UNDER THE TAX POWER

A. Repeated Use of the Term "Penalty" in the Individual Mandate
B. Designation of Numerous Other Provisions in the Act as "Taxes"
C. Legislative History of the Individual Mandate

VII. SEVERABILITY

## I. STANDING

As a threshold matter, we consider the government's challenge to the

6

plaintiffs' standing to bring this lawsuit. "Article III of the Constitution limits the jurisdiction of federal courts to 'cases' and 'controversies.'" *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1244 (11th Cir. 1998) (citations omitted). As we have explained:

> The case-or-controversy constraint, in turn, imposes a dual limitation on federal courts commonly referred to as "justiciability." Basically, justiciability doctrine seeks to prevent the federal courts from encroaching on the powers of the other branches of government and to ensure that the courts consider only those matters that are presented in an adversarial context. Because the judiciary is unelected and unrepresentative, the Article III case-or-controversy limitation, as embodied in justiciability doctrine, presents an important restriction on the power of the federal courts.

*Id.* (citations omitted). Indeed, there are "three strands of justiciability doctrine—standing, ripeness, and mootness—that go to the heart of the Article III case or controversy requirement." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1247 (11th Cir. 2010) (quotation marks and alterations omitted).

As for the first strand, "[i]t is by now axiomatic that a plaintiff must have standing to invoke the jurisdiction of the federal courts." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1266 (11th Cir. 2006). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Primera Iglesia Bautista Hispana of Boca Raton,*

7

*Inc. v. Broward Cnty.*, 450 F.3d 1295, 1304 (11th Cir. 2006) (quotation marks

omitted). To demonstrate standing, a plaintiff must show that "(1) he has suffered,

or imminently will suffer, an injury-in-fact; (2) the injury is fairly traceable to [the

statute]; and (3) a favorable judgment is likely to redress the injury." *Harrell*, 608

F.3d at 1253; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112

S. Ct. 2130, 2136 (1992). "The plaintiff bears the burden of establishing each of

these elements." *Elend v. Basham*, 471 F.3d 1199, 1206 (11th Cir. 2006). And

standing must be established for each claim a plaintiff raises. *See Harrell*, 608

F.3d at 1253–54. "We review standing determinations *de novo*." *Bochese v. Town

of Ponce Inlet*, 405 F.3d 964, 975 (11th Cir. 2005).

In fact, "[s]tanding is a threshold jurisdictional question which must be

addressed prior to and independent of the merits of a party's claims." *Id.* at 974

(quotation marks and alteration omitted). And "we are obliged to consider

questions of standing regardless of whether the parties have raised them." *Id.* at

975.

Notably, the government does not contest the standing of the individual

plaintiffs or of the NFIB to challenge the individual mandate. In fact, the

government expressly concedes that one of the individual plaintiffs—Mary

Brown—has standing to challenge the individual mandate. *See* Government's Opening Br. at 6 n.1 ("Defendants do not dispute that plaintiff Brown's challenge to the minimum coverage provision is justiciable."). Nor does the government dispute the state plaintiffs' standing to challenge the Medicaid provisions.

The only question raised by the government is whether the state plaintiffs have standing to challenge the individual mandate. The government claims that the state plaintiffs do not have standing because they are impermissibly suing the government as *parens patriae*—or as representatives of their citizens—in violation of the rule articulated in *Massachusetts v. Mellon*, 262 U.S. 447, 485–86, 43 S. Ct. 597, 600 (1923).[6] The state plaintiffs respond that they are not in violation of the *Mellon* rule, but rather have standing to challenge the individual mandate for three independent reasons: first, because the increased enrollment in Medicaid spurred by the individual mandate will cost the states millions of dollars in additional Medicaid funding; second, because they are injured by other provisions of the Act—such as the Medicaid expansion—from which the individual mandate cannot be severed; and finally, because the individual mandate

---

[6]In *Mellon*, the Supreme Court held that states cannot sue the federal government in a representative capacity to protect their citizens from the operation of an allegedly unconstitutional federal law. 262 U.S. at 485–86, 43 S. Ct. at 600. This has come to be known as the *Mellon* rule.

intrudes upon their sovereign interest in enacting and enforcing state statutes that shield their citizens from the requirement to purchase health insurance. States' Opening Br. at 67–69.

Although the question of the state plaintiffs' standing to challenge the individual mandate is an interesting and difficult one, in the posture of this case, it is purely academic and one we need not confront today. The law is abundantly clear that so long as at least one plaintiff has standing to raise each claim—as is the case here—we need not address whether the remaining plaintiffs have standing. *See, e.g., Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160, 102 S. Ct. 205, 212 (1981) ("Because we find California has standing, we do not consider the standing of the other plaintiffs."); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9, 97 S. Ct. 555, 562 & n.9 (1977) ("Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain suit."); *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009) ("Because Balzli has standing to raise those claims, we need not decide whether either of the organizational plaintiffs also has standing to do so."); *Jackson v. Okaloosa Cnty.*, 21 F.3d 1531, 1536 (11th Cir. 1994) ("In order for this court to have jurisdiction

10

over the claims before us, at least one named plaintiff must have standing for each of the claims."); *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996) ("For each claim, if constitutional and prudential standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim."). Because it is beyond dispute that at least one plaintiff has standing to raise each claim here—the individual plaintiffs and the NFIB have standing to challenge the individual mandate, and the state plaintiffs undeniably have standing to challenge the Medicaid provisions—this case is justiciable, and we are permitted, indeed we are obliged, to address the merits of each. Accordingly, we turn to the constitutionality of the Act.

## II. THE ACT

### A. Congressional Findings

The congressional findings for the Act, including those relating to the individual mandate, are contained in two pages, now codified in 42 U.S.C. § 18091(a)(1)–(3). Approximately 50 million people are uninsured.[7] The

---

[7]U.S. Census Bureau, P60-238, *Income, Poverty, and Health Insurance Coverage in the United States: 2009* 23 tbl.8 (2010) ("*Census Report*"), *available at* http://www.census.gov/prod/2010pubs/p60-238.pdf. Although the congressional findings do not state the precise number of the uninsured, the parties use the 50 million figure, so we will too.

Copies of the Internet materials cited in this opinion are on file in the Clerk's Office. *See* 11th Cir. R. 36, I.O.P. 10.

congressional findings focus on these uninsureds, health insurance, and health care. *Id.*

### 1.	The Uninsured and Cost-Shifting Problems

The congressional findings state that some individuals make "an economic and financial decision to forego health insurance coverage and attempt to self-insure, which increases financial risks to households and medical providers." *Id.* § 18091(a)(2)(A). In its findings, Congress determined that the decision by the uninsured to forego insurance results in a cost-shifting scenario. *Id.* § 18091(a)(2)(F).

Congress's findings identify a multi-step process that starts with consumption of health care: (1) some uninsured persons consume health care; (2) some fail to pay the full costs; (3) in turn the unpaid costs of that health care—$43 billion in 2008—are shifted to and spread among medical providers; (4) thereafter medical providers, by imposing higher charges, spread and shift the unpaid costs to private insurance companies; (5) then private insurance companies raise premiums for health policies and shift and spread the unpaid costs to already-insured persons; and (6) consequently already-insured persons suffer higher premiums. *Id.* § 18091(a)(2). Also, some uninsured persons continue not to buy coverage because of higher premiums. *Id.*

12

The findings state that this cost-shifting scenario increases family premiums on average by $1,000 per year. *Id.* § 18091(a)(2)(F). Although not in the findings, the data show the cost-shifting increases individual premiums on average by $368–410 per year.[8] The cost-shifting represents roughly 8% of average premiums.[9]

In its findings, Congress also points out that national health care spending in 2009 was approximately $2.5 trillion, or 17.6% of the national economy.[10] *Id.* § 18091(a)(2)(B). Thus, the $43 billion in shifted costs represents about 1.7% of total health care expenditures. Of that $2.5 trillion in national health care spending in 2009, federal, state, and local governments paid $1.1 trillion, or 44%.[11]

---

[8]Uncompensated care costs translate into "a surcharge of $368 for individual premiums and a surcharge of $1017 for family premiums in 2008." *See* Families USA, *Hidden Health Tax: Americans Pay a Premium* 7 (2009), *available at* http://familiesusa2.org/assets/pdfs/hidden-health-tax.pdf (cited by both the plaintiffs and the government).

[9]"[A] 'hidden tax' on health insurance accounts for roughly 8% of the average health insurance premium" and "[t]his cost-shift added, on average, $1,100 to each family premium in 2009 and about $410 to an individual premium." Br. of *Amici Curiae* Am. Ass'n of People with Disabilities, *et al.*, in Support of the Government at 15 (citing Ben Furnas & Peter Harbage, Ctr. for Am. Progress Action Fund, *The Cost Shift from the Uninsured* 1–2 (2009), *available at* http://www.americanprogressaction.org/issues/2009/03/pdf/cost_shift.pdf (calculations based on a 2005 analysis by Families USA)).

[10]*See* Centers for Medicare & Medicaid Services ("CMS"), *National Health Expenditure Web Tables* tbls.1, 5, 11, *available at* http://www.cms.gov/NationalHealthExpendData/downloads/tables.pdf (derived from calculations).

[11]*See* CMS, *National Health Expenditure Web Tables*, *supra* note 10, at tbl.5. The governments' health care spending in 2009 included $503 billion for Medicare and $374 billion for Medicaid and the Children's Health Insurance Program ("CHIP").

Private insurers still paid for 32% of health care spending in 2009,[12] *id.*, through: (1) primarily private employer-based insurance plans, or (2) the private individual insurance market. The private *employer-based* health system covers 176 million Americans. *Id.* § 18091(a)(2)(D). The private *individual insurance market* covers 24.7 million people.[13] Undisputedly, "[h]ealth insurance and health care services are a significant part of the national economy." *Id.* § 18091(a)(2)(B).

## 2. $90 Billion Private Underwriting Costs Problem

Congress also recognized that many of the uninsured desire insurance but have been denied coverage or cannot afford it. Its findings emphasize the barriers created by private insurers' underwriting practices and related administrative costs. *Id.* § 18091(a)(2)(J). Private insurers want healthy insureds and try to protect themselves against unhealthy entrants through medical underwriting, especially in the individual market. As a result of medical underwriting, many uninsured Americans—ranging from 9 million to 12.6 million—voluntarily sought

---

Projected Medicare spending is $723.1 billion in 2016 and $891.4 billion in 2019. CMS, *Nat'l Health Expenditure Projections 2009–2019* tbl.2, *available at* http://www.cms.gov/National HealthExpendData/Downloads/NHEProjections2009to2019.pdf.
With the Act's Medicaid expansion and other factors, projected Medicaid and CHIP spending is $737.5 billion in 2016 and $896.2 billion in 2019. *Id.*

[12] *See* CMS, *National Health Expenditure Web Tables*, *supra* note 10, at tbl.3 (derived from calculations).

[13] *See Census Report*, *supra* note 7, at 22–25 & 23 tbl.8 (derived from calculations).

health coverage in the individual market but were denied coverage, charged a higher premium, or offered only limited coverage that excludes a preexisting condition.[14]

In its findings, Congress determined that the "[a]dministrative costs for private health insurance" were $90 billion in 2006, comprising "26 to 30 percent of premiums in the current individual and small group markets." *Id.* The findings state that Congress seeks to create health insurance markets "that do not require underwriting and eliminate its associated administrative costs." *Id.* The Act requires private insurers to allow all applicants to enroll. 42 U.S.C. § 300gg-1(a). Congress stated that the Act, by eliminating underwriting costs, will lower health insurance premiums. *Id.*

### 3. Congress's Solutions

Given the 50 million uninsured, $43 billion in uncompensated costs, and $90 billion in underwriting costs, Congress determined these problems affect the national economy and interstate commerce. *Id.* § 18091(a)(2). The congressional

---

[14]HHS, *Coverage Denied: How the Current Health Insurance System Leaves Millions Behind*, http://www.healthreform.gov/reports/denied_coverage/index.html (citing Commonwealth Fund Biennial Health Insurance Survey, 2007); Sara R. Collins, *et al.*, The Commonwealth Fund, *Help on the Horizon: How the Recession Has Left Millions of Workers Without Health Insurance, and How Health Reform Will Bring Relief* xi (2011), *available at* http://www.commonwealthfund.org/~/media/Files/Surveys/2011/1486_Collins_ help_on_the_horizon_2010_biennial_survey_report_FINAL_31611.pdf.

findings identify what the Act regulates: (1) the "health insurance market," (2) "how and when health care is paid for," and (3) "when health insurance is purchased." *Id.* § 18091(a)(2)(A), (H). The findings also state that the Act's reforms will significantly reduce the number of the uninsured and will lower health insurance premiums. *Id.* § 18091(a)(2)(F).

To reduce the number of the uninsured, the Act employs five main tools: (1) comprehensive insurance industry reforms which alter private insurers' underwriting practices, guarantee issuance of coverage, overhaul their health insurance products, and restrict their premium pricing structure; (2) creation of state-run "Health Benefit Exchanges" as new marketplaces through which individuals, families, and small employers, now pooled together, can competitively purchase the new insurance products and obtain federal tax credits and subsidies to do so; (3) a mandate that individuals must purchase and continuously maintain health insurance or pay annual penalties; (4) penalties on private employers who do not offer at least some type of health plan to their employees; and (5) the expansion of Medicaid eligibility and subsidies.

The Act's Medicaid expansion alone will cover 9 million of the 50 million uninsured by 2014 and 16 million by 2016.[15] The Act's health insurance reforms

---

[15]*CBO's Analysis of the Major Health Care Legislation Enacted in March 2010*: Before the Subcomm. on Health of the H. Comm. on Energy & Commerce 112th Cong. 18 tbl.3 (2011)

16

remove private insurers' barriers to coverage and restrict their pricing to make coverage accessible to the 9 to 12 million uninsured who were denied coverage or had their preexisting conditions excluded.[16] The Act's new Exchanges, with significant federal tax credits and subsidies, are predicted to make insurance available to 9 million in 2014 and 22 million by 2016.[17]

Congress's findings state that the Act's multiple provisions, combined together:[18]

(1) "will add millions of new consumers to the health insurance market" and "will increase the number and share of Americans who are insured";

(2) will reduce the number of the uninsured, will broaden the health insurance risk pool to include additional healthy individuals, will increase economies of scale, and will significantly reduce insurance companies' administrative costs, all of which will lower health insurance premiums;

(3) will build upon and strengthen the private employer-based health insurance system, which already covers "176,000,000 Americans"; and

---

(Statement of Douglas Elmendorf, Director, Cong. Budget Office) [hereinafter CBO, *Analysis*], *available at* http://www.cbo.gov/ftpdocs/121xx/doc12119/03-30-HealthCareLegislation.pdf.

[16]*See* HHS, *Coverage Denied,* and Collins, *supra* note 14.

[17]CBO, *Analysis*, *supra* note 15, at tbl.3.

[18]The congressional findings refer six times to the individual mandate "requirement, together with the other provisions of this Act." 42 U.S.C. § 18091(a)(2)(C), (E), (F), (G), (I), (J).

(4) will achieve "near-universal" coverage of the uninsured.

 *Id.* § 18091(a)(2).

Although the congressional findings summarily refer to "the uninsured," the parties' briefs and the 52 *amici* briefs contain, and indeed rely on, additional data about the uninsured. Before turning to the Act, we review that data.[19]

### 4. Data about the Uninsured and Uncompensated Care

So who are the uninsured? As to health care usage, the uninsured do not fall into a single category. Many of the uninsured do not seek health care each year. Of course, many do. In 2007, 57% of the 40 million uninsured that year used some medical services; in 2008, 56% of the 41 million uninsured that year used some medical services.[20]

As to medical services, 50% of uninsured people had routine checkups in the past two years; 68% of uninsured people had routine checkups in the past five

---

[19]There has been no evidentiary objection by any party to the data and studies cited in the parties' briefs or in any of the *amici* briefs. In fact, at times the parties cite the same data.

[20]HHS, Agency for Healthcare Research and Quality, Medical Expenditure Panel Survey, Household Component Summary Tables ("MEPS Summary Tables"), Table 1: Total Health Services–Median and Mean Expenses per Person with Expense and Distribution of Expenses by Source of Payment: United States, 2007 & 2008, *available at* http://www.meps.ahrq.gov/mepsweb/data_stats/quick_tables.jsp (follow "Household Component summary tables" hyperlink; then select 2007 or 2008 for "year" and follow the "search" hyperlink; then follow the hyperlink next to "Table 1").
The Medical Expenditure Panel Survey ("MEPS") is a set of large-scale surveys of families and individuals, their medical providers (including doctors, hospitals, and pharmacies), and employers across the United States. It is conducted under the auspices of HHS.

years.[21] In 2008, the uninsured made more than 20 million visits to emergency rooms,[22] and 2.1 million were hospitalized.[23] The medical care used by each uninsured person cost about $2,000 on average in 2007, and $1,870 on average in 2008.[24]

When the uninsured do seek health care, what happens? Some pay in full. Some partially pay. Some pay nothing. Data show the uninsured paid on average 37% of their health care costs out of pocket in 2007, and 46.01% in 2008,[25] while

---

[21]June E. O'Neill & Dave M. O'Neill, *Who Are the Uninsured? An Analysis of America's Uninsured Population, Their Characteristics and Their Health*, EMP'T POLICIES INSTITUTE, 21 tbl.9 (2009), *available at* http://epionline.org/studies/oneill_06-2009.pdf.

[22]Br. of *Amici Curiae* Am. Hosp. Ass'n *et al.* in Support of the Government at 11 (citing Press Release, HHS, New Data Say Uninsured Account for Nearly One-Fifth of Emergency Room Visits (Jul. 15, 2009), *available at* http://www.hhs.gov/news/press/2009pres/ 07/20090715b.html).

[23]In 2008, U.S. hospitals reported more than 2.1 million hospitalizations of the uninsured. Office of the Assistant Sec'y for Planning and Evaluation, HHS, *The Value of Health Insurance: Few of the Uninsured Have Adequate Resources to Pay Potential Hospital Bills* 5 (2011), *available at* http://aspe.hhs.gov/health/reports/2011/valueofinsurance/rb.shtml.

[24]MEPS Summary Tables, *supra* note 20. An Economic Scholars' *amici* brief, filed in support of the government, states: "The medical care used by each uninsured person costs about $2000 per year, on average." Br. of *Amici Curiae* Economists in Support of the Government at 16 (citing "Agency for Health Care Quality and Research, Medical Expenditure Panel Survey, Summary Data Tables, Table 1" (*see* MEPS Summary Tables, *supra* note 20); Jack Hadley, *et al.*, "Covering the Uninsured in 2008: Current Costs, Sources of Payment, and Incremental Costs," 27(5) HEALTH AFFAIRS W399-415 (2008)).
    In contrast, this same *amici* brief points out: "In 2007, the average person used $6,186 in personal health care services." *Id.* at 11 (citing "Center for Medicare and Medicaid Services, National Health Expenditure Accounts"); *see* CMS, *National Expenditure Web Tables*, *supra* note 10, at tbl.1.

[25]*See* MEPS Summary Tables, *supra* note 20.

third parties pay another 26% on their behalf.[26] Not surprisingly, the poorer uninsured, on average, consume more health care for which they do not pay.[27] Even in households at or above the median income level ($41,214) in 2000, the uninsured paid, on average, less than half their medical care costs.[28]

It is also undisputed that people are uninsured for a wide variety of reasons. The uninsured are spread across different income brackets:

(1) less than $25,000: 15.5 million uninsured, or about 31%;

(2) $25,000 to $49,999: 15.3 million uninsured, or about 30%;

(3) $50,000 to $74,999: 9.4 million uninsured, or about 18%;

(4) $75,000 or more: 10.6 million uninsured, or about 21%.[29]

As the data show, many of the uninsured have low to moderate incomes and simply cannot afford insurance. Some of the uninsured can afford insurance and tried to obtain it, but were denied coverage based on health status.[30] Some are

---

[26] *See* Families USA, *Hidden Health Tax*, *supra* note 8, at 2 (cited by both the plaintiffs and the government).

[27] Bradley Herring, *The Effect of the Availability of Charity Care to the Uninsured on the Demand for Private Health Insurance*, 24 J. HEALTH ECON. 225, 229–31 (2005).

[28] Herring, *supra* note 27, at 231 ("[T]he median income for all household[s] in the U.S. is roughly 300% of poverty, and the poverty threshold was US$13,738 for a family of three in 2000."); *see id.* at 230 tbl.1.

[29] *See Census Report*, *supra* note 7, at 23 tbl.8.

[30] *See* HHS, *Coverage Denied*, and Collins, *supra* note 14.

voluntarily uninsured and self-finance because they can pay for their medical care or have modest medical care needs. Some may not have considered the issue. There is no one reason why people are uninsured. It is also not surprising, therefore, that Congress has attacked the uninsured problem through multiple reforms and numerous avenues in the Act that we outline later.

Given these identified problems, congressional findings, and data as background, we now turn to Congress's legislative response in the Act.

**B.    Overall Structure of Nine Titles**

The sweeping and comprehensive nature of the Act is evident from its nine Titles:

I.      Quality, Affordable Health Care for All Americans

II.     Role of Public Programs

III.    Improving the Quality and Efficiency of Health Care

IV.     Prevention of Chronic Disease and Improving Public Health

V.      Health Care Workforce

VI.     Transparency and Program Integrity

VII.    Improving Access to Innovative Medical Therapies

VIII.   Community Living Assistance Services and Supports

IX.    Revenue Provisions[31]

The Act's provisions are spread throughout many statutes and different titles in the

United States Code. As our Appendix A demonstrates, the Act's nine Titles

contain hundreds of new laws about hundreds of different areas of health

insurance and health care. Appendix A details most parts of the Act with section

numbers. Here, we merely list the broad subject matter in each Title.

Title I contains these four components mentioned earlier: (1) the insurance

industry reforms; (2) the new state-run Exchanges; (3) the individual mandate; and

(4) the employer penalty. Act §§ 1001–1568. Title II shifts the Act's focus to

publicly-funded programs designed to provide health care for the uninsured, such

as Medicaid, CHIP, and initiatives under the Indian Health Care Improvement Act.

*Id.* §§ 2001–2955. Title II contains the Medicaid expansion at issue here. Title II's

provisions also create, or expand, other publicly-funded programs. *Id.*

Title III primarily addresses Medicare. *Id.* §§ 3001–3602. Title IV

concentrates on prevention of illness. *Id.* §§ 4001–4402. Title V seeks to increase

the supply of health care workers through education loans, training grants, and

other programs. *Id.* §§ 5001–5701.

Title VI creates new transparency and anti-fraud requirements for physician-

---

[31]There is also a tenth Title dedicated to amendments to these nine Titles.

owned hospitals participating in Medicare and for nursing facilities participating in Medicare or Medicaid. *Id.* §§ 6001–6801. Title VI includes the Elder Justice Act, designed to eliminate elder abuse, neglect, and exploitation. *Id.*

Title VII extends and expands certain drug discounts in health care facilities serving low-income patients. *Id.* §§ 7001–7103. Title VIII establishes a national, voluntary long-term care insurance program for purchasing community living assistance services and support by persons with functional limitations. *Id.* §§ 8001–8002. Title IX contains revenue provisions. *Id.* §§ 9001–9023.

We include Appendix A because it documents (1) the breadth and scope of the Act; (2) the multitudinous reforms enacted to reduce the number of the uninsured; (3) the large number and diverse array of new, or expanded, federally-funded programs, grants, studies, commissions, and councils in the Act; (4) the extensive new federal requirements and regulations on myriad subjects; and (5) how many of the Act's provisions on their face operate separately and independently.

We now examine in depth the five parts of the Act largely designed to reduce the number of the uninsured. Because of the Act's comprehensive and complex regulatory scheme, it is critical to examine what the Act actually does and does not do. We start with some terms and definitions.

## C.     Terms and Definitions

The Act regulates three aspects of health insurance: (1) "markets," the outlets where consumers may purchase insurance products; (2) "plans," the insurance products themselves; and (3) "benefits," the health care services or items covered under an insurance plan.

### 1.     Markets

Given its focus on making health insurance available to the uninsured, the Act recognizes and regulates four markets for health insurance products: (1) the "individual market"; (2) the "small group market"; (3) the "large group market"; and (4) the new Exchanges, to be created and run by each state.

The term "individual market" means "the market for health insurance coverage offered to individuals other than in connection with a group health plan." 42 U.S.C. §§ 300gg-91(e)(1)(A), 18024(a)(2).

The term "group market" means "the health insurance market under which individuals obtain health insurance coverage (directly or through any arrangement) on behalf of themselves (and their dependents) through a group health plan maintained by an employer." *Id.* § 18024(a)(1).

Within the "group market," the Act distinguishes between the "large group market" and the "small group market." The term "large group market" refers to the

market under which individuals purchase coverage through a group plan of a "large employer." *Id.* §§ 300gg-91(e)(3), 18024(a)(3). A "large employer" is an employer with over 100 employees. *Id.* §§ 300gg-91(e)(2), 18024(b)(1).

The term "small group market" refers to the market under which individuals purchase coverage through a group plan of a "small employer," or an employer with no more than 100 employees. *Id.* §§ 300gg-91(e)(4), (5), 18024(a)(3), (b)(2).

The term "Exchanges" refers to the health benefit exchanges that each state must create and operate.[32] *Id.* § 18031(b). Companies (profit and nonprofit) participating in the Exchanges will offer insurance for purchase by individuals and employees of small employers. *See id.*; *id.* § 18042. The uninsured can obtain significant federal tax credits and subsidies through the Exchanges. *See* 26 U.S.C. § 36B; 42 U.S.C. § 18071. In 2017, the states will have the option to open the Exchanges to large employers. 42 U.S.C. § 18032(f)(2)(B).

## 2. "Essential Health Benefits Package" Term

Two key terms in the Act are: (1) "essential health benefits package" and (2) "minimum essential coverage." Although they sound similar, each has a different meaning.

---

[32]The Act allows a state to opt out of creating and operating an Exchange, in which case the federal government (or a nonprofit contractor) will establish the Exchange. 42 U.S.C. § 18041(c).

The term "essential health benefits package" refers to the comprehensive benefits package that must be provided by plans in the individual and small group markets by 2014. *Id.* § 300gg-6(a) (effective Jan. 1, 2014); *id*. § 18022(a). The Act does not impose the essential health benefits package on plans offered by large group employers to their employees.

An "essential health benefits package" must: (1) provide coverage for the "essential health benefits" described in § 18022(b); (2) limit the insured's cost-sharing, as provided in § 18022(c); and (3) provide "either the bronze, silver, gold, or platinum level of coverage" described in § 18022(d). *Id.* § 18022(a).

The Act leaves it to HHS to define the term "essential health benefits." *Id.* § 18022(b). However, that definition of "essential health benefits" must include at least these ten services:

> (A) Ambulatory patient services.
> (B) Emergency services.
> (C) Hospitalization.
> (D) Maternity and newborn care.
> (E) Mental health and substance use disorder services, including behavioral health treatment.
> (F) Prescription drugs.
> (G) Rehabilitative and habilitative services and devices.
> (H) Laboratory services.
> (I) Preventive and wellness services and chronic disease management.
> (J) Pediatric services, including oral and vision care.

*Id.* § 18022(b)(1).[33] The bronze, silver, gold, and platinum levels of coverage reflect the levels of cost-sharing (or actuarial value of benefits) in a plan and do not represent the level or type of services. *Id.* § 18022(d)(1)–(2). For example, a bronze plan covers 60% of the benefits' costs, and the insured pays 40% out of pocket; a platinum plan covers 90%, with the insured paying 10%. *Id.* § 18022(d)(1)(A), (D).

### 3.  Individual Mandate's "Minimum Essential Coverage" Term

The Act uses a wholly different term—"minimum essential coverage"—in connection with the individual mandate. "Minimum essential coverage" is the type of *plan* needed to satisfy the individual mandate. A wide variety of health plans are considered "minimum essential coverage": (1) government-sponsored programs, (2) eligible employer-sponsored health plans, (3) individual market health plans, (4) grandfathered health plans, and (5) health plans that qualify for, and are offered in, a state-run Exchange. 26 U.S.C. § 5000A(a), (f)(1).

Many of these plan types will satisfy the mandate even if they do not have the "essential health benefits package" and regardless of the level of benefits or

---

[33]In defining "essential health benefits," HHS must ensure that the scope of essential health benefits is "equal to the scope of benefits provided under a typical employer plan." 42 U.S.C. § 18022(b)(2). HHS must take additional elements into consideration, such as balance among the categories of benefits, discrimination based on age or disability, and the needs of diverse segments of the population. *Id*. § 18022(b)(4).

coverage. The requirement of the "essential health benefits package" is directly tied to some of the insurance product reforms, but not the individual mandate.

We turn to the Act's first component: the insurance reforms.

**D.     Health Insurance Reforms**

To reduce the number of the uninsured, the Act heavily regulates private insurers and reforms their health insurance products. We list examples of the major reforms.

**1. Guaranteed Issue.** Insurers must permit every employer or individual who applies in the individual or group markets to enroll. 42 U.S.C. § 300gg-1(a) (effective Jan. 1, 2014). However, insurers "may restrict enrollment in coverage described [in subsection (a)] to open or special enrollment periods."[34] *Id.* § 300gg-1(b)(1) (effective Jan. 1, 2014).

**2. Guaranteed renewability.** Insurers in the individual and group markets must renew or continue coverage at the individual or plan sponsor's option in the absence of certain exceptions, such as premium nonpayment, fraud, or the

---

[34]The Act directs HHS to promulgate regulations with respect to enrollment periods. 42 U.S.C. § 300gg-1(b)(3) (effective Jan. 1, 2014). Insurers must establish "special enrollment periods for 'qualifying events.'" *Id.* § 300gg-1(b)(2). "Qualifying events" include, for example: (1) "[t]he death of the covered employee"; (2) "[t]he termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment"; and (3) "[t]he divorce or legal separation of the covered employee from the employee's spouse." 29 U.S.C. § 1163.

insurer's discontinuation of coverage in the relevant market. *Id.* § 300gg-2(b).

**3. Waiting periods.** Under group health plans, insurers may impose waiting periods of up to 90 days before a potential enrollee is eligible to be covered under the plan. *Id.* §§ 300gg-7 (effective Jan. 1, 2014), 300gg-3(b)(4). The Act places no limits on insurers' waiting periods for applications in the individual market.

**4. Elimination of preexisting conditions limitations.** Insurers may no longer deny or limit coverage due to an individual's preexisting medical conditions. The Act prohibits preexisting condition exclusions for children under 19 within six months of the Act's enactment, and eliminates preexisting condition exclusions for adults beginning in 2014.[35] *Id*. § 300gg-3.

**5. Prohibition on health status eligibility rules.** Insurers may not establish eligibility rules based on any of the health status-related factors listed in the Act.[36]

---

[35]For dates effective as to children and then adults, *see* Pub. L. No. 111-148, Title I, § 1255 (formerly § 1253), 124 Stat. 162 (2010) (renumbered § 1255 and amended, Pub. L. No. 111-148, Title X, § 10103(e), (f)(1), 124 Stat. 895 (2010), and codified in note to 42 U.S.C. § 300gg-3).

[36]Health status-related factors include:
    (1) Health status.
    (2) Medical condition (including both physical and mental illnesses).
    (3) Claims experience.
    (4) Receipt of health care.
    (5) Medical history.
    (6) Genetic information.
    (7) Evidence of insurability (including conditions arising out of acts of domestic violence).
    (8) Disability.
    (9) Any other health status-related factor determined appropriate by the [HHS]

*Id.* § 300gg-4 (effective Jan. 1, 2014).

**6. Community rating.** In the individual and small group markets and the Exchanges, insurers may vary premium rates only based on (1) whether the plan covers an individual or a family; (2) "rating area"; (3) age (limited to a 3–to–1 ratio); and (4) tobacco use (limited to a 1.5–to–1 ratio). *Id.* § 300gg(a)(1). Each state must establish one or more rating areas subject to HHS review. *Id.* § 300gg(a)(2)(B). This rule prevents insurers from varying premiums within a geographic area based on gender, health status, or other factors.

**7. Essential health benefits package.** The individual and small group market plans must contain comprehensive coverage known as the "essential health benefits package," defined above. *Id.* §§ 300gg-6(a) (effective Jan. 1, 2014), 18022(a). The Act does not impose this requirement on large group market plans.[37]

**8. Preventive service coverage.** Insurers must provide coverage for certain enumerated preventive health services without any deductibles, copays, or other cost-sharing requirements. *Id.* § 300gg-13(a).

---

Secretary.
42 U.S.C. § 300gg-4(a) (effective Jan. 1, 2014).

[37]Rather, the large group market is subject to only a few coverage-reform requirements that apply broadly to either *all* insurance plans or group health plans in particular. *See* Amy Monahan & Daniel Schwarcz, *Will Employers Undermine Health Care Reform by Dumping Sick Employees?*, 97 Va. L. Rev. 125, 147 (2011).

**9. Dependent coverage**. Insurers must allow dependent children to remain on their parents' policies until age 26. *Id.* § 300gg-14(a).

**10. Elimination of annual and lifetime limits.** Insurers may no longer establish lifetime dollar limits on essential health benefits. *Id.* § 300gg-11(a)(1)(A), (b). Insurers may retain annual dollar limits on essential health benefits until 2014.[38] *Id.* § 300gg-11(a).

**11. Limits on cost-sharing by insureds.** "Cost-sharing"[39] includes out-of-pocket "deductibles, coinsurance, copayments, or similar charges" and "qualified medical expenses."[40] *Id.* § 18022(c)(3)(A). Annual cost-sharing limits apply to group health plans, health plans sold in the individual market, and qualified health plans offered through an Exchange.[41] *Id.* §§ 300gg-6(b) (effective Jan. 1, 2014), 18022(a), (c).

_____

[38]HHS shall determine what restricted annual limits are permitted on the dollar value of essential health benefits until 2014. 42 U.S.C. § 300gg-11(a)(1), (2). "Subsection (a) shall not be construed to prevent a group health plan or health insurance coverage from placing annual or lifetime per beneficiary limits on specific covered benefits that are not essential health benefits . . . ." *Id.* § 300gg-11(b).

[39]"Cost-sharing" does not include "premiums, balance billing amounts for non-network providers, or spending for non-covered services." 42 U.S.C. § 18022(c)(3)(B).

[40]"Qualified medical expense" is defined in 26 U.S.C. § 223(d)(2).

[41]Annual limits on cost-sharing are equal to the current limits on out-of-pocket spending for high-deductible health plans under the Internal Revenue Code (for 2011, $5,950 for self-only coverage and $11,900 for family coverage), adjusted after 2014 by a "premium adjustment percentage." 42 U.S.C. §§ 300gg-6(b) (effective Jan. 1, 2014), 18022(c)(1); 26 U.S.C. § 223(c)(2)(A)(ii), (g); I.R.S. Pub. 969 (2010), at 3.

**12. Deductibles.** Deductibles for any plans offered in the small group market are capped at $2,000 for plans covering single individuals and $4,000 for any other plan, adjusted after 2014. *Id.* §§ 300gg-6(b) (effective Jan. 1, 2014), 18022(c)(2). The deductible limits do not apply to individual plans or large group plans. *See id.*

**13. Medical loss ratio.** Insurers must maintain certain ratios of premium revenue spent on the insureds' medical care versus overhead expenses. *Id.* § 300gg-18(a), (b)(1). In the large group market, insurers must spend 85% of their premium revenue on patient care and no more than 15% on overhead. *Id.* § 300gg-18(a), (b)(1)(A)(i). In the individual and small group markets, insurers must spend 80% of their revenue on patient care and no more than 20% on overhead. *Id.* § 300gg-18(a), (b)(1)(A)(ii). This medical-loss ratio requirement applies to all plans (including grandfathered plans). *Id.* § 300gg-18(a), (b)(1). Insurers must report to HHS their ratio of incurred claims to earned premiums. *Id.* § 300gg-18(a).

**14. Premium increases.** HHS, along with all states, shall annually review "unreasonable" increases in premiums beginning in 2010. *Id.* § 300gg-94(a)(1). Issuers must justify any unreasonable premium increase. *Id.* § 300gg-94(a)(2).

**15. Prohibition on coverage rescissions.** Insurers may not rescind

coverage except for fraud or intentional misrepresentation of material fact. *Id.* § 300gg-12.

16. **Single risk pool.** Insurers must consider all individual-market enrollees in their health plans (except enrollees in grandfathered plans) to be members of a single risk pool (whether enrolled privately or through an Exchange). *Id.* § 18032(c)(1). Small group market enrollees must be considered in the same risk pool. *Id.* § 18032(c)(2).

17. **Temporary high risk pool program.** To cover many of the uninsured immediately, the Act directs HHS to establish a "temporary high risk health insurance pool program" to offer coverage to uninsured individuals with preexisting conditions until the prohibition on preexisting condition exclusions for adults becomes effective in 2014. *Id.* § 18001(a). The premiums for persons with a preexisting condition remain what a healthy person would pay. *Id.* §§ 18001(c)(2)(C), 300gg(a)(1). The Act allocates $5 billion to HHS to cover this high-risk pool. When this temporary program ends in 2014, such individuals will be transferred to coverage through an Exchange. *Id.* § 18001(a)–(d), (g).

18. **State regulation maintained.** States will license insurers and enforce both federal and state insurance laws. *Id.* § 18021(a)(1)(C). The Act provides for the continued operation of state regulatory authority, even with respect to

interstate "health care choice compacts," which enable qualified health plans to be offered in more than one state.[42] *Id.* § 18053(a).

In addition to reforming health insurance products, the Act requires the creation of Exchanges where the uninsured can buy the new products. We examine this second component of the Act, also designed to make insurance more accessible and affordable and thus reduce the number of the uninsured.

## E.     Health Benefit Exchanges

### 1.     Establishment of State-Run Exchanges

By January 1, 2014, all states must establish "American Health Benefit Exchanges" and "Small Business Health Options Program Exchanges," which are insurance marketplaces where individuals, families, and small employers can shop for the Act's new insurance products. *Id.* § 18031(b). Consumers can compare prices and buy coverage from one of the Exchange's issuers. *Id.* § 18031(b), (c). Exchanges centralize information and facilitate the use of the Act's significant federal tax credits and other subsidies to purchase health insurance. *See* 26 U.S.C.

---

[42]Health care choice compacts allow qualified health plans to be offered in the individual markets of multiple states, yet such plans will "only be subject to the laws and regulations of the State in which the plan was written or issued." 42 U.S.C. § 18053(a)(1)(A). The issuer of such qualified health plans offered through health care choice compacts "would continue to be subject to market conduct, unfair trade practices, network adequacy, and consumer protection standards . . . of the State in which the purchaser resides" and "would be required to be licensed in each State in which it offers the plan under the compact." *Id.* § 18053(a)(1)(B)(i)–(ii).

§ 36B; 42 U.S.C. §§ 18031, 18071, 18081–83. States may create and run the Exchanges through a governmental or nonprofit entity. 42 U.S.C. § 18031(d)(1).

States may establish regional, interstate, or subsidiary Exchanges. *Id.* § 18031(f). The federal government will provide funding until January 1, 2015 to establish Exchanges. *Id.* § 18031(a). Insurers may offer their products inside or outside these Exchanges, or both. *Id.* § 18032(d).

Importantly, the Exchanges draw upon the states' significant experience regulating the health insurance industry. *See id.* § 18041. The Act allows states some flexibility in operations and enforcement, though states must either (1) directly adopt the federal requirements set forth by HHS, or (2) adopt state regulations that effectively implement the federal standards, as determined by HHS. *Id.* § 18041(b). In a subsection entitled, "No interference with State regulatory authority," the Act provides that "[n]othing in this chapter shall be construed to preempt any State law that does not prevent the application of the provisions of this chapter." *Id.* § 18041(d).

## 2. Qualified Individuals and Employers in the Exchanges

The Act provides that "qualified individuals" and "qualified employers" may purchase insurance through the Exchanges. *Id.* § 18031(d)(2). Although

"qualified individuals" is broadly defined,[43] "qualified employers" are initially limited to small employers, but in 2017, states may allow large employers to participate in their Exchanges. *Id.* § 18032(f)(2)(A), (B). Qualified employers can purchase group plans in or out of Exchanges. *Id.* § 18032(d)(1).

### 3. Qualified Health Plans in the Exchanges

The Act prescribes the types of plans available in the Exchanges, known as "qualified health plans." *Id.* § 18031(d)(2)(B)(i). A "qualified health plan" is a health plan that: (1) is certified as a qualified health plan in each Exchange through which the plan is offered; (2) provides an "essential health benefits package"; and (3) is offered by an issuer that (a) is licensed and in good standing in each state where it offers coverage, and (b) complies with HHS regulations and any requirements of the Exchange. *Id.* § 18021(a)(1). The issuer must agree, *inter alia*, to offer at least one plan in the "silver" level and one in the "gold" level in each Exchange in which it participates, as described in § 18022(d). *Id.* § 18021(a)(1)(C). The issuer must charge the same premium rate regardless of

---

[43]A "qualified individual" is a legal resident who (1) seeks to enroll in a "qualified health plan" in the individual market through the Exchange, and (2) resides in the state that established the Exchange. 42 U.S.C. § 18032(f)(1), (3). Prisoners and illegal aliens may not purchase insurance through Exchanges. *Id.* § 18032(f)(1)(B), (3).

whether a plan is offered in an Exchange or directly.[44] *Id.*

### 4. "Essential Health Benefits Package" and Catastrophic Plans

The "essential health benefits package" is required of all qualified health plans sold in the Exchanges. *Id.* § 18021(a)(1)(B). States may require that a qualified health plan offered in that state cover benefits in addition to "essential health benefits," but the state must defray the costs of additional coverage through payments directly to patients or insurers. *Id*. § 18031(d)(3)(B).

One significant exception to the "essential health benefits package" requirement is the catastrophic plan in the individual market only. In and outside the Exchanges, insurers may offer catastrophic plans which provide no benefits until a certain level of out-of-pocket costs—$5,950 for self-only coverage and $11,900 for family coverage in 2011—are incurred. *Id.* § 18022(e); *see id.* § 18022(c)(1), (e)(1)(B)(i); 26 U.S.C. § 223(c)(2)(A)(ii), (g); I.R.S. Pub. 969 (2010), at 3. The level of out-of-pocket costs is equal to the current limits on out-of-pocket spending for high deductible health plans adjusted after 2014. 42 U.S.C. § 18022(e), (c)(1).

---

[44]HHS establishes the criteria for certification of insurance plans as "qualified health plans" and develops a rating system to "rate qualified health plans offered through an Exchange in each benefits level on the basis of the relative quality and price." 42 U.S.C. § 18031(c)(1), (3). States must rate each health plan offered in an Exchange (in accordance with federal standards) and certify health plans as "qualified health plans." *See id.* § 18031(e).

This catastrophic plan exception applies only if the plan: (1) is sold in the individual market; (2) restricts enrollment to those under age 30 *or* certain persons exempted from the individual mandate; (3) provides the essential health benefits coverage *after* the out-of-pocket level is met; and (4) provides coverage for at least three primary care visits. *Id.* § 18022(e)(1), (2).

### 5.    Federal Premium Tax Credit

To reduce the number of the uninsured, the Act also establishes considerable federal tax credits for individuals and families (1) with household incomes between 1 and 4 times the federal poverty level; (2) who do not receive health insurance through an employer; and (3) who purchase health insurance through an Exchange.[45] 26 U.S.C. § 36B(a), (b), (c)(1)(A)–(C).

To receive the credit, eligible individuals must enroll in a plan offered

---

[45]Specifically, the amount of the federal tax credit for a given month is an amount equal to the lesser of (1) the monthly premiums for the qualified health plan or plans, offered in the individual market through an Exchange, that cover the taxpayer and the members of the taxpayer's household, *or* (2) the excess of: (a) the monthly premium the taxpayer would be charged for the second lowest-cost silver plan over (b) 1/12 of the taxpayer's yearly household income multiplied by the "applicable percentage," a percentage which ranges from 2.0% to 9.5%, depending on income. 26 U.S.C. § 36B(b)(3)(A)–(C).

An example helps translate. For a family of four with an income of $33,075 per year, assuming that the premium in the second lowest-cost silver plan covering the family is $4,500 per year ($375 per month), the federal tax credit would be $3,177 per year ($264.75 per month). *See* Families USA, *Lower Taxes, Lower Premiums: The New Health Insurance Tax Credit* 8 (2010), *available at* http://www.familiesusa.org/assets/pdfs/health-reform/Premium-Tax-Credits.pdf. Without the federal tax credit, the family pays $375 per month; with the credit, the family pays $110.25 per month, or a total of $1,323, instead of the full $4,500 premium. *Id.* The federal tax credit provides a major incentive for the uninsured (in the individual market) to purchase insurance from a private insurer but through the Exchange.

through an Exchange and report their income to the Exchange. 42 U.S.C.

§ 18081(b). If the individual's income level qualifies, the Treasury pays the

premium tax credit amount directly to the individual's insurance plan issuer. *Id.*

§ 18082(c)(2)(A). The individual pays only the dollar difference between the

premium tax credit and the total premium charged. *Id.* § 18082(c)(2)(B). The

credit amount is tied to the cost of the second-cheapest plan in the silver level

offered through an Exchange where the individual resides, though the credit may

be used for any plan purchased through an Exchange.[46] *See* 26 U.S.C. § 36B(b)(2).

### 6.      Federal Cost-Sharing Subsidies

The Act also provides a variety of federal cost-sharing subsidies to reduce

the out-of-pocket expenses for individuals who (1) enroll in a qualified health plan

---

[46]Commentators have explained the operation of the tax credit for households between one and four times the federal poverty level as follows:

> For taxable years after 2013, certain low- and moderate-income individuals who purchase insurance under a health insurance exchange that the states are required to create will receive a refundable credit that subsidizes their purchase of that insurance. . . . According to the Social Security Administration, the current poverty level for a single individual is $10,830; thus a single individual can have household income of as much as $43,320 and still qualify to have his insurance cost subsidized by the government. For a family of four, the current poverty level is $22,050; such a family can have household income as large as $88,200 and still qualify for a subsidy.

Douglas A. Kahn & Jeffrey H. Kahn, *Free Rider: A Justification for Mandatory Medical Insurance Under Health Care Reform,* 109 MICH. L. REV. FIRST IMPRESSIONS 78, 83 (2011).

HHS has since raised the poverty level for 2011 to $22,350 for a family of four and $10,890 for a single individual. 76 Fed. Reg. 3637, 3638 (Jan. 20, 2011). Thus, a single individual can have a household income of as much as $43,560 and still be eligible for a federal tax credit. A family of four can have a household income of as much as $89,400 and still be eligible for a federal tax credit. *See* 42 U.S.C. § 18071(b).

sold through an Exchange in the silver level of coverage, and (2) have a household income between 1 and 4 times the federal poverty level. 42 U.S.C. § 18071.

As noted earlier, the Exchanges, with significant federal tax credits and subsidies, are predicted to make insurance available to 9 million in 2014 and 22 million by 2016.[47] We now turn to the Act's third component: the individual mandate.

## F.    Individual Mandate

The individual mandate and its penalty are housed entirely in the Internal Revenue Code, in subtitle D, labeled "Miscellaneous Excise Taxes." 26 U.S.C. § 5000A *et seq.* The Act mandates that, after 2013, all "applicable individuals" (1) shall maintain "minimum essential coverage" for themselves and their dependents, or (2) pay a monetary penalty. *Id.* § 5000A(a)–(b). Taxpayers must include the penalty on their annual federal tax return. *Id.* § 5000A(b)(2). Married taxpayers filing a joint return are jointly liable for any penalty. *Id.* § 5000A(b)(3)(B).

---

[47]CBO, *Analysis*, *supra* note 15, at 18 tbl.3. The CBO predicts that by 2019, 24 million will be insured through the Exchanges, with at least four-fifths receiving "federal subsidies to substantially reduce the cost of purchasing health insurance coverage," on average $6,460 per person. *Id.* at 2, 18–19 tbl.3.

The CBO estimates that this 9 million increase in 2014 will be partially offset by a 3 million decrease in individual-market coverage outside the Exchanges. *Id.* The number obtaining coverage in the individual market outside the Exchanges is projected to decrease because the Act incentivizes individuals—through premium tax credits, subsidies, and otherwise—to purchase policies through the Exchanges. Similarly, the 22 million increase in Exchange-based coverage in 2016 will be partially offset by a 5 million decrease in those covered by individual-market policies obtained outside the Exchanges. *Id.*

### 1. "Minimum Essential Coverage"

At first glance, the term "minimum essential coverage," as used in the Internal Revenue Code, sounds like it refers to a base level of benefits or services. However, the Act uses a different term—the "essential health benefits package" in Title 42—to describe health care benefits and services. 42 U.S.C. § 300gg-6(a) (effective Jan. 1, 2014). In contrast, "minimum essential coverage" refers to a broad array of plan types that will satisfy the individual mandate. 26 U.S.C. § 5000A(f)(1).

An individual can satisfy the mandate's "minimum essential coverage" requirement through: (1) any government-funded health plan such as Medicare Part A, Medicaid, TRICARE, or CHIP; (2) any "eligible employer-sponsored plan"; (3) any health plan in the individual market; (4) any grandfathered health plan; or (5) as a catch-all, "such other health benefits coverage" that is recognized by HHS in coordination with the Treasury. *Id.* The mandate provisions in § 5000A do not specify what benefits must be in that plan. The listed plans, in many instances, satisfy the mandate regardless of the level of benefits or coverage.

### 2. Government-Sponsored Programs

For example, a variety of government-sponsored programs will satisfy the individual mandate. For individuals 65 or over, enrolling in Medicare Part A will

41

suffice. *Id.* § 5000A(f)(1)(A)(i). Individuals and families may satisfy the mandate by enrolling in Medicaid, if eligible. *Id.* § 5000A(f)(1)(A)(ii). Qualifying children under age 19 can satisfy the mandate by enrolling in CHIP. *Id.* § 5000A(f)(1)(A)(iii). Government-sponsored programs for veterans, active and former military personnel and their families, active Peace Corps volunteers, and active and retired civilian Defense Department personnel and their dependents satisfy the mandate. *Id.* § 5000A(f)(1)(A)(iv), (v), (vi).

### 3. Eligible Employer-Sponsored Plans

Individuals may also satisfy the mandate by purchasing coverage through any "eligible employer-sponsored plan." *Id.* § 5000A(f)(1)(B). An "eligible employer-sponsored plan" is a "group health plan or group health insurance coverage" offered "by an employer to the employee," which is defined broadly as: (1) a governmental plan established by the federal, state, or local government for its employees; (2) "any other plan or coverage offered in the small or large group market within a State"; or (3) a grandfathered health plan offered in a group market. *Id.* § 5000A(f)(2). Health plans of large employers satisfy the individual mandate whatever the nature of the benefits offered to the employee.[48]

---

[48]Because of these looser restrictions, some commentators have found it surprising that employer-sponsored coverage qualifies as "minimum essential coverage" under the Act. *See* Monahan & Schwarcz, *supra* note 37, at 157 ("Surprisingly, . . . [the Act] appears to define employer-provided coverage as automatically constituting minimum essential coverage for

Whether a "self-insured health plan" of large employers satisfies the mandate is another story.[49] The mandate's § 5000A(f)(2) refers to plans in the "small or large group *market*." *Id.* § 5000A(f)(2). A "self-insured health plan," by definition, is not sold or offered in a "market." It is thus not clear whether large employers' self-insured plans will constitute "eligible employer-sponsored plans" in § 5000A(f)(2) and thereby satisfy the mandate. It may be that HHS will later recognize "self-insured plans" under the "other coverage" or "grandfathered plan" categories in the mandate's § 5000A(f)(2).

### 4.    Plans in the Individual Market

Individuals can also satisfy the mandate by purchasing insurance in the individual market through Exchanges or directly from issuers. *Id.* § 5000A(f)(1)(C). The Act imposes the "essential health benefits package" requirement on plans sold in the individual and small group markets. 42 U.S.C. § 300gg-6 (effective Jan. 1, 2014). However, in the individual market, insurers can offer catastrophic plans to persons under age 30 or certain persons exempted from the mandate. *Id.* § 18022(e).

---

individuals, despite the minimal requirements applicable to such plans.").

[49]The Act defines an "applicable self-insured health plan" to include self-insured plans providing health care coverage where "any portion of such coverage is provided other than through an insurance policy." 26 U.S.C. § 4376(c).

## 5. Grandfathered Plans

An already-insured individual can fulfill the individual mandate by being covered by any "grandfathered health plan," 26 U.S.C. § 5000A(f)(1)(D), which is any group health plan or health insurance coverage in which an individual was enrolled on March 23, 2010.[50] 42 U.S.C. § 18011(a)(1), (e).

While not subject to many of the Act's product reforms, grandfathered plans must comply with some provisions, among them the extension of dependent coverage until age 26, the medical-loss ratio requirements, and the prohibitions on (1) preexisting condition exclusions, (2) lifetime limits on coverage, (3) excessive waiting periods, and (4) unfair rescissions of coverage. *Id.* § 18011(a)(2)–(4), (e). Under the "interim final regulations" issued by HHS, plans will lose their grandfathered status if they choose to significantly (1) cut or eliminate benefits; (2) increase copayments, deductibles, or out-of-pocket costs for their enrollees; (3) decrease the share of premiums employers contribute for workers in group plans;

---

[50]The Act also allows the enrollment of family members and newly hired employees in grandfathered plans without losing the plans' grandfathered status. 42 U.S.C. § 18011(b), (c). Under the "interim final regulations" issued by HHS, "[a] group health plan or group health insurance coverage does not cease to be grandfathered health plan coverage merely because one or more (or even all) individuals enrolled on March 23, 2010 cease to be covered, provided that the plan has continuously covered someone since March 23, 2010 (not necessarily the same person, but at all times at least one person)." 45 C.F.R. § 147.140(a)(1)(i).

or (4) decrease annual limits.[51] 45 C.F.R. § 147.140(g).

### 6. "Other Coverage Recognized" by HHS

The individual mandate even provides a catch-all that leaves open the door to other health coverage. The "minimum essential coverage" requirement may be met by any other coverage that HHS, in coordination with the Treasury, recognizes for purposes of meeting this requirement. 26 U.S.C. § 5000A(f)(1)(E).

### 7. Exemptions and Exceptions to Individual Mandate

The individual mandate, however, does not apply to eight broad categories of persons, either by virtue of an exemption from the mandate or an exception to the mandate's penalty. The Act carves out these three exemptions from the individual mandate: (1) persons with religious exemptions; (2) aliens not legally present in the country; and (3) incarcerated persons. *Id*. § 5000A(d).

The Act also excepts five additional categories of persons from the individual mandate penalty: (1) individuals whose required annual premium contribution exceeds 8% of their household income for the taxable year;[52] (2)

---

[51]*See also* HealthReform.gov, *Fact Sheet: Keeping the Health Plan You Have: The Affordable Care Act and "Grandfathered" Health Plans*, http://www.healthreform.gov/newsroom/keeping_the_health_plan_you_have.html; Families USA, *Grandfathered Plans under the Patient Protection and Affordable Care Act* (2010), *available at* http://www.familiesusa.org/assets/pdfs/health-reform/Grandfathered-Plans.pdf.

[52]The required contribution for coverage means, generally, the amount required to maintain coverage either in an employer-sponsored health plan or in a bronze-level plan offered on an Exchange. *See* 26 U.S.C. § 5000A(e)(1)(A).

individuals whose household income for the taxable year is below the federal income tax filing threshold in 26 U.S.C. § 6012(a)(1); (3) members of Indian tribes; (4) individuals whose gaps in health insurance coverage last less than three months; and (5) as a catch-all, individuals who, as determined by HHS, have suffered a "hardship" regarding their ability to obtain coverage under a qualified health plan. *Id.* § 5000A(e).

## 8. Calculation of Individual Mandate Penalty

If an applicable individual fails to purchase an insurance plan in one of the many ways allowed, the individual must pay a penalty. *Id*. § 5000A(b)(1). The annual penalty will be either: (1) a flat dollar amount, or (2) a percentage of the individual's income if higher than the flat rate. *Id*. § 5000A(c)(1). However, the percentage-of-income figure is capped at the national average premium amount for bronze-level plans in the Exchanges.[53] *Id.*

The flat dollar penalty amount, which sets the floor, is equal to $95 in 2014, $325 in 2015, and $695 in 2016. *Id.* § 5000A(c)(2)(A), (c)(3)(A)–(C). Beyond 2016, it remains $695, except for inflation adjustments.[54] *Id.* § 5000A(c)(3)(D).

---

[53]If the individual fails to fulfill the mandate requirement for only certain months as opposed to a full year, the penalty for each month of no coverage is equal to one-twelfth of the greater of these figures. 26 U.S.C. § 5000A(c)(2)–(3).

[54]The flat dollar amount applies to each individual and dependent in the taxpayer's household without minimum essential coverage, but will not exceed three times the flat dollar amount (even if more than three persons are in the household). 26 U.S.C. § 5000A(c)(2)(A). A

The percentage-of-income number that will apply, if higher than the flat dollar amount, is a set percentage of the taxpayer's income that is in excess of the tax-filing threshold (defined in 26 U.S.C. § 6012(a)(1)).[55] *Id.* § 5000A(c)(2). In any event, the total penalty for the taxable year cannot exceed the national average premium of a bronze-level qualified health plan. *Id.* § 5000A(c)(1).

### 9. Collection of Individual Mandate Penalty

An individual who fails to pay the penalty is not subject to criminal or additional civil penalties. *Id.* § 5000A(g)(2)(A), (B). The IRS's authority to use liens or levies does not apply to the penalty. *Id.* § 5000A(g)(2)(B). No interest accrues on the penalty. The Act contains no enforcement mechanism. *See id.* All the IRS, practically speaking, can do is offset any tax refund owed to the uninsured taxpayer.[56]

We now review the Act's fourth component aimed at reducing the number of the uninsured: the employer penalty.

### G. Employer Penalty

---

family's flat dollar penalty in 2016 would not exceed $2,085 ($695 multiplied by 3).

[55]The percentage by which the taxpayer's household income exceeds the filing threshold is phased in over three years: 1% in 2014, 2% in 2015, and 2.5% in 2016 and thereafter. 26 U.S.C. § 5000A(c)(2)(B)(i)–(iii).

[56]Of course, the government can always file a civil lawsuit, but the cost of that suit would exceed the modest penalty amount.

The Act imposes a penalty, also housed in the Internal Revenue Code, on certain employers if they do not offer coverage, or offer inadequate coverage, to their employees. *Id.* § 4980H(a), (b). The penalty applies to employers with an average of at least 50 full-time employees. *Id.* § 4980H(a), (b), (c)(2). The employer must pay a penalty if the employer: (1) does not offer its full-time employees the opportunity to enroll in "minimum essential coverage" under an "eligible employer-sponsored plan" as defined in § 5000(A)(f)(2); *or* (2) offers minimum essential coverage (i) that is "unaffordable," or (ii) that consists of a plan whose share of the total cost of benefits is less than 60% (*i.e.*, does not provide "minimum value"); *and* (3) at least one full-time employee purchases a qualified health plan through an Exchange and is allowed a premium tax credit or a subsidy. *Id.* § 4980H(a), (c).

The employer penalty is tied to an employer's failure to offer "minimum essential coverage." *Id.* § 4980H(a), (b). Recall that "minimum essential coverage" is not the same thing as the "essential health benefits package." Thus, a large employer may avoid the penalty so long as it offers any plan in the large group market in the state, and the plan is "affordable" and provides "minimum value." *Id.* § 4980H(b)(1), (c)(3).

A small employer's plan, however, must include an "essential health

benefits package" and also be "affordable" and provide "minimum value." 42

U.S.C. §§ 300gg-6(a) (effective Jan. 1, 2014), 18022(a)(1)–(3). The Act also

provides tax incentives for certain small employers (up to 25 employees) to

purchase health insurance for their workers. 26 U.S.C. § 45R.

1.      **Calculation of Penalty Amount**

The penalty amount depends on whether the employee went to the

Exchange because the employer's plan (1) was not "minimum essential coverage"

or (2) was either "unaffordable" or did not provide "minimum value." The penalty

translates to $2,000 to $3,000 per employee annually. *Id.* § 4980H.

An employer that does not offer "minimum essential coverage" to all full-

time employees faces a tax penalty of $166.67 per month (one-twelfth of $2,000)

for each of its full-time employees, until the employer offers such coverage

(subject to an exemption for the first 30 full-time employees). *Id.* § 4980H(a),

(c)(1), (c)(2)(D). This particular penalty applies for as long as at least one

employee, eligible for a premium tax credit or a subsidy, enrolls in a qualified

health plan through an Exchange. *Id.*

In the "unaffordable coverage"[57] or "no minimum value" scenarios, the

---

[57]Employer-sponsored coverage that is not "affordable" is defined as coverage where the employee's required annual contribution to the premium is more than 9.5% of the employee's household income (as defined for purposes of the premium tax credits in the Exchanges). 26 U.S.C. § 36B(c)(2)(C)(i). This percentage of the employee's income is indexed to the per capita

employer faces a tax penalty of $250 per month (one-twelfth of $3,000) for each employee who (1) turns down the employer-sponsored plan; (2) purchases a qualified health plan in an Exchange; and (3) is eligible for a federal premium tax credit or subsidy in an Exchange.[58] *Id.* § 4980H(b)(1).

### 2. Automatic Enrollment

An automatic enrollment requirement applies to employers who (1) have more than 200 employees and (2) elect to offer coverage to their employees. *Id*. § 218a. Such employers must automatically enroll new and current full-time employees, who do not opt out, in one of the employer's plans. *Id.* The maximum 90-day waiting period rule applies, however. *Id.*; 42 U.S.C. § 300gg-7 (effective Jan. 1, 2014).

### 3. Temporary Reinsurance Program for Employers' Early Retirees

To reduce the number of the uninsured, the Act provides for immediate coverage for even retired employees 55 years and older who are not yet eligible for

---

growth in premiums for the insurance market as determined by HHS. *Id.* § 36B(c)(2)(C)(iv). Note that the definition of "unaffordable" for the purposes of obtaining a federal tax credit or subsidy is *not* the same standard that is used to determine whether an individual is exempt from the individual mandate because that individual cannot afford coverage. *Compare id.* § 36B(c)(2)(C)(i), *with id.* § 5000A(e)(1).

[58]The employer's penalty, in this instance, does not exceed the maximum penalty for offering no coverage at all. The penalty for any month is capped at an amount equal to the number of full-time employees during the month multiplied by one-twelfth of $2,000, or $166.67 (subject to the exemption for the first 30 full-time employees). *See* 26 U.S.C. § 4980H(b)(2), (c).

Medicare. A federal temporary reinsurance program will reimburse former employers who allow their early retirees and the retirees' dependents and spouses to participate in their employment-based plans. The federal government will reimburse a portion of the plan's cost.[59] 42 U.S.C. § 18002(a)(1), (a)(2)(C).

We turn to the Act's fifth component: the Medicaid expansion, which alone will cover millions of the uninsured.

## H.    Medicaid Expansion

The Act expands Medicaid eligibility and subsidies by amending 42 U.S.C. § 1396a, the section of the Medicaid Act outlining what states must offer in their coverage plans. The Act imposes these substantive requirements on the states' plans, starting in 2014, unless otherwise noted:

(1) States will be required to cover adults under age 65 (who are not pregnant and not already covered) with incomes up to 133% of the federal poverty level ("FPL"). *Id.* § 1396a(a)(10)(A)(i)(VIII). This is a significant change, because previously the Medicaid Act did not set a baseline income level for mandatory eligibility. Thus, many states currently do not provide Medicaid to childless adults

---

[59]The plan shall submit claims for reimbursement to HHS, and HHS shall reimburse the plan for 80% of the costs of claims in excess of $15,000 but not greater than $90,000. 42 U.S.C. § 18002(c)(2). The reimbursements will be available until January 1, 2014. *Id.* § 18002(a)(1). This federally-subsidized temporary program closes the gap between now and 2014, when the Exchanges, with their federal tax credits and subsidies, become operational.

and cover parents only at much lower income levels.

(2) States will be required to provide Medicaid to all children whose families earn up to 133% of the FPL, including children currently covered through separate CHIP programs. *Id.* §§ 1396a(a)(10)(A)(i)(VII), 1396a(l)(1)(D), 1396a(l)(2)(C). States currently must provide Medicaid to children under age 6 with family income up to 133% of the FPL and children ages 6 through 18 with family income up to 100% of the FPL. *Id.* §§ 1396a(a)(10)(A)(i)(IV), (VI), (VII), 1396a(l)(1)(B)–(D), 1396a(l)(2)(A)–(C).

(3) States are required to at least maintain existing Medicaid eligibility levels for adults and children (that were in place as of March 23, 2010) until a state's Exchange is fully operational. *Id.* § 1396a(gg)(1). Whereas states previously had the option to raise or lower their eligibility levels, states cannot institute more restrictive eligibility standards until the new policies take place. *Id.*

(4) Children under age 26 who were receiving Medicaid but were "aged out" of foster care will be newly eligible to continue receiving Medicaid. *Id.* § 1396a(a)(10)(A)(i)(IX) (effective Jan. 1, 2014).

(5) The new law will increase Medicaid payments for primary care services provided by primary care doctors to 100% of the Medicare payment rates for 2013 and 2014. *Id.* § 1396a(a)(13)(C). States will receive 100% federal funding for the

cost of the increasing payment rates for 2013 and 2014.[60] *Id.* § 1396d(dd).

Having covered the Act's five major components, we examine the two components challenged as unconstitutional: (1) the Medicaid expansion and (2) the individual mandate.

## III. CONSTITUTIONALITY OF MEDICAID EXPANSION

The state plaintiffs challenge the district court's grant of summary judgment in favor of the government on the state plaintiffs' claim that the Act's expansion of the Medicaid program, enacted pursuant to the Spending Clause, is unduly coercive under *South Dakota v. Dole*, 483 U.S. 203, 211, 107 S. Ct. 2793, 2798 (1987). For the reasons given below, we conclude that it is not.

### A. History of the Medicaid Program

Medicaid is a long-standing partnership between the national and state sovereigns that has been in place for nearly half a century. "In 1965, Congress enacted the Medicaid Act, 42 U.S.C. § 1396 *et seq.*, as Title XIX of the Social Security Act." *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011); *see also Harris v. McRae*, 448 U.S. 297, 301, 100 S. Ct. 2671, 2680 (1980). "Medicaid is a jointly financed federal-state cooperative program, designed to help states furnish medical treatment to their needy citizens." *Reese*, 637 F.3d at 1232.

---

[60]*See also* Julie Stone, *et al.*, Cong. Research Serv., R41210, *Medicaid and the State Children's Health Insurance Program (CHIP) Provisions in the PPACA* 2–4 (2010).

The Medicaid Act "prescribes substantive requirements governing the scope of each state's program." *Curtis v. Taylor*, 625 F.2d 645, 649 (5th Cir. 1980).[61] "Section 1396a provides that a 'State plan for medical assistance' must meet various guidelines, including the provision of certain categories of care and services." *Reese*, 637 F.3d at 1232 (citing 42 U.S.C. § 1396a). "Some of these categories are discretionary, while others are mandatory for participating states." *Id.* (citing 42 U.S.C. § 1396a(a)(10)).

Under the Act, the Medicaid program serves as a cornerstone for expanded health care coverage. As explained above in Section II(H), the Act expands Medicaid eligibility and provides significant Medicaid subsidies to the impoverished. As a result of the Act's Medicaid expansion, an estimated 9 million of the 50 million uninsured will be covered for health care by 2014 (and 16 million by 2016 and 17 million by 2021).[62]

The federal government will pay 100% of the fees associated with the increased Medicaid eligibility and subsidies beginning in 2014 and until 2016; that percentage will then drop gradually each year until reaching 90% in 2020. 42

---

[61] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit issued before the close of business on September 30, 1981.

[62] CBO, *Analysis*, *supra* note 15, at 18 tbl.3.

U.S.C. § 1396d(y)(1). The federal government will not cover administrative expenses associated with implementing the new Medicaid policies. *See id.* Under 42 U.S.C. § 1396c, a state whose plan does not comply with the requirements under § 1396a will be notified by HHS of its noncompliance, and "further payments will not be made to the State (or, in [HHS's] discretion . . . payments will be limited to categories under or parts of the State plan not affected by such failure), until [HHS] is satisfied that there will no longer be any such failure to comply." *Id.* § 1396c.

## B.    Congress's Power under the Spending Clause

The Spending Clause provides that "Congress shall have Power . . . to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1. The Spending Clause permits Congress to "fix the terms on which it shall disburse federal money to the States." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S. Ct. 1531, 1539 (1981). "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Id.* at 17, 101 S. Ct. at 1540.

There are four primary restrictions on legislation enacted pursuant to the Spending Clause. First, the exercise of the spending power must be in pursuit of

the general welfare. *See Helvering v. Davis*, 301 U.S. 619, 640, 57 S. Ct. 904, 908

(1937). Second, the conditions on the receipt of federal funds must be reasonably

related to the legislation's stated goal. *Dole*, 483 U.S. at 207, 107 S. Ct. at 2796.

Third, Congress's intent to condition funds on a particular action must be

unambiguous and must enable the states to knowingly exercise their choice

whether to participate. *Pennhurst*, 451 U.S. at 17, 101 S. Ct. at 1540. Finally, the

federal legislation cannot "induce the States to engage in activities that would

themselves be unconstitutional." *Dole*, 483 U.S. at 210, 107 S. Ct. at 2798. The

state plaintiffs do not contend the Act's Medicaid expansion violates any of these

restrictions.[63]

Rather, the state plaintiffs argue that the Medicaid expansion violates an

additional limitation on the use of the spending power to encourage state

legislation, one that derives not from the spending power alone, but also from the

---

[63]The state plaintiffs suggest that the conditions imposed here violated the second *Dole* restriction because they have no reasonable relationship to the size of the federal inducement. States' Opening Br. at 48, 53. In so arguing, the plaintiffs misinterpret *Dole*. The Supreme Court made clear that the required relationship is between the conditions imposed and "the federal interest in particular national projects or programs," *Dole*, 483 U.S. at 207, 107 S. Ct. at 2796 (quotation marks omitted)—that is, "the purpose of federal spending." *New York v. United States*, 505 U.S. 144, 167, 122 S. Ct. 2408, 2423 (1992). The state plaintiffs mistakenly assert that the required relationship is between the conditions imposed and "the size of the federal inducement." States' Opening Br. at 53. The condition Congress imposes here on the receipt of federal funds—requiring Medicaid coverage of certain newly eligible individuals—is undeniably related to the purpose of the Medicaid Act, which is to "provid[e] federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." *McRae*, 448 U.S. at 301, 100 S. Ct. at 2680.

Tenth Amendment's reservation of certain powers to the states. U.S. CONST. amend. X; *see Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 585, 57 S. Ct. 883, 890 (1937); *West Virginia v. HHS*, 289 F.3d 281, 286–87 (4th Cir. 2002). Congress may not employ the spending power in such a way as to "coerce" the states into compliance with the federal objective. *See Dole*, 483 U.S. at 211, 107 S. Ct. at 2798; *Steward Mach.*, 301 U.S. at 589–91, 57 S. Ct. at 892–93; *cf. Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 687, 119 S. Ct. 2219, 2231 (1999) (holding that a state's waiver of its sovereign immunity is not voluntary where Congress has made it a condition of the state's participation in an otherwise lawful activity). This restriction is different from the restrictions stemming from the spending power because it addresses whether the legislation, while perhaps an appropriate use of the spending power, goes beyond the Spending Clause by forcing the states to participate in a federal program. *Cf. Printz v. United States*, 521 U.S. 898, 117 S. Ct. 2365 (1997) (holding that Congress may not enact a law pursuant to one of its enumerated powers and then compel state officers to execute those federal laws); *see also Steward Mach.*, 301 U.S. at 585, 57 S. Ct. at 890. That is, the coercion test asks whether the federal scheme removes state choice and compels the state to act because the state, in fact, has no other option.

The coercion doctrine was first discussed at length by the Supreme Court in

*Charles C. Steward Machine Co. v. Davis*. In that case, a corporation challenged

the imposition of an employment tax under the newly enacted Social Security Act.

Addressing the corporation's argument that the federal government improperly

coerced states into participation in the Social Security program, the Supreme Court

stated:

> The difficulty with the petitioner's contention is that it confuses motive with coercion. Every tax is in some measure regulatory. To some extent it interposes an economic impediment to the activity taxed as compared with others not taxed. In like manner every rebate from a tax when conditioned upon conduct is in some measure a temptation. But to hold that motive or temptation is equivalent to coercion is to plunge the law in endless difficulties. The outcome of such a doctrine is the acceptance of a philosophical determinism by which choice becomes impossible. Till now the law has been guided by a robust common sense which assumes the freedom of the will as a working hypothesis in the solution of its problems. . . . Nothing in the case suggests the exertion of a power akin to undue influence, *if we assume that such a concept can ever be applied with fitness to the relations between state and nation*. Even on that assumption the location of the point at which pressure turns into compulsion, and ceases to be inducement, would be a question of degree, at times, perhaps, of fact.

301 U.S. at 589–90, 57 S. Ct. at 892 (quotation marks and citation omitted)

(emphasis added).

This discussion of the coercion doctrine was later revived by the Supreme

Court in *South Dakota v. Dole*. In *Dole*, the state of South Dakota challenged 23

U.S.C. § 158, which directed the Secretary of Transportation to withhold a

58

percentage of federal highway funds otherwise allocable to the states if states failed to maintain a minimum drinking-age requirement of 21 years. 483 U.S. at 205, 107 S. Ct. at 2795. The Court noted that Congress may attach conditions on the receipt of federal funds to meet certain policy objectives, including those that Congress could not otherwise meet through direct regulation. *Id.* at 206–07, 107 S. Ct. at 2795–96. After analyzing whether the minimum drinking-age condition met the four restrictions on the Spending Clause discussed above, the Court noted, "Our decisions have recognized that in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'" *Id.* at 211, 107 S. Ct. at 2798 (quoting *Steward Mach.*, 301 U.S. at 590, 57 S. Ct. at 892). It further opined:

> When we consider, for a moment, that all South Dakota would lose if she adheres to her chosen course as to a suitable minimum drinking age is 5% of the funds otherwise obtainable under specified highway grant programs, the argument as to coercion is shown to be more rhetoric than fact. . . .
> Here Congress has offered relatively mild encouragement to the States to enact higher minimum drinking ages than they would otherwise choose. But the enactment of such laws remains the prerogative of the States *not merely in theory but in fact*.

*Id.* (emphasis added). Thus, the Court once again recognized the coercion doctrine, but found no violation.

The limited case law on the doctrine of coercion and the fact that the

59

Supreme Court has never devised a test to apply it has left many circuits with the conclusion that the doctrine, twice recognized by the Supreme Court, is not a viable defense to Spending Clause legislation. *See, e.g.*, *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 278 (5th Cir. 2005) (en banc) ("It goes without saying that, because states have the independent power to lay and collect taxes, they retain the ability to avoid the imposition of unwanted federal regulation simply by rejecting federal funds."); *A.W. v. Jersey City Pub. Schs.*, 341 F.3d 234, 243–44 (3d Cir. 2003) (noting that the state's freedom to tax makes it difficult to find a federal law coercive, even when that law threatens to withhold all federal funding in a particular area); *Kansas v. United States*, 214 F.3d 1196, 1201–02 (10th Cir. 2000) ("The cursory statements in *Steward Machine* and *Dole* mark the extent of the Supreme Court's discussion of a coercion theory. The Court has never employed the theory to invalidate a funding condition, and federal courts have been similarly reluctant to use it." (footnote omitted)); *id.* at 1202 (observing that the theory is "unclear, suspect, and has little precedent to support its application"); *California v. United States*, 104 F.3d 1086, 1092 (9th Cir. 1997) (noting in a Medicaid expansion case that "to the extent that there is any viability left in the coercion theory, it is not reflected in the facts of this record"); *Nevada v. Skinner*, 884 F.2d 445, 448 (9th Cir. 1989) ("The difficulty if not the impropriety of making judicial

60

judgments regarding a state's financial capabilities renders the coercion theory highly suspect as a method for resolving disputes between federal and state governments."); *Oklahoma v. Schweiker*, 655 F.2d 401, 414 (D.C. Cir. 1981) ("The courts are not suited to evaluating whether the states are faced here with an offer they cannot refuse or merely a hard choice. . . . We therefore follow the lead of other courts that have explicitly declined to enter this thicket when similar funding conditions have been at issue.") (pre-*Dole*); *N.H. Dep't of Emp't Sec. v. Marshall*, 616 F.2d 240, 246 (1st Cir. 1980) ("Petitioners argue, however, that this option of the state to refuse to participate in the program is illusory, since the severe financial consequences that would follow such refusal negate any real choice. . . . We do not agree that the carrot has become a club because rewards for conforming have increased. It is not the size of the stakes that controls, but the rules of the game.") (pre-*Dole*).

Even in those circuits that do recognize the coercion doctrine, it has had little success. *See West Virginia v. HHS*, 289 F.3d at 290, 294–95 (rejecting a coercion doctrine challenge to previous Medicaid Act amendments on the ground that the Secretary may choose to withhold only some funds); *Jim C. v. United States*, 235 F.3d 1079, 1081–82 (8th Cir. 2000) (en banc) (holding that loss of all federal education funds, in that case amounting to 12% of the state's education

budget, was "politically painful" but not coercive). Indeed, our review of the relevant case law indicates that no court has ever struck down a law such as this one as unduly coercive.

There are two cases in which the Supreme Court has struck down a statute because it violated the Tenth Amendment's prohibition on commandeering state legislators and executive officials to perform the federal government's work. While not Spending Clause cases, these cases do give us an understanding of when a law may be considered so coercive as to violate the Tenth Amendment. In *New York v. United States*, the Court struck down as unduly coercive a portion of the Low-Level Radioactive Waste Policy Amendments Act that required states to "take title" to waste created within the state, noting that Congress has ample opportunity to create incentives for states to act the way that Congress desires. 505 U.S. 144, 176–77, 112 S. Ct. 2408, 2428–29 (1992); *see also Printz*, 521 U.S. 898, 117 S. Ct. 2365 (holding, in accord with *New York*, that Congress cannot compel states to enact or administer federal regulatory programs).[64] It is clear from these

---

[64]The Supreme Court has also briefly discussed coercion in another context. In *Florida Prepaid*, the Court held that federal courts lack jurisdiction over a Lanham Act suit against a state, despite a law purporting to abrogate the states' sovereign immunity under the Lanham Act. 527 U.S. at 691, 119 S. Ct. at 2233. While the holding rested on Eleventh Amendment immunity grounds, Justice Scalia noted: "[W]e think where the constitutionally guaranteed protection of the States' sovereign immunity is involved, the point of coercion is automatically passed—and the voluntariness of waiver destroyed—when what is attached to the refusal to waive is the exclusion of the State from otherwise lawful activity." *Id.* at 687, 119 S. Ct. at 2231.

two cases that Congress cannot directly compel a state to act, nor can Congress

hinge the state's right to regulate in an area that the state has a constitutional right

to regulate on the state's participation in a federal program. Either act is clearly

unconstitutionally coercive.

If anything can be said of the coercion doctrine in the Spending Clause

context, however, it is that it is an amorphous one, honest in theory but

complicated in application. But this does not mean that we can cast aside our duty

to apply it; indeed, it is a mystery to us why so many of our sister circuits have

done so. To say that the coercion doctrine is not viable or does not exist is to

ignore Supreme Court precedent, an exercise this Court will not do. As the district

court noted, "The reluctance of some circuits to deal with this issue because of the

potential legal and factual complexities is not entitled to a great deal of weight,

because courts deal every day with the difficult complexities of applying

Constitutional principles set forth and defined by the Supreme Court." *Florida ex

rel. McCollum v. HHS*, 716 F. Supp. 2d 1120, 1160 (N.D. Fla. 2010).[65] If the

government is correct that Congress *should* be able to place any and all conditions

---

[65]In *Florida ex rel. McCollum v. HHS*, 716 F. Supp. 2d 1120 (N.D. Fla. 2010), the district court granted in part and denied in part the government's motion to dismiss. In *Florida ex rel. Bondi v. HHS*, No. 3:10-CV-91-RV/EMT, __ F. Supp. 2d __, 2011 WL 285683 (N.D. Fla. Jan. 31, 2011), the district court ruled that (1) the Medicaid expansion did not exceed Congress's Spending Clause powers and (2) the individual mandate is beyond Congress's commerce powers and is inseverable from the rest of the Act.

it wants on the money it gives to the states, then the Supreme Court must be the one to say it.

For now, we find it a reasonable conclusion that *Dole* instructs that the Tenth Amendment places certain limitations on congressional spending; namely, that Congress cannot place restrictions so burdensome and threaten the loss of funds so great and important to the state's integral function as a state—funds that the state has come to rely on heavily as part of its everyday service to its citizens—as to compel the state to participate in the "optional" legislation. This is the point where "'pressure turns into compulsion.'" *Dole*, 483 U.S. at 211, 107 S. Ct. at 2798 (quoting *Steward Mach.*, 301 U.S. at 590, 57 S. Ct. at 892).

And so it is not without serious thought and some hesitation that we conclude that the Act's expansion of Medicaid is not unduly coercive under *Dole* and *Steward Machine*. There are several factors, which, for us, are determinative. First, the Medicaid-participating states were warned from the beginning of the Medicaid program that Congress reserved the right to make changes to the program. *See* 42 U.S.C. § 1304 ("The right to alter, amend, or repeal any provision of this chapter is hereby reserved to the Congress."); *McRae*, 448 U.S. at 301, 100 S. Ct. at 2680 (noting "[a]lthough participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements"

that Congress sees fit to impose). Indeed, Congress has made numerous amendments to the program since its inception in 1965. 42 U.S.C. § 1396a Note (listing amendments).[66] In each of these previous amendments, the states were given the option to comply with the changes, or lose all or part of their funding. *Id*. § 1396c. None of these amendments has been struck down as unduly coercive.

Second, the federal government will bear nearly all of the costs associated with the expansion. The states will only have to pay incidental administrative costs associated with the expansion until 2016; after which, they will bear an increasing percentage of the cost, capping at 10% in 2020.[67] *Id.* § 1396d(y)(1). If states bear little of the cost of expansion, the idea that states are being coerced into spending

---

[66]The government discusses the various Medicaid expansions at length:

Congress has amended the Medicaid Act many times since its inception, and, between 1966 and 2000, Medicaid enrollment increased from four million to 33 million recipients. Klemm, *Medicaid Spending: A Brief History*, 22 Health Care Fin. Rev. 106 (Fall 2000). For example, in 1972, Congress required participating states to extend Medicaid to recipients of Supplemental Security Income, thereby significantly expanding Medicaid enrollment. Social Security Act Amendments of 1972, Pub. L. No. 92-603, 86 Stat. 1329 (1972). In 1989, Congress again expanded enrollment by requiring states to extend Medicaid to pregnant women and children under age six who meet certain income limits. Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, 103 Stat. 2106 (1989).

Government's Reply Br. at 46–47.

[67]At oral argument, the state plaintiffs expressed a concern that Medicaid costs would be even larger because the individual mandate would greatly increase the number of persons in Medicaid who are currently eligible but for one reason or another do not choose to participate. This argument is not persuasive, however, as to whether the expansions themselves are coercive, because the increase in enrollment would still occur if the mandate were upheld, even if the Medicaid expansions were struck down.

65

money in an ever-growing program seems to us to be "more rhetoric than fact." *Dole*, 483 U.S. at 211, 107 S. Ct. at 2798.

Third, states have plenty of notice—nearly four years from the date the bill was signed into law—to decide whether they will continue to participate in Medicaid by adopting the expansions or not. This gives states the opportunity to develop new budgets (indeed, Congress allocated the cost of the entire expansion to the federal government initially, with the cost slowly shifting to the states over a period of six years) to deal with the expansion, or to develop a replacement program in their own states if they decide to do so. Fourth, like our sister circuits, we cannot ignore the fact that the states have the power to tax and raise revenue, and therefore can create and fund programs of their own if they do not like Congress's terms. *See Pace*, 403 F.3d at 278; *Jersey City Pub. Schs.*, 341 F.3d at 243–44.

Finally, we note that while the state plaintiffs vociferously argue that states who choose not to participate in the expansion will lose all of their Medicaid funding, nothing in the Medicaid Act states that this is a foregone conclusion. Indeed, the Medicaid Act provides HHS with the discretion to withhold all or merely a portion of funding from a noncompliant state. 42 U.S.C. § 1396c; *see also West Virginia v. HHS*, 289 F.3d at 291–92; *Dole*, 483 U.S. at 211, 107 S. Ct.

at 2798 (finding no coercion when "all South Dakota would lose if she adheres to her chosen course as to a suitable minimum drinking age is 5% of the funds otherwise obtainable under specified highway grant programs").

Taken together, these factors convince us that the Medicaid-participating states have a real choice—not just in theory but in fact—to participate in the Act's Medicaid expansion. *See Dole*, 483 U.S. at 211, 107 S. Ct. at 2798. Where an entity has a real choice, there can be no coercion. *See Steward Mach.*, 301 U.S. at 590, 57 S. Ct. at 892 (noting that in the absence of undue influence, "the law has been guided by a robust common sense which assumes the freedom of the will as a working hypothesis in the solution of its problems").

Accordingly, the district court's grant of summary judgment to the government on the Medicaid expansion issue is affirmed.

We now turn to the constitutionality of the Act's fourth component: the individual mandate. We begin with the relevant constitutional clauses and Supreme Court precedent.

### IV. SUPREME COURT'S COMMERCE CLAUSE DECISIONS

Two constitutional provisions govern our analysis of whether Congress acted within its commerce authority in enacting the individual mandate: the Commerce Clause and the Necessary and Proper Clause. U.S. CONST. art. I, § 8,

cls. 3, 18.

Seven words in the Commerce Clause—"[t]o regulate Commerce . . . among the several States," *id.* art. I, § 8, cl. 3—have spawned a 200-year debate over the permissible scope of this enumerated power. For many years, the Supreme Court described Congress's commerce power as regulating "traffic"—the "buying and selling, or the interchange of commodities"—and "intercourse" among states, including transportation. *See Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 189–90 (1824). Under this early understanding of the Clause, Congress could not reach commerce that was strictly internal to a state. *See id.* at 194–95 ("The enumeration presupposes something not enumerated; and that something, if we regard the language or the subject of the sentence, must be the exclusively internal commerce of a State.").

Ultimately, in recognition of a modern and integrated national economy and society, the New Deal decisions of the Supreme Court charted an expansive doctrinal path. *See, e.g., United States v. Darby*, 312 U.S. 100, 61 S. Ct. 451 (1941); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S. Ct. 615 (1937). These Supreme Court decisions adopted a broad view of the Commerce Clause, in tandem with the Necessary and Proper Clause, and permitted Congress to regulate purely local, intrastate economic activities that substantially affect interstate

commerce. The "substantial effects" doctrine, along with the related "aggregation" doctrine, expanded the reach of Congress's commerce power exponentially. Nonetheless, the Supreme Court has staunchly maintained that the commerce power contains outer limits which are necessary to preserve the federal-state balance in the Constitution.

We therefore review the principal Commerce Clause precedents that inform our analysis of the difficult question before us. Although extensive, this survey is necessary to understanding the rudiments of the Supreme Court's existing Commerce Clause doctrines that we, as an inferior Article III court, must apply.

## A.  *Wickard v. Filburn*

One of the early "substantial effects" decisions is *Wickard v. Filburn*, 317 U.S. 111, 63 S. Ct. 82 (1942), where the Supreme Court held that Congress's wheat production quotas were constitutional as applied to a plaintiff farmer's home-grown and home-consumed wheat. The Agricultural Adjustment Act of 1938 ("AAA") sought to control the volume of wheat in interstate and foreign commerce by placing acreage limits on farmers. *Id.* at 115, 63 S. Ct. at 84. This scheme was intended to prevent wheat surpluses and shortages, attendant price instability, and obstructions to commerce. *Id.*

Plaintiff Filburn operated a small farm raising wheat. *Id.* at 114, 63 S. Ct. at

84. Filburn sold some of this wheat crop, allocated a portion as feed for livestock and poultry on his farm, used another portion as flour for home consumption, and preserved the remainder for future seedings. *Id.* Although his AAA allotment was only 11.1 acres, Filburn sowed and harvested 23 acres of wheat—11.9 excess acres that the Supreme Court treated as home-consumed wheat.[68] *Id.* at 114–15, 63 S. Ct. at 84. This violation subjected him to a penalty of 49 cents a bushel.[69] *Id.* Filburn sued, claiming that Congress's acreage quotas on his home-consumed wheat exceeded its commerce power because the regulated activities were local in nature and their effects upon interstate commerce were "indirect." *Id.* at 119, 63 S. Ct. at 86.

The Supreme Court examined the factors of home-consumed wheat that impinged on interstate commerce—factors which could potentially frustrate Congress's regulatory scheme if not controlled. The Court declared that home-consumed wheat "constitutes the most variable factor in the disappearance of the wheat crop," since "[c]onsumption on the farm where grown appears to vary in an amount greater than 20 per cent of average production." *Id.* at 127, 63 S. Ct. at 90.

---

[68] *See also Gonzales v. Raich*, 545 U.S. 1, 20, 125 S. Ct. 2195, 2207 (2005) (noting that *Wickard* Court treated Filburn's wheat as home-consumed, not part of commercial farming operation).

[69] These penalties were levied regardless of "whether any part of the wheat either within or without the quota, is sold or intended to be sold." *Wickard*, 317 U.S. at 119, 63 S. Ct. at 86.

Filburn's home-consumed wheat therefore "compete[d]" with wheat sold in commerce, since "it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market." *Id.* at 128, 63 S. Ct. at 91.

The *Wickard* Court recognized that "the power to regulate commerce includes the power to regulate the prices at which commodities in that commerce are dealt in and practices affecting such prices" and "it can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions." *Id.* at 128, 63 S. Ct. at 90–91. Therefore, the objectives of the AAA acreage quotas—"to increase the market price of wheat and to that end to limit the volume thereof that could affect the market"— constituted appropriate regulatory goals. *Id.*

Despite the fact that Congress's commerce power "has been held to have great latitude," *id.* at 120, 63 S. Ct. at 86, the Supreme Court recognized the novelty of its decision, remarking that "there is no decision of this Court that such activities may be regulated where no part of the product is intended for interstate commerce or intermingled with the subjects thereof." *Id.* at 120, 63 S. Ct. at 86–87. However, the *Wickard* Court concluded that "even if [Filburn's] activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on

71

interstate commerce and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.'" *Id.* at 125, 63 S. Ct. at 89. The Court declared that "questions of the power of Congress are not to be decided by reference to any formula which would give controlling force to nomenclature such as 'production' and 'indirect' and foreclose consideration of the actual effects of the activity in question upon interstate commerce." *Id.* at 120, 63 S. Ct. at 87; *see also id.* at 123–24, 63 S. Ct. at 88 (stating that "the relevance of the economic effects in the application of the Commerce Clause . . . has made the mechanical application of legal formulas no longer feasible").

Even though Filburn's own contribution to wheat demand "may be trivial by itself," this was "not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." *Id.* at 127–28, 63 S. Ct. at 90. Since Filburn's home-grown wheat slackened demand for market-based wheat and placed downward pressures on price, "Congress may properly have considered that wheat consumed on the farm where grown if wholly outside the scheme of regulation would have a substantial effect in defeating and obstructing its purpose to stimulate trade therein at increased prices." *Id.* at 128–29, 63 S. Ct. at 91.

The Supreme Court noted that restricting Filburn's acreage could have the

effect of forcing Filburn to buy wheat in the market: "It is said, however, that this Act, forcing some farmers into the market to buy what they could provide for themselves, is an unfair promotion of the markets and prices of specializing wheat growers." *Id.* at 129, 63 S. Ct. at 91. Rejecting this, the Supreme Court stated, "It is of the essence of regulation that it lays a restraining hand on the self-interest of the regulated and that advantages from the regulation commonly fall to others." *Id.*

**B.** **United States v. South-Eastern Underwriters Association**

Although not concerning the "substantial effects" doctrine, the 1944 case *United States v. South-Eastern Underwriters Association*, 322 U.S. 533, 64 S. Ct. 1162 (1944), is important to our analysis, as it marked the Supreme Court's first recognition that the insurance business *is commerce*—and where it is conducted across state borders, it constitutes interstate commerce capable of being regulated by Congress.[70] *Id.* at 553, 64 S. Ct. at 1173. The Supreme Court emphasized the interstate character of insurance business practices, which resulted in a

---

[70]Prior to 1944, the Supreme Court consistently upheld the power of the states to regulate insurance. During those early years, Congress had not regulated insurance, but the states had. The operative question concerned whether Congress's power to regulate interstate commerce deprived states of the power to regulate the insurance business themselves. Since Congress had not sought to regulate insurance, an invalidation of the states' statutes would entail that insurance companies could operate without any regulation. The earlier Supreme Court decisions held that insurance is not commerce, thereby skirting any constitutional problem arising from the Constitution's grant of power to Congress to regulate interstate commerce. *See Paul v. Virginia*, 75 U.S. (8 Wall.) 168 (1868); *see also N.Y. Life Ins. Co. v. Deer Lodge Cnty.*, 231 U.S. 495, 34 S. Ct. 167 (1913); *Hooper v. California*, 155 U.S. 648, 15 S. Ct. 207 (1895).

"continuous and indivisible stream of intercourse among the states composed of collections of premiums, payments of policy obligations, and the countless documents and communications which are essential to the negotiation and execution of policy contracts." *Id.* at 541, 64 S. Ct. at 1167. The defendants' insurances policies "covered not only all kinds of fixed local properties, but also . . . movable goods of all types carried in interstate and foreign commerce by every media of transportation." *Id.* at 542, 64 S. Ct. at 1168.

The *South-Eastern Underwriters* Court rejected the notion that, if any components of the insurance business constitute interstate commerce, the states may not exercise regulatory control over the industry. *Id.* at 548, 64 S. Ct. at 1171. Nevertheless, the Court pronounced that "[n]o commercial enterprise of any kind which conducts its activities across state lines has been held to be wholly beyond the regulatory power of Congress under the Commerce Clause. We cannot make an exception of the business of insurance." *Id.* at 553, 64 S. Ct. at 1173.

C.      *Heart of Atlanta Motel v. United States*

In another landmark Commerce Clause case, *Heart of Atlanta Motel v. United States*, 379 U.S. 241, 85 S. Ct. 348 (1964), the Supreme Court held that Congress acted within its commerce authority in enacting Title II of the Civil Rights Act of 1964, which prohibited discrimination in public accommodations.

The plaintiff owned and operated a 216-room motel whose guests were primarily out-of-state visitors. *Id.* at 243, 85 S. Ct. at 350–51. The motel refused to rent rooms to black patrons. *Id.* at 243, 85 S. Ct. at 351.

The Supreme Court detailed the "overwhelming evidence that discrimination by hotels and motels impedes interstate travel." *Id.* at 253, 85 S. Ct. at 355. The Court noted that it had "long been settled" that transportation of persons in interstate commerce is within Congress's regulatory power, regardless of "whether the transportation is commercial in character." *Id.* at 256, 85 S. Ct. at 357. Additionally, Supreme Court precedents confirmed that "the power of Congress to promote interstate commerce also includes the power to regulate the local incidents thereof . . . which might have a substantial and harmful effect upon that commerce." *Id.* at 258, 85 S. Ct. at 358. Thus, "Congress may—as it has—prohibit racial discrimination by motels serving travelers, however 'local' their operations may appear." *Id.*

The *Heart of Atlanta Motel* Court acknowledged that "Congress could have pursued other methods to eliminate the obstructions it found in interstate commerce caused by racial discrimination," but the means employed in removing such obstructions are "within the sound and exclusive discretion of the Congress" and are "subject only to one caveat—that the means chosen by it must be

75

reasonably adapted to the end permitted by the Constitution." *Id.* at 261–62, 85 S. Ct. at 360. The means chosen by Congress in Title II clearly met this standard.[71]

## D.   *United States v. Lopez*

For the next thirty years, the Supreme Court applied an expansive interpretation of Congress's commerce power and upheld a wide variety of statutes. *See, e.g.*, *Preseault v. ICC*, 494 U.S. 1, 110 S. Ct. 914 (1990) (upholding statute amending National Trails System Act in facial challenge); *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 101 S. Ct. 2352 (1981) (sustaining Surface Mining Control and Reclamation Act in facial challenge); *Perez v. United States*, 402 U.S. 146, 91 S. Ct. 1357 (1971) (sustaining Title II of Consumer Credit Protection Act in as-applied challenge); *Maryland v. Wirtz*, 392 U.S. 183, 88 S. Ct. 2017 (1968) (upholding validity of amendments to Fair Labor Standards Act of 1938 in facial challenge), *overruled on other grounds*, *Nat'l League of Cities v. Usery*, 426 U.S. 833, 96 S. Ct. 2465 (1976), *overruled by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S. Ct. 1005 (1985). These cases reflect a practical need to allow federal regulation of a growing and unified national economy.

---

[71]In *Katzenbach v. McClung*, 379 U.S. 294, 85 S. Ct. 377 (1964), a companion case, the Court also upheld Title II's prohibition on discrimination in restaurants serving food to interstate travelers or serving food that had moved in interstate commerce.

In 1995, the Supreme Court decided *United States v. Lopez*, 514 U.S. 549, 115 S. Ct. 1624 (1995), the first Supreme Court decision since the 1930s to rule that Congress had exceeded its commerce power. *Lopez* concerned the Gun-Free School Zones Act of 1990, which made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(1)(A) (1993). The defendant Alfonso Lopez, a twelfth-grade student, was convicted of carrying a concealed handgun to his Texas school. *Lopez*, 514 U.S. at 551, 115 S. Ct. at 1626.

In a 5–4 opinion, the *Lopez* Court invalidated § 922(q). The *Lopez* Court first observed that the Constitution created a federal government of enumerated, delegated, and thus limited powers. *Id.* at 552, 115 S. Ct. at 1626. Although the Supreme Court's New Deal precedents expanded Congress's commerce power, the *Lopez* Court recognized that "this power is subject to outer limits." *Id.* at 557, 115 S. Ct. at 1628. The *Lopez* Court then enumerated the "three broad categories of activity that Congress may regulate under its commerce power": (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) "those activities that

substantially affect interstate commerce."[72] *Id.* at 558–59, 115 S. Ct. at 1629–30. After determining that § 922(q) could be sustained only under this third category, the *Lopez* Court identified four factors influencing its analysis of whether gun possession in school zones substantially affects interstate commerce.

First, the *Lopez* Court differentiated between economic and non-economic activity, stressing how prior cases utilizing the substantial effects test to reach intrastate conduct had all involved economic activity. The Supreme Court stated that "Section 922(q) is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise" and was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* at 561, 115 S. Ct. at 1630–31. The Court opined that "[e]ven *Wickard*, which is perhaps the most far reaching example of Commerce Clause authority over intrastate activity, involved *economic activity* in a way that the possession of a gun in a school zone does not." *Id.* at 560, 115 S. Ct. at 1630 (emphasis added). The *Lopez* Court acknowledged that "a determination whether an intrastate activity is commercial or noncommercial may in some cases result in legal uncertainty," yet "so long as [Congress's] enumerated powers are interpreted as having judicially enforceable

---

[72]The "third *Lopez* prong is the broadest expression of Congress' commerce power." *United States v. Ballinger*, 395 F.3d 1218, 1226 (11th Cir. 2005) (en banc).

outer limits, congressional legislation under the Commerce Clause always will engender 'legal uncertainty.'" *Id.* at 566, 115 S. Ct. at 1633.

Second, the *Lopez* Court found it significant that § 922(q) did not contain a "jurisdictional element" to "ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at 561, 115 S. Ct. at 1631. Instead, the Act penalized "mere possession" and lacked any requirement that there be "an explicit connection with or effect on interstate commerce."[73] *Id.* at 562, 115 S. Ct. at 1631.

Third, the Court noted that Congress provided no legislative findings demonstrating the purported nexus between gun possession around schools and its effects on interstate commerce. *Id.* at 562–63, 115 S. Ct. at 1631–32.

Fourth, the *Lopez* Court examined the actual relationship between gun possession in a school zone and its effects on interstate commerce. The government posited three effects: (1) violent crime, even when purely local, generates substantial costs that are spread to the wider populace through

---

[73]In this respect, the *Lopez* Court contrasted the Gun-Free School Zones Act of 1990 with the firearm possession statute at issue in *United States v. Bass*, 404 U.S. 336, 92 S. Ct. 515 (1971). In *Bass*, the Supreme Court construed legislation making it a federal crime for a felon to "receiv[e], posses[s], or transpor[t] *in commerce or affecting commerce* . . . any firearm." *Lopez*, 514 U.S. at 561–62, 115 S. Ct. at 1631 (emphasis added) (quoting former 18 U.S.C. § 1202(a)). The *Lopez* Court stated that "[u]nlike the statute in *Bass*, § 922(q) has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Id.* at 562, 115 S. Ct. at 1631.

insurance; (2) individuals are deterred from traveling to areas beset by violent crime; and (3) guns in schools imperil the learning environment, which in turn adversely impacts national productivity. *Id.* at 563–64, 115 S. Ct. at 1632.

The *Lopez* Court declared that the government's arguments yielded no limiting principles. For example, under the government's proffered "costs of crime" theory, "Congress could regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce." *Id.* at 564, 115 S. Ct. at 1632. Likewise, the "national productivity" rationale afforded no bounds, either. If Congress could employ its Commerce Clause authority to "regulate activities that adversely affect the learning environment, then, *a fortiori*, it also can regulate the educational process directly." *Id.* at 566, 115 S. Ct. at 1633. Indeed, "Congress could regulate any activity that it found was related to the economic productivity of individual citizens," including "marriage, divorce, and child custody." *Id.* at 564, 115 S. Ct. at 1632.

The Supreme Court pronounced that these links were too attenuated to conclude that the regulated activity "substantially affects" interstate commerce: "[I]f we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate." *Id.* "To

80

uphold the Government's contentions," the Supreme Court continued, "we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* at 567, 115 S. Ct. at 1634.

Lastly, the *Lopez* Court acknowledged that some of the Supreme Court's precedents gave "great deference to congressional action" but refused to expand the "broad language" of these precedents any further, since "[t]o do so would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated." *Id.* Such judicial abdication would dissolve the "distinction between what is truly national and what is truly local" and subvert constitutional notions of federalism. *Id.* at 567–68, 115 S. Ct. at 1634.

Although both joined the majority opinion in full, two justices wrote separately and echoed the majority's emphasis on the significance of the federal-state balance in the structure of the Constitution, and the need for judicial intervention when Congress has "tipped the scales too far." *See id.* at 568–83, 115 S. Ct. at 1634–42 (Kennedy, J., concurring);[74] *id.* at 584–602, 115 S. Ct. at

---

[74]In a concurring opinion, Justice Kennedy explained why he joined the *Lopez* majority opinion in full and what he characterized as its "necessary though limited holding." 514 U.S. at 568, 115 S. Ct. at 1634 (Kennedy, J., concurring). Justice Kennedy noted "the imprecision of content-based boundaries used without more to define the limits of the Commerce Clause," referring to earlier dichotomies that distinguished between "manufacturing and commerce," "direct and indirect effects," and other formalistic categories. *Id.* at 574, 115 S. Ct. at 1637. He stressed that the Supreme Court is "often called upon to resolve questions of constitutional law

1642–51 (Thomas, J., concurring).[75]

## E.  *United States v. Morrison*

In another 5–4 decision, the Supreme Court in *United States v. Morrison*, 529 U.S. 598, 120 S. Ct. 1740 (2000), reapplied the *Lopez* principles and invalidated a section of the Violence Against Women Act of 1994 ("VAWA"), 42 U.S.C. § 13981, which provided a federal civil remedy for victims of gender-motivated violence.[76]

In enacting the VAWA, Congress made specific findings about the relationship between gender-motivated violence and its substantial effects on interstate commerce. Congress declared its objectives were "to protect victims of gender motivated violence" and "to promote public safety, health, and activities

---

not susceptible to the mechanical application of bright and clear lines." *Id.* at 579, 115 S. Ct. at 1640.

Justice Kennedy found that § 922(q) "upsets the federal balance to a degree that renders it an unconstitutional assertion of the commerce power, and our intervention is required." *Id.* at 580, 115 S. Ct. at 1640. Much like the majority opinion, Justice Kennedy emphasized the far-reaching implications of the government's position: "In a sense any conduct in this interdependent world of ours has an ultimate commercial origin or consequence, but we have not yet said the commerce power may reach so far. If Congress attempts that extension, then at the least we must inquire whether the exercise of national power seeks to intrude upon an area of traditional state concern." *Id.* Such an interference was present in *Lopez*, as "it is well established that education is a traditional concern of the States." *Id.* Justice Kennedy added that courts have a "duty to recognize meaningful limits on the commerce power of Congress." *Id.*

[75]*See* discussion of Justice Thomas's concurring opinion *infra* note 78.

[76]The VAWA provided that a person who "commits a crime of violence motivated by gender . . . shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate." 42 U.S.C. § 13981(c).

affecting interstate commerce."[77] *Id.* § 13981(a).

The *Morrison* Court observed that since the New Deal case of *Jones &*

*Laughlin Steel*, "Congress has had considerably greater latitude in regulating

conduct and transactions under the Commerce Clause than our previous case law

permitted." *Morrison*, 529 U.S. at 608, 120 S. Ct. at 1748. *Lopez* clarified,

however, that "Congress' regulatory authority is not without effective bounds." *Id.*

The Supreme Court stated that "a fair reading of *Lopez* shows that the

noneconomic, criminal nature of the conduct at issue was central to our decision in

that case." *Id.* at 610, 120 S. Ct. at 1750. The *Morrison* Court pointed out that

"[g]ender-motivated crimes of violence are not, in any sense of the phrase,

economic activity." *Id.* at 613, 120 S. Ct. at 1751. "While we need not adopt a

categorical rule against aggregating the effects of any noneconomic activity in

order to decide these cases," the Supreme Court reiterated that "our cases have

upheld Commerce Clause regulation of intrastate activity only where that activity

is economic in nature." *Id.*

The Supreme Court next noted that § 13981 contained no jurisdictional

---

[77]The *Morrison* plaintiff was a college student allegedly raped by two football players. 529 U.S. at 602, 120 S. Ct. at 1745–46. The plaintiff filed suit in federal court under § 13981(c). *Id.* at 604, 120 S. Ct. at 1746. The defendant's motion to dismiss argued that Congress lacked authority to enact the VAWA's federal civil remedy provision under either the Commerce Clause or § 5 of the Fourteenth Amendment. *Id.* at 604, 120 S. Ct. at 1746–47.

element. It commented that another provision of the VAWA, which similarly provided a federal remedy for gender-motivated crime, *did* contain a jurisdictional hook. *Id.* at 613 n.5, 120 S. Ct. at 1752 n.5 (discussing 18 U.S.C. § 2261(a)(1), which at the time applied only to an individual "who travels across a State line or enters or leaves Indian country").

Unlike § 922(q) in *Lopez*, § 13981 was "supported by numerous findings regarding the serious impact that gender-motivated violence has on victims and their families." *Id.* at 614, 120 S. Ct. at 1752. Nonetheless, the *Morrison* Court stated that congressional findings were not dispositive, echoing *Lopez*'s statement that "[s]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Id.* (alteration in original) (quoting *Lopez*, 514 U.S. at 557 n.2, 115 S. Ct. at 1624 n.2).

The *Morrison* Court determined that "Congress' findings are substantially weakened by the fact that they rely so heavily on a method of reasoning that we have already rejected as unworkable if we are to maintain the Constitution's enumeration of powers." *Id.* at 615, 120 S. Ct. at 1752. The congressional findings in *Morrison* asserted that gender-motivated violence deterred potential victims from interstate travel and employment in interstate business, decreased national productivity, and increased medical costs. *Id.* According to the *Morrison* Court,

84

"[t]he reasoning that petitioners advance seeks to follow the but-for causal chain from the initial occurrence of violent crime (the suppression of which has always been the prime object of the States' police power) to every attenuated effect upon interstate commerce." *Id.* The logical entailment of this "but-for causal chain" of reasoning "would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption." *Id.* at 615, 120 S. Ct. at 1752–53. Such arguments suggested no stopping point, and Congress could thereby exercise powers traditionally reposed in the states.[78] *Id.* at 615–16, 120 S. Ct. at 1753.

F.      *Gonzales v. Raich*

Next came *Gonzales v. Raich*, 545 U.S. 1, 125 S. Ct. 2195 (2005), where the Supreme Court, in a 6–3 vote, concluded that Congress acted within its commerce power in prohibiting the plaintiffs' wholly intrastate production and possession of marijuana, even though California state law approved the drug's use for medical

---

[78]Although joining the majority opinion in full in both *Lopez* and *Morrison*, Justice Thomas wrote separately in both cases to reject the substantial effects doctrine. In *Morrison*, Justice Thomas wrote "only to express my view that the very notion of a 'substantial effects' test under the Commerce Clause is inconsistent with the original understanding of Congress' powers and with this Court's early Commerce Clause cases." 529 U.S. at 627, 120 S. Ct. at 1759 (Thomas, J., concurring). Characterizing the substantial effects test as a "rootless and malleable standard," Justice Thomas remarked that the Supreme Court's present Commerce Clause jurisprudence had encouraged the federal government to operate under the misguided belief that the Clause "has virtually no limits." *Id.* Unless the Supreme Court reversed its course,"we will continue to see Congress appropriating state police powers under the guise of regulating commerce." *Id.*

purposes. The legislation at issue was the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.*, in which Congress sought to "conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances" and "prevent the diversion of drugs from legitimate to illicit channels." *Raich*, 545 U.S. at 12–13, 125 S. Ct. at 2203. Congress consequently "devised a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA." *Id.* at 13, 125 S. Ct. at 2203. Under the CSA, marijuana is classified as a "Schedule I" drug, meaning that the manufacture, distribution, or possession of marijuana constitutes a criminal offense. *Id.* at 14, 125 S. Ct. at 2204.

In 1996, California voters passed Proposition 215, which exempted from criminal prosecution physicians who recommend marijuana to a patient for medical purposes, as well as patients and primary caregivers who possess and cultivate marijuana for doctor-approved medical purposes.[79] *Id.* at 5–6, 125 S. Ct. at 2199. The two California plaintiffs, Angel Raich and Diane Monson, suffered from serious medical conditions and used marijuana as medication for several years, as recommended by their physicians. *Id*. at 6–7, 125 S. Ct. at 2199–2200. Monson cultivated her own marijuana, while Raich relied upon two caregivers to

---

[79]Proposition 215 is codified as the Compassionate Use Act of 1996, CAL. HEALTH & SAFETY CODE § 11362.5.

provide her with locally grown marijuana at no cost. *Id.* at 7, 125 S. Ct. at 2200.

After federal agents seized and destroyed Monson's cannabis plants, the *Raich* plaintiffs sued. *Id.* They acknowledged that the CSA was within Congress's commerce authority and did not contend that any section of the CSA was unconstitutional. *Id.* at 15, 125 S. Ct. at 2204. Instead, they argued solely that the CSA was unconstitutional *as applied to* their manufacture, possession, and consumption of cannabis for personal medical use. *Id.* at 7–8, 125 S. Ct. at 2200.

In rejecting the plaintiffs' "quite limited" as-applied challenge, the *Raich* Court stated that its case law "firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.* at 15, 17, 125 S. Ct. at 2204–05. The Supreme Court emphasized that, in assessing Congress's commerce power, its review was a "modest one": "We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Id.* at 22, 125 S. Ct. at 2208. The *Raich* Court commented that "[w]hen Congress decides that the 'total incidence' of a practice poses a threat to a national market, it may regulate the entire class," and it need not "legislate with scientific exactitude." *Id.* at 17, 125 S. Ct. at 2206 (quotation marks omitted). "[W]e have reiterated," the Supreme Court

87

continued, "that when 'a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.'" *Id.* (quotation marks omitted) (quoting *Lopez*, 514 U.S. at 558, 115 S. Ct. at 1629).

The Supreme Court found similar regulatory concerns underlying both the CSA in *Raich* and the AAA wheat provisions in *Wickard*. Just as rising market prices could draw wheat grown for home consumption into the interstate market and depress prices, a "parallel concern making it appropriate to include marijuana grown for home consumption in the CSA is the likelihood that the high demand in the interstate market will draw such marijuana into that market." *Id.* at 19, 125 S. Ct. at 2207. In both cases, there was a threat of unwanted commodity diversion that could disrupt Congress's regulatory control over interstate commerce. *Id.*

According to the *Raich* Court, *Wickard* established that "Congress can regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Id.* at 18, 125 S. Ct. at 2206. Characterizing the similarities between the plaintiffs' case and *Wickard* as "striking," the *Raich* Court explained that "[i]n both cases, the regulation is squarely within Congress' commerce power because production of

88

the commodity meant for home consumption, be it wheat or marijuana, has a substantial effect on supply and demand in the national market for that commodity." *Id.* at 18–19, 125 S. Ct. at 2206–07.

The *Raich* Court opined that the failure to regulate intrastate production and possession of marijuana would leave a "gaping hole" in the CSA's regulatory scheme: CSA enforcement would be frustrated by the difficulty in distinguishing between locally cultivated marijuana and out-of-state marijuana, and the marijuana authorized by state law could be diverted into "illicit channels." *Id.* at 22, 125 S. Ct. at 2209. The *Raich* Court rejected the notion that California had "surgically excised a discrete activity that is hermetically sealed off from the larger interstate marijuana market." *Id.* at 30, 125 S. Ct. at 2213. Accordingly, even though the CSA "ensnares some purely intrastate activity," the *Raich* Court "refuse[d] to excise individual components of that larger scheme." *Id.* Instead, "congressional judgment that an exemption for such a significant segment of the total market would undermine the orderly enforcement of the entire regulatory scheme is entitled to a strong presumption of validity." *Id.* at 28, 125 S. Ct. at 2212.

The *Raich* Court concluded that the statutory challenges in *Lopez* and *Morrison* were "markedly different" from the plaintiffs' statutory challenge to the CSA. *Id*. at 23, 125 S. Ct. at 2209. Whereas the *Raich* plaintiffs sought to "excise

individual applications of a concededly valid statutory scheme," the Supreme

Court noted that "in both *Lopez* and *Morrison*, the parties asserted that a particular

statute or provision fell outside Congress' commerce power in its entirety." *Id*.

The *Raich* Court considered this distinction between facial and as-applied

challenges "pivotal" because "[w]here the class of activities is regulated and that

class is within the reach of federal power, the courts have no power to excise, as

trivial, individual instances of the class." *Id.* (alteration in original) (quoting *Perez*,

402 U.S. at 154, 91 S. Ct. at 1361). Additionally, since the CSA was a "lengthy

and detailed statute creating a comprehensive framework," its statutory scheme

was "at the opposite end of the regulatory spectrum" from the statutes in *Lopez*

and *Morrison*. *Id.* at 24, 125 S. Ct. at 2210.

Once again central to the Court's analysis was whether the regulated

activities were economic or noneconomic. The *Raich* Court defined "[e]conomics"

as referring to "the production, distribution, and consumption of commodities." *Id.*

at 25–26, 125 S. Ct. at 2211 (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY

720 (1966)). In contrast to the activities regulated in *Lopez* and *Morrison*, the

*Raich* Court concluded that "the activities regulated by the CSA are

quintessentially economic." *Id.* at 25, 125 S. Ct. at 2211. Indeed, the activities

engaged in by the plaintiffs themselves fit the Court's definition of economic,

90

since they involved the production, distribution, and consumption of marijuana.

Concurring in only the *Raich* judgment, Justice Scalia commented that under his understanding of the commerce power, "the authority to enact laws necessary and proper for the regulation of interstate commerce is not limited to laws governing intrastate activities that substantially affect interstate commerce. Where necessary to make a regulation of interstate commerce effective, Congress may regulate even those intrastate activities that do not themselves substantially affect interstate commerce." *Id.* at 34–35, 125 S. Ct. at 2216 (Scalia, J., concurring).

Justice Scalia cited "two general circumstances" in which the regulation of intrastate activities may be "necessary to and proper for the regulation of interstate commerce." *Id.* at 35, 125 S. Ct. at 2216. First, "the commerce power permits Congress not only to devise rules for the governance of commerce between States but also to facilitate interstate commerce by eliminating potential obstructions, and to restrict it by eliminating potential stimulants." *Id.* at 35, 125 S. Ct. at 2216. Yet, "[t]his principle is not without limitation," as the cases of *Lopez* and *Morrison* made clear. *Id.* at 35–36, 125 S. Ct. at 2216–17. Second, Justice Scalia submitted that "Congress may regulate even noneconomic local activity if that regulation is a necessary part of a more general regulation of interstate commerce." *Id.* at 37, 125

S. Ct. at 2217. The "relevant question" then becomes "whether the means chosen are 'reasonably adapted' to the attainment of a legitimate end under the commerce power." *Id.*

In addition to relying on these Commerce Clause cases, both parties and the district court conducted a separate analysis of the Necessary and Proper Clause's implications for the Act. We review some foundational principles relating to that Clause, focusing our attention on *United States v. Comstock*, 560 U.S. __, 130 S. Ct. 1949 (2010).

**G.     Necessary and Proper Clause: *United States v. Comstock***

Congress has the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its enumerated power. U.S. CONST. art. I, § 8, cl. 18. The Necessary and Proper Clause is intimately tied to the enumerated power it effectuates. The Supreme Court has recognized that the Necessary and Proper Clause "is not the delegation of a new and independent power, but simply provision for making effective the powers theretofore mentioned." *Kansas v. Colorado*, 206 U.S. 46, 88, 27 S. Ct. 655, 663 (1907). It is "merely a declaration, for the removal of all uncertainty, that the means of carrying into execution those [powers] otherwise granted are included in the grant." *Kinsella v. United States*, 361 U.S. 234, 247, 80 S. Ct. 297, 304 (1960) (alterations in original) (quoting VI

WRITINGS OF JAMES MADISON 383 (Gaillard Hunt ed., 1906)). It reaffirms that Congress has the incidental powers necessary to carry its enumerated powers into effect.

The Supreme Court's most definitive statement of the Necessary and Proper Clause's function remains Chief Justice Marshall's articulation in *McCulloch v. Maryland*: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." 17 U.S. (4 Wheat.) 316, 421 (1819). Thus, when legislating within its enumerated powers, Congress has broad authority: "the Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise.'" *Comstock*, 560 U.S. at __, 130 S. Ct. at 1956 (quoting *McCulloch*, 17 U.S. at 413, 418).

As it relates to the commerce power, the Supreme Court has essentially bound up the Necessary and Proper Clause with its substantial effects analysis.[80]

---

[80]For instance, the Court formulated the question in *Raich* as "whether the power vested in Congress by Article I, § 8, of the Constitution 'to make all Laws which shall be necessary and proper for carrying into Execution' its authority to 'regulate Commerce with foreign Nations, and among the several States' includes the power [asserted]." 545 U.S. at 5, 125 S. Ct. at 2198–99 (alteration omitted). Although the *Wickard* Court did not expressly invoke the Necessary and Proper Clause, the *Raich* Court clearly assumed as much. *See id.* at 22, 125 S. Ct. at 2209.

As Justice Scalia noted in *Raich*, "Congress's regulatory authority over intrastate activities that are not themselves part of interstate commerce (including activities that have a substantial effect on interstate commerce) derives from the Necessary and Proper Clause." 545 U.S. at 34, 125 S. Ct. at 2216 (Scalia, J., concurring).

*Comstock* represents the Supreme Court's most recent, detailed application of Necessary and Proper Clause doctrine. In *Comstock*, the Supreme Court held that Congress acted pursuant to its Article I powers in enacting a federal civil-commitment statute, 18 U.S.C. § 4248, that authorized the Department of Justice to detain mentally ill, sexually dangerous prisoners beyond the term of their sentences. The majority opinion enumerated five "considerations" that supported the statute's constitutional validity: "(1) the breadth of the Necessary and Proper Clause, (2) the long history of federal involvement in this arena, (3) the sound reasons for the statute's enactment in light of the Government's custodial interest in safeguarding the public from dangers posed by those in federal custody, (4) the statute's accommodation of state interests, and (5) the statute's narrow scope." *Comstock*, 560 U.S. at __, 130 S. Ct. at 1965.

On the breadth of the Necessary and Proper Clause, the *Comstock* Court noted that (1) the federal government is a government of enumerated powers, but (2) is also vested "'with ample means'" for the execution of those powers. *Id.*

94

(quoting *McCulloch*, 17 U.S. at 408). The Supreme Court must determine whether a federal statute "constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Id.* "[T]he relevant inquiry is simply 'whether the means chosen are reasonably adapted to the attainment of a legitimate end under the commerce power' or under other powers that the Constitution grants Congress the authority to implement." *Id.* at __, 130 S. Ct. at 1957 (quotation marks omitted) (quoting *Raich*, 545 U.S. at 37, 125 S. Ct. at 2217 (Scalia, J., concurring)).

Turning to the second factor—the history of federal involvement—the Supreme Court recognized that, beginning in 1855, persons charged with or convicted of federal offenses could be confined to a federal mental institution for the duration of their sentences. *Id.* at __, 130 S. Ct. at 1959. Since 1949, Congress had also "authorized the postsentence detention of federal prisoners who suffer from a mental illness and who are thereby dangerous." *Id.* at __, 130 S. Ct. at 1961. The Supreme Court observed that "[a]side from its specific focus on sexually dangerous persons, § 4248 is similar to the provisions first enacted in 1949" and therefore represented "a modest addition to a longstanding federal statutory framework, which has been in place since 1855." *Id.*

As to the third factor—reasons for enactment in light of the government's

95

interest—the Supreme Court concluded that "Congress reasonably extended its longstanding civil-commitment system to cover mentally ill and sexually dangerous persons who are already in federal custody, even if doing so detains them beyond the termination of their criminal sentence." *Id.* The federal government: (1) is the custodian of its prisoners and (2) has the power to protect the public from the threats posed by the prisoners in its charge. *Id.*

Turning to the fourth factor—accommodation of state interests—the *Comstock* Court ruled that § 4248 "properly accounts for state interests." *Id.* at __, 130 S. Ct. at 1962. The Supreme Court found persuasive that the statute required the Attorney General (1) to allow (and indeed encourage) the state in which the prisoner was domiciled or tried to take custody and (2) to immediately release the prisoner if the state seeks to assert authority over him.[81] *Id.*

On the fifth and final factor—the statute's narrow scope—the *Comstock* Court found the statute not "too sweeping in its scope" and the link between § 4248 and an enumerated Article I power "not too attenuated." *Id.* at __, 130 S. Ct. at 1963. The Supreme Court concluded that *Lopez*'s admonition that courts

---

[81]The Attorney General must "make all reasonable efforts to cause" the state in which the prisoner is domiciled or tried to "assume responsibility for his custody, care, and treatment." *Comstock*, 560 U.S. at __, 130 S. Ct. at 1954 (quoting 18 U.S.C. § 4248(d)). If the state consents, the prisoner will be released to the appropriate official in that state. *Id.* at __, 130 S. Ct. at 1954–55. If the state declines to take custody, the Attorney General will "place the person for treatment in a suitable facility" until the state assumes the role or until the person no longer poses a sexually dangerous threat. *Id.* at __, 130 S. Ct. at 1955 (quoting 18 U.S.C. § 4248(d)).

should not "pile inference upon inference" did not present any problems with respect to the civil-commitment statute. *Id.* (quoting *Lopez*, 514 U.S. at 567, 115 S. Ct. at 1634). Specifically, the *Comstock* Court discerned that "the same enumerated power that justifies the creation of a federal criminal statute, and that justifies the additional implied federal powers that the dissent considers legitimate, justifies civil commitment under § 4248 as well." *Id.* at __, 130 S. Ct. at 1964. The Supreme Court rejected the notion that "Congress's authority can be no more than one step removed from a specifically enumerated power." *Id.* at __, 130 S. Ct. at 1963.

Lastly, the Supreme Court emphasized that § 4248 had been applied to "only a small fraction of federal prisoners." *Id.* at __, 130 S. Ct. at 1964 (citing evidence that "105 individuals have been subject to § 4248 out of over 188,000 federal inmates"). The Supreme Court concluded that "§ 4248 is a reasonably adapted and narrowly tailored means of pursuing the Government's legitimate interest as a federal custodian in the responsible administration of its prison system" and thus did not endow Congress with a general police power. *Id.* at __, 130 S. Ct. at 1965.

Although concurring in the judgment, Justice Kennedy and Justice Alito[82]

_____

[82]Justice Alito wrote separately to express "concern[] about the breadth of the Court's language, and the ambiguity of the standard that the Court applies." 560 U.S. at __, 130 S. Ct. at

did not join the Court's majority opinion. Because Justice Kennedy's concurring opinion focuses on Commerce Clause and federalism issues, we provide extended treatment of it here.

Justice Kennedy's primary disagreement with the majority concerned its application of a "means-ends rationality" test. He advised that "[t]he terms 'rationally related' and 'rational basis' must be employed with care, particularly if either is to be used as a stand-alone test." *Id.* at __, 130 S. Ct. at 1966 (Kennedy, J., concurring). Justice Kennedy observed that the phrase "rational basis" is typically employed in Due Process Clause contexts, where the Court adopts a very deferential review of congressional acts. *Id.* Under the *Lee Optical* test applied in such due process settings, the Court merely asks whether "'it might be thought that the particular legislative measure was a rational way to correct'" an evil. *Id.* (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487–88, 75 S. Ct. 461, 464 (1955)). By contrast, Justice Kennedy asserted, "under the Necessary and

---

1968 (Alito, J., concurring) (citation omitted). Justice Alito stressed that "the Necessary and Proper Clause does not give Congress *carte blanche*." *Id.* at __, 130 S. Ct. at 1970. While the word "necessary" need not connote that the means employed by Congress be "absolutely necessary" or "indispensable," "the term requires an 'appropriate' link between a power conferred by the Constitution and the law enacted by Congress." *Id.* It is the Supreme Court's duty, he declared, "to enforce compliance with that limitation." *Id.* Like Justice Kennedy, Justice Alito suggested that the Necessary and Proper Clause context of the case did not warrant an analysis "in which it is merely possible for a court to think of a rational basis on which Congress might have perceived an attenuated link between the powers underlying the federal criminal statutes and the challenged civil commitment provision." *Id.* In *Comstock*, by contrast, the government had demonstrated "a substantial link to Congress' constitutional powers." *Id.*

Proper Clause, application of a 'rational basis' test should be at least as exacting as it has been in the Commerce Clause cases, if not more so." *Id.*

The Commerce Clause precedents of *Raich*, *Lopez*, and *Hodel* "require a tangible link to commerce, not a mere conceivable rational relation, as in *Lee Optical*." *Id.* at __, 130 S. Ct. at 1967. "The rational basis referred to in the Commerce Clause context is a demonstrated link in fact, based on empirical demonstration." *Id.* Justice Kennedy reiterated *Lopez*'s admonition that "'[s]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.'" *Id.* (quoting *Lopez*, 514 U.S. at 557 n.2, 115 S. Ct. at 1629 n.2). In this regard, "[w]hen the inquiry is whether a federal law has sufficient links to an enumerated power to be within the scope of federal authority, the analysis depends not on the number of links in the congressional-power chain but on the strength of the chain." *Id.* at __, 130 S. Ct. at 1966.

In summary, these landmark Supreme Court decisions—*Wickard*, *South-Eastern Underwriters*, *Heart of Atlanta Motel*, *Lopez*, *Morrison*, *Raich*, and *Comstock*—together set forth the governing principles and analytical framework we must apply to the commerce power issues presented here.

## V. CONSTITUTIONALITY OF INDIVIDUAL MANDATE UNDER THE COMMERCE POWER

With a firm understanding of the Act's provisions, the congressional findings, and the Supreme Court's Commerce Clause precedents, we turn to the central question at hand: whether the individual mandate is beyond the constitutional power granted to Congress under the Commerce Clause and Necessary and Proper Clause.

In this Section, we begin with first principles. We then examine the subject matter the individual mandate seeks to regulate, and whether it can be readily categorized under the classes of activity the Supreme Court has previously identified. We follow with a discussion of the unprecedented nature of the individual mandate. Next, we analyze whether the individual mandate is a valid exercise of Congress's power to regulate activities that substantially affect interstate commerce. In this regard, we appraise whether the government's argument furnishes judicially enforceable limiting principles and address the individual mandate's far-reaching implications for our federalist structure. Lastly, we consider the government's alternative argument that the individual mandate is an essential part of a larger regulation of economic activity.

We conclude that the individual mandate exceeds Congress's commerce power.

## A.    First Principles

As the Supreme Court has observed, "The judicial authority to determine the constitutionality of laws, in cases and controversies, is based on the premise that the 'powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.'" *City of Boerne v. Flores*, 521 U.S. 507, 516, 117 S. Ct. 2157, 2162 (1997) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803)). The judiciary is called upon not only to interpret the laws, but at times to enforce the Constitution's limits on the power of Congress, even when that power is used to address an intractable problem.

In enforcing these limits, we recognize that the Constitution established a federal government that is "'acknowledged by all to be one of enumerated powers.'" *Comstock*, 560 U.S. at __, 130 S. Ct. at 1956 (quoting *McCulloch*, 17 U.S. at 405). In describing this constitutional structure, the Supreme Court has emphasized James Madison's exposition in The Federalist No. 45: "'The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite.'" *Gregory v. Ashcroft*, 501 U.S. 452, 458, 111 S. Ct. 2395, 2399 (1991) (quoting THE FEDERALIST NO. 45, at 292–93 (James Madison) (Clinton Rossiter ed., 1961)); *see also Lopez*, 514 U.S. at 552, 115 S. Ct. at 1626 (quoting same). In

101

that same essay, Madison noted that the commerce power was one such enumerated power: "The regulation of commerce, it is true, is a new power; but that seems to be an addition which few oppose, and from which no apprehensions are entertained." THE FEDERALIST NO. 45, at 289 (James Madison) (E.H. Scott ed., 1898). The commerce power has since come to dominate federal legislation.

The power to regulate commerce is the power "to prescribe the rule by which commerce is to be governed." *Gibbons*, 22 U.S. at 196. As the Supreme Court instructs us, "The power of Congress in this field is broad and sweeping; where it keeps within its sphere and violates no express constitutional limitation it has been the rule of this Court, going back almost to the founding days of the Republic, not to interfere." *Katzenbach v. McClung*, 379 U.S. 294, 305, 85 S. Ct. 377, 384 (1964). In fact, if the object of congressional legislation falls within the sphere contemplated by the Commerce Clause, "[t]hat power is plenary and may be exerted to protect interstate commerce no matter what the source of the dangers which threaten it." *Jones & Laughlin Steel Corp.*, 301 U.S. at 37, 57 S. Ct. at 624 (citation and quotation marks omitted).

It is because of the breadth and depth of this power that even when the Supreme Court has blessed Congress's most expansive invocations of the Commerce Clause, it has done so with a word of warning: "Undoubtedly the scope

of this power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *Id.* It is this dualistic nature of the Commerce Clause power—necessarily broad yet potentially dangerous to the fundamental structure of our government—that has led the Court to adopt a flexible approach to its application, one that is often difficult to apply. As Chief Justice Hughes noted,

> Whatever terminology is used, the criterion is necessarily one of degree and must be so defined. This does not satisfy those [who] seek for mathematical or rigid formulas. But such formulas are not provided by the great concepts of the Constitution such as 'interstate commerce,' 'due process,' 'equal protection.' In maintaining the balance of the constitutional grants and limitations, it is inevitable that we should define their applications in the gradual process of inclusion and exclusion.

*Santa Cruz Fruit Packing Co. v. NLRB.*, 303 U.S. 453, 467, 58 S. Ct. 656, 660 (1938); *see also Lopez*, 514 U.S. at 566, 115 S. Ct. at 1633 ("But, so long as Congress' authority is limited to those powers enumerated in the Constitution, and so long as those enumerated powers are interpreted as having judicially enforceable outer limits, congressional legislation under the Commerce Clause always will engender 'legal uncertainty.'").

Thus, it is not surprising that *Lopez* begins not with categories or substantial effects tests, but rather "first principles," reaffirming the "constitutionally mandated division of authority [that] 'was adopted by the Framers to ensure protection of our fundamental liberties.'" 514 U.S. at 553, 115 S. Ct. at 1626 (citing *Gregory*, 501 U.S. at 458, 111 S. Ct. at 2400). While the substantial growth and development of Congress's power under the Commerce Clause has been well-documented, the Court has often reiterated that the power therein granted remains "subject to outer limits." *Id.* at 557, 115 S. Ct. at 1628. When Congress oversteps those outer limits, the Constitution requires judicial engagement, not judicial abdication.

The Supreme Court has placed two broad limitations on congressional power under the Commerce Clause. First, Congress's regulation must accommodate the Constitution's federalist structure and preserve "a distinction between what is truly national and what is truly local." *Id.* at 567–68, 115 S. Ct. at 1634. Second, the Court has repeatedly warned that courts may not interpret the Commerce Clause in a way that would grant to Congress a general police power, "which the Founders denied the National Government and reposed in the States." *Morrison*, 529 U.S. at 618, 120 S. Ct. at 1754; *see also Lopez*, 514 U.S. at 584, 115 S. Ct. at 1642 (Thomas, J., concurring) ("[W]e *always* have rejected readings

104

of the Commerce Clause and the scope of federal power that would permit

Congress to exercise a police power; our cases are quite clear that there are real

limits to federal power.").

Therefore, in determining if a congressional action is within the limits of the

Commerce Clause, we must look not only to the action itself but also its

implications for our constitutional structure. *See Lopez*, 514 U.S. at 563–68, 115

S. Ct. at 1632–34. While these structural limitations are often discussed in terms of

federalism, their ultimate goal is the protection of individual liberty. *See Bond v.

United States*, 564 U.S. __, __, 131 S. Ct. 2355, 2363 (2011) ("Federalism secures

the freedom of the individual."); *New York v. United States*, 505 U.S. at 181, 112

S. Ct. at 2431 ("The Constitution does not protect the sovereignty of States for the

benefit of the States or state governments as abstract political entities . . . . To the

contrary, the Constitution divides authority between federal and state governments

for the protection of individuals.").

With this at stake, we examine whether Congress legislated within its

constitutional boundaries in enacting the individual mandate.[83] We begin this

analysis with a "presumption of constitutionality," meaning that "we invalidate a

---

[83] As a preliminary matter, we note that the parties appear to agree that if the individual mandate is to be sustained, it must be under the third category of activities that Congress may regulate under its commerce power: *i.e.*, "those activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 559, 115 S. Ct. at 1630.

congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *Morrison*, 529 U.S. at 607, 120 S. Ct. at 1748.

## B.    Dichotomies and Nomenclature

The parties contend that the answer to the question of the individual mandate's constitutionality is straightforward. The government emphasizes that Congress intended to regulate the health insurance and health care markets to ameliorate the cost-shifting problem created by individuals who forego insurance yet at some time in the future seek health care for which they cannot pay. 42 U.S.C. § 18091(a)(1)(A), (H). One of the tools Congress employed to solve that problem is an economic mandate requiring Americans to purchase and continuously maintain health insurance. The government argues that the individual mandate is constitutional because it regulates "quintessentially economic" activity related to an industry of near universal participation, whereas the regulations in *Lopez* and *Morrison* touched on criminal conduct, which is not "in any sense of the phrase, economic activity." *Morrison*, 529 U.S. at 613, 120 S. Ct. at 1751. The government submits that Congress has mandated only how Americans finance their inevitable health care needs.

The plaintiffs respond that the plain text of the Constitution and Supreme Court precedent support the conclusion that "activity" is a prerequisite to valid

congressional regulation under the commerce power. The plaintiffs stress that Congress's authority is to "regulate" commerce, not to compel individuals to *enter into* commerce so that the federal government may regulate them. The plaintiffs point out that by choosing not to purchase insurance, the uninsured are outside the stream of commerce. Indeed, the nature of the conduct is marked by the *absence* of a commercial transaction. Since they are not engaged in commerce, or activities associated with commerce, they cannot be regulated pursuant to the Commerce Clause. The plaintiffs emphasize that, in 220 years of constitutional history, Congress has never exercised its commerce power in this manner.

Whereas the parties and many commentators have focused on this distinction between activity and inactivity, we find it useful only to a point. Beginning with the plain language of the text, the Commerce Clause gives Congress the power to "regulate Commerce." U.S. CONST. art. I, § 8, cl. 3. The power to regulate commerce, of course, presupposes that something exists to regulate. In its first comprehensive discussion of the Commerce Clause, the Supreme Court in *Gibbons* attempted to define commerce, stating, "Commerce, undoubtedly, is traffic, but it is something more: it is *intercourse*. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and *is regulated by prescribing rules for carrying on that intercourse*." *Gibbons*,

107

22 U.S. at 189–90 (emphasis added). The nature of Chief Justice Marshall's formulation presaged the Supreme Court's tendency to describe commerce in very general terms, since an attempt to formulate a precise and all-encompassing definition would prove impractical.

However, the Supreme Court has always described the commerce power as operating on already existing or ongoing activity. The *Gibbons* Court stated, "If Congress has the power to regulate it, that power must be exercised whenever the subject *exists*. If it exists within the States, if a foreign voyage may commence or terminate at a port within a State, then the power of Congress may be exercised within a State." *Id.* at 195 (emphasis added). In its recent cases, the Supreme Court has continued to articulate Congress's commerce authority in terms of "activity." In *Lopez*, the Court identified "three broad *categories of activity* that Congress may regulate under its commerce power" and concluded that "possession of a gun in a local school zone is in no sense an *economic activity*." 514 U.S. at 558, 567, 115 S. Ct. at 1629, 1634 (emphasis added); *see also Raich*, 545 U.S. at 26, 125 S. Ct. at 2211 ("[T]he CSA is a statute that directly regulates *economic, commercial activity*." (emphasis added)); *Morrison*, 529 U.S. at 611, 120 S. Ct. at 1750 ("*Lopez*'s review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate *activity* based upon the

*activity's* substantial effects on interstate commerce, the *activity* in question has been some sort of *economic endeavor*." (emphasis added)).

As our extensive discussion of the Supreme Court's precedent reveals, Commerce Clause cases run the gamut of possible regulation. But the diverse fact patterns of *Wickard*, *South-Eastern Underwriters*, *Heart of Atlanta Motel*, *Lopez*, *Morrison*, and *Raich* share at least one commonality: they all involved attempts by Congress to regulate preexisting, freely chosen classes of activities.

Nevertheless, we are not persuaded that the formalistic dichotomy of activity and inactivity provides a workable or persuasive enough answer in this case. Although the Supreme Court's Commerce Clause cases frequently speak in activity-laden terms, the Court has never expressly held that activity is a precondition for Congress's ability to regulate commerce—perhaps, in part, because it has never been faced with the type of regulation at issue here.

We therefore must refine our understanding of the nature of the individual mandate and the subject matter it seeks to regulate. The uninsured have made a decision, either consciously or by default, to direct their financial resources to some other item or need than health insurance. Congress described "the activity" it sought to regulate as "economic and financial *decisions* about how and when health care is paid for, and when health insurance is purchased." 42 U.S.C.

§ 18091(a)(2)(A) (emphasis added). It deemed such decisions as activity that is "commercial and economic in nature." *Id.* Congress linked the individual mandate to this decision: "In the absence of th[is] requirement, some individuals would make an economic and financial decision to forego health insurance coverage and attempt to self-insure . . . ." *Id.*

That Congress casts the individual mandate as regulating economic activity is not surprising. In *Morrison*, the Supreme Court acknowledged that "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." 529 U.S. at 613, 120 S. Ct. at 1751. *Raich* confirmed the continued viability of this distinction between economic and noneconomic activity in assessing Congress's commerce authority. *See* 545 U.S. at 25–26, 125 S. Ct. at 2210–11.

The parties here disagree about where the individual mandate falls within this "economic versus noneconomic activity" framework. On one hand, a decision not to purchase insurance and to self-insure for health care is a financial decision that has more of an economic patina than the gun possession in *Lopez* or the gender-motivated violence in *Morrison*. But whether such an economic decision constitutes economic *activity* as previously conceptualized by the Supreme Court is not so clear, nor do we find this sort of categorical thinking particularly helpful

in assessing the constitutionality of such an unprecedented congressional action. After all, in choosing not to purchase health insurance, the individuals regulated by the individual mandate are hardly involved in the "production, distribution, and consumption of commodities," which was the broad definition of economics provided by the *Raich* Court.[84] 545 U.S. at 25, 125 S. Ct. at 2211 (citation and quotation marks omitted). Rather, to the extent the uninsured can be said to be "active," their activity consists of the *absence* of such behavior, at least with respect to health insurance.[85] Simply put, the individual mandate cannot be neatly classified under either the "economic activity" or "noneconomic activity" headings.

This confirms the wisdom in the conclusion that the Court's attempts throughout history to define by "semantic or formalistic categories those activities that were commerce and those that were not" are doomed to fail. *Lopez*, 514 U.S. at 569, 115 S. Ct. at 1635 (Kennedy, J., concurring). *Compare United States v.*

---

[84]The fact that conduct may be said to have economic *effects* does not, by that fact alone, render the conduct "economic activity," at least as defined by the Supreme Court. *Lopez* and *Morrison* make this observation apparent. Even the fact that conduct in some way *relates* to commerce does not, by itself, convert that conduct into economic activity. Indeed, the regulated activity in *Lopez* (firearm possession) directly related to an article of commerce (the firearm being possessed). The Supreme Court has emphasized that the relevant inquiry is the *link* between the regulated activity and its effects on interstate commerce.

[85]The government correctly notes that many of the uninsured do actively consume health care, even though they are not participants in the health insurance market. We address this point at length later.

*E.C. Knight Co.*, 156 U.S. 1, 13, 15 S. Ct. 249, 254 (1895) (approving

manufacturing-commerce dichotomy), *with Standard Oil Co. v. United States*, 221

U.S. 1, 68–69, 31 S. Ct. 502, 519 (1911) (declaring manufacturing-commerce

dichotomy "unsound"). *See also Lopez*, 514 U.S. at 572, 115 S. Ct. at 1636

(Kennedy, J., concurring) (noting "the Court's recognition of the importance of a

practical conception of the commerce power"); *Wickard*, 317 U.S. at 120, 63 S. Ct.

at 87 (stating that "questions of the power of Congress are not to be decided by

reference to any formula which would give controlling force to nomenclature such

as 'production' and 'indirect'"); *Swift & Co. v. United States*, 196 U.S. 375, 398,

25 S. Ct. 276, 280 (1905) (observing that "commerce among the states is not a

technical legal conception, but a practical one, drawn from the course of

business"). Yet, confusing though these dichotomies and doctrinal vacillations

have been, they appear animated by one overarching goal: to provide courts with

meaningful, judicially administrable limiting principles by which to assess

Congress's exercise of its Commerce Clause power.

Properly formulated, we perceive the question before us to be whether the

federal government can issue a mandate that Americans purchase and maintain

health insurance from a private company for the entirety of their lives.[86] These

---

[86]Whether one describes the regulated individual's decision as the financing of health care, self-insurance, or risk retention, the congressional mandate is to acquire and continuously

types of purchasing decisions are legion. Every day, Americans decide what products to buy, where to invest or save, and how to pay for future contingencies such as their retirement, their children's education, and their health care. The government contends that embedded in the Commerce Clause is the power to override these ordinary decisions and redirect those funds to other purposes. Under this theory, because Americans have money to spend and must inevitably make decisions on where to spend it, the Commerce Clause gives Congress the power to direct and compel an individual's spending in order to further its overarching regulatory goals, such as reducing the number of uninsureds and the amount of uncompensated health care.

In answering whether the federal government may exercise this asserted power to issue a mandate for Americans to purchase health insurance from private companies, we next examine a number of issues: (1) the unprecedented nature of the individual mandate; (2) whether Congress's exercise of its commerce authority affords sufficient and meaningful limiting principles; and (3) the far-reaching implications for our federalist structure.

## C.    Unprecedented Nature of the Individual Mandate

Both parties have cited extensively to previous Supreme Court opinions

---

maintain health coverage. And unless the person is covered by a government-financed health program, the mandate is to purchase insurance from a private insurer.

defining the scope of the Commerce Clause. Economic mandates such as the one contained in the Act are so unprecedented, however, that the government has been unable, either in its briefs or at oral argument, to point this Court to Supreme Court precedent that addresses their constitutionality. Nor does our independent review reveal such a precedent.

The Supreme Court has sustained Congress's authority to regulate steamboat traffic, *Gibbons*, 22 U.S. 1; trafficking of lottery tickets across state lines, *The Lottery Case*, 188 U.S. 321, 23 S. Ct. 321 (1903); and carrying a woman across state lines for "immoral purposes," *Hoke v. United States*, 227 U.S. 308, 320, 33 S. Ct. 281, 283 (1913). Through the Commerce Clause, Congress may prevent the interstate transportation of liquor, *United States v. Simpson*, 252 U.S. 465, 40 S. Ct. 364 (1920); punish an automobile thief who crosses state lines, *Brooks v. United States*, 267 U.S. 432, 45 S. Ct. 345 (1925); and prevent diseased herds of cattle from bringing their contagion from Georgia to Florida, *Thornton v. United States*, 271 U.S. 414, 46 S. Ct. 585 (1926).

In the modern era, the Commerce Clause has been used to regulate labor practices, *Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S. Ct. 615; impose minimum working conditions, *Darby*, 312 U.S. 100, 61 S. Ct. 451; limit the production of wheat for home consumption, *Wickard*, 317 U.S. 111, 63 S. Ct. 82;

regulate the terms of insurance contracts, *South-Eastern Underwriters,* 322 U.S. 533, 64 S. Ct. 1162; prevent discrimination in hotel accommodations, *Heart of Atlanta Motel*, 379 U.S. 241, 85 S. Ct. 348, and restaurant services, *Katzenbach*, 379 U.S. 294, 85 S. Ct. 377; and prevent the home production of marijuana for medical purposes, *Raich,* 545 U.S. 1, 125 S. Ct. 2195. What the Court has never done is interpret the Commerce Clause to allow Congress to dictate the financial decisions of Americans through an economic mandate.

Both the Congressional Budget Office ("CBO") and the Congressional Research Service ("CRS") have commented on the unprecedented nature of the individual mandate. When the idea of an individual mandate to purchase health insurance was first floated in 1994, the CBO stated that a "mandate requiring all individuals to purchase health insurance would be an unprecedented form of federal action." SPEC. STUDIES DIV., CONG. BUDGET OFFICE, THE BUDGETARY TREATMENT OF AN INDIVIDUAL MANDATE TO BUY HEALTH INSURANCE 1 (1994) [hereinafter CBO MANDATE MEMO]. The CBO observed that Congress "has never required people to buy any good or service as a condition of lawful residence in the United States," noting that "mandates typically apply to people as parties to economic transactions, rather than as members of society." *Id.* at 1–2. Meanwhile, in reviewing the present legislation in 2009, the CRS warned:

> Despite the breadth of powers that have been exercised under the Commerce Clause, it is unclear whether the clause would provide a solid constitutional foundation for legislation containing a requirement to have health insurance. Whether such a requirement would be constitutional under the Commerce Clause is perhaps the most challenging question posed by such a proposal, as it is a novel issue whether Congress may use this clause to require an individual to purchase a good or a service.

JENNIFER STAMAN & CYNTHIA BROUGHER, CONG. RESEARCH SERV., R. 40725, REQUIRING INDIVIDUALS TO OBTAIN HEALTH INSURANCE: A CONSTITUTIONAL ANALYSIS 3 (2009).

The fact that Congress has never before exercised this supposed authority is telling. As the Supreme Court has noted, "the utter lack of statutes imposing obligations on the States' executive (notwithstanding the attractiveness of that course to Congress), suggests an assumed *absence* of such power." *Printz*, 521 U.S. at 907–08, 117 S. Ct. at 2371; *see also Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. __, __, 131 S. Ct. 1632, 1641 (2011) ("Lack of historical precedent can indicate a constitutional infirmity."); *Alden v. Maine*, 527 U.S. 706, 743–44, 119 S. Ct. 2240, 2261 (1999). Few powers, if any, could be more attractive to Congress than compelling the purchase of certain products. Yet even if we focus on the modern era, when congressional power under the Commerce Clause has been at its height, Congress still has not asserted this authority. Even in the face of a Great Depression, a World War, a Cold War, recessions, oil shocks,

inflation, and unemployment, Congress never sought to require the purchase of wheat or war bonds, force a higher savings rate or greater consumption of American goods, or require every American to purchase a more fuel efficient vehicle.[87] *See Printz*, 521 U.S. at 905, 117 S. Ct. at 2370 ("[I]f . . . earlier Congresses avoided use of this highly attractive power, we would have reason to believe that the power was thought not to exist.").

Traditionally, Congress has sought to encourage commercial activity it favors while discouraging what it does not. This is instructive. Not only have prior congressional actions not asserted the power now claimed, they "contain some indication of precisely the opposite assumption." *Id.* at 910, 117 S. Ct. at 2372. Instead of requiring action, Congress has sought to encourage it. The instances of such encouragement are ubiquitous, but the example of flood insurance provides a particularly relevant illustration of how the individual mandate departs from conventional exercises of congressional power.

In passing the National Flood Insurance Act of 1968, Congress recognized that "from time to time flood disasters have created personal hardships and economic distress which have required unforeseen disaster relief measures and have placed an increasing burden on the Nation's resources." 42 U.S.C.

---

[87]Compare the lack of legislation compelling activity to the long history of Congress forbidding activity.

§ 4001(a)(1). Despite considerable expenditures on public programs designed to prevent floods, those programs had "not been sufficient to protect adequately against growing exposure to future flood losses." *Id.* § 4001(a)(2). In response to this problem, however, Congress did not require everyone who owns a house in a flood plain to purchase flood insurance. In fact, Congress did not even require anyone who chooses to build a new house in a flood plain to buy insurance. Rather, Congress created a series of incentives designed to encourage voluntary purchase of flood insurance. These incentives included requiring flood insurance before the home owner could receive federal financial assistance or federally regulated loans. *See id.* § 4012a(a), (b)(1).

Without an "individual mandate," the flood insurance program has largely been a failure. *See* Bryant J. Spann, Note, *Going Down for the Third Time: Senator Kerry's Reform Bill Could Save the Drowning National Flood Insurance Program*, 28 GA. L. REV. 593, 597 (1994) ("One of the most astounding facts to surface from the Midwestern flood of 1993 was that so few homeowners eligible for flood insurance actually had it. Of the states impacted by the flood, Illinois had the highest percentage of eligible households covered, with 8.7%."). One key reason for this low participation is not surprising. "Disaster relief, as a political issue, is almost invincible. No politician wants to be on record as opposing

disaster relief, particularly for his or her own constituents." *Id.* at 602. People

living in a flood plain know that even if they do not have insurance, they can count

on the virtually guaranteed availability of federal funds.[88] Nevertheless, despite the

unpredictability of flooding, the inevitability that floods will strike flood plains,

and the cost shifting inherent in uninsured property owners seeking disaster relief

funds, Congress has never taken the obvious and expedient step of invoking the

power the government now argues it has and forcing all property owners in flood

plains to purchase insurance.[89]

Contrast flood insurance with the very few instances of activity in which

Congress has compelled Americans to engage solely as a consequence of being

citizens living in the United States. Given the attractiveness of the power to

compel behavior in order to solve important problems, we find it illuminating that

Americans have, historically, been subject only to a limited set of personal

mandates: serving on juries, registering for the draft, filing tax returns, and

responding to the census. These mandates are in the nature of duties owed to the

government attendant to citizenship, and they contain clear foundations in the

---

[88]Compare this with the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, which ensures public access to emergency medical services without regard to one's ability to pay.

[89]The contrast with the individual mandate is even more stark when we consider that property owners in flood plains have actually entered the housing market.

119

constitutional text.[90] Additionally, all these mandates involve a citizen directly interacting with the government, whereas the individual mandate requires an individual to enter into a compulsory contract with a private company. In these respects, the individual mandate is a sharp departure from all prior exercises of federal power.

The draft is an excellent example of this sort of duty, particularly as it is one upon which the Supreme Court has spoken. In the *Selective Draft Law Cases*, the Supreme Court reviewed challenges to the draft instituted in 1917 upon the entry of the United States into World War I. 245 U.S. 366, 38 S. Ct. 159 (1918). The Court rejected these challenges on several grounds, primarily based on the long history of the draft both in the United States and other nations. *Id.* at 379–87, 38 S. Ct. at 162–64. But it also pointed to the relationship between citizens and government: "It may not be doubted that the very [c]onception of a just government and its duty to the citizen includes the reciprocal obligation of the citizen to render military service in case of need and the right to compel it." *Id.* at 378, 38 S. Ct. at 161.

---

[90] *See, e.g.*, U.S. CONST. art. I, § 2 ("[An] Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct."); *id.* art. I, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes"); *id.* art. I, § 8, cl. 12 (providing Congress with power "[t]o raise and support Armies"); *id.* art. III, § 2 ("The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury.").

It is striking by comparison how very different this economic mandate is from the draft. First, it does not represent the solution to a duty owed to the government as a condition of citizenship. Moreover, unlike the draft, it has no basis in the history of our nation, much less a long and storied one. Until Congress passed the Act, the power to regulate commerce had not included the authority to issue an economic mandate. Now Congress seeks not only the power to reach a new class of "activity"—financial decisions whose effects are felt some time in the future—but it wishes to do so through a heretofore untested power: an economic mandate.

Having established the unprecedented nature of the individual mandate and the lack of any Supreme Court case addressing this issue, we are left to apply some basic Commerce Clause principles derived largely from *Wickard*, *Lopez*, *Morrison*, and *Raich*.

D.    *Wickard* **and Aggregation**

It is not surprising that *Wickard*, which the *Lopez* Court considered "perhaps the most far reaching example of Commerce Clause authority over intrastate activity,"[91] 514 U.S. at 560, 115 S. Ct. at 1630, provides perhaps the best perspective on an economic mandate. Congress's restrictions on Roscoe Filburn's

---

[91]Some have argued that *Raich* now represents the high-water mark of Congress's commerce authority. We discuss *Raich* in more detail below.

wheat acreage potentially forced him to purchase wheat on the open market. In doing so, Congress was able to artificially inflate the price of wheat by simultaneously decreasing supply and increasing demand. But *Wickard* is striking not for its similarity to our present case, but in how different it is. Although *Wickard* represents the zenith of Congress's powers under the Commerce Clause, the wheat regulation therein is remarkably less intrusive than the individual mandate.

Despite the fact that Filburn was a commercial farmer[92] and thus far more amenable to Congress's commerce power than an ordinary citizen, the legislative act did not require him to purchase more wheat. Instead, Filburn had any number of other options open to him. He could have decided to make do with the amount of wheat he was allowed to grow. He could have redirected his efforts to agricultural endeavors that required less wheat. He could have even ceased part of his farming operations. The wheat-acreage regulation imposed by Congress, even though it lies at the outer bounds of the commerce power, was a limitation—not a mandate—and left Filburn with a choice. The Act's economic mandate to purchase

---

[92]In enacting the Agricultural Adjustment Act at issue in *Wickard*, Congress apparently sought to avoid reaching subsistence farmers whose production did not leave surplus for sale. Thus, it exempted small farms from the quota. *See Wickard*, 317 U.S. at 130 n.30, 63 S. Ct. at 92 n.30. In other words, Congress's regulation only applied to suppliers operating in the stream of commerce, even though some of those market suppliers also consumed a portion of wheat at home.

insurance, on the contrary, leaves no choice and is more far-reaching.

Although this distinction appears, at first blush, to implicate liberty concerns not at issue on appeal,[93] in truth it strikes at the heart of whether Congress has acted within its enumerated power. Individuals subjected to this economic mandate have not made a voluntary choice to enter the stream of commerce, but instead are having that choice imposed upon them by the federal government. This suggests that they are removed from the traditional subjects of Congress's commerce authority, in the same manner that the regulated actors in *Lopez* and *Morrison* were removed from the traditional subjects of Congress's commerce authority by virtue of the noneconomic cast of their activity.

This departure from commerce power norms is made all the more salient when we consider principles of aggregation, the chief addition of *Wickard* to the Commerce Clause canon. Aggregation may suffice to bring otherwise non-regulable, "trivial" instances of intrastate activity within Congress's reach if the cumulative effect of this class of activity (*i.e.*, the intrastate activity "taken together with that of many others similarly situated") substantially affects interstate commerce. *Wickard*, 317 U.S. at 127–28, 63 S. Ct. at 90. Aggregation is

---

[93]Among other counts, the district court dismissed the plaintiffs' substantive due process challenge under the Fifth Amendment. *Florida v. HHS*, 716 F. Supp. 2d at 1161–62. That ruling is not on appeal.

a doctrine that allows Congress to apply an otherwise valid regulation to a class of intrastate activity it might not be able to reach in isolation.[94]

In *Morrison* and *Lopez*, the Supreme Court declined to apply aggregation to the noneconomic activity at issue, reasoning that "in every case where we have sustained federal regulation under the aggregation principle in [*Wickard*], the regulated activity was of an apparent commercial character." *Morrison*, 529 U.S. at 611 n.4, 120 S. Ct. at 1750 n.4. The Court thereby resisted "additional expansion" of the substantial effects and aggregation doctrines. *Lopez*, 514 U.S. at 567, 115 S. Ct. at 1634.

The question before us is whether Congress may regulate individuals outside the stream of commerce, on the theory that those "economic and financial decisions" to avoid commerce *themselves* substantially affect interstate commerce. Applying aggregation principles to an individual's decision not to purchase a product would expand the substantial effects doctrine to one of unlimited scope. Given the economic reality of our national marketplace, any person's decision not to purchase a good would, when aggregated, substantially affect interstate

---

[94]Although not made explicit in *Wickard*, the courts have come to recognize aggregation as flowing from Congress's powers to enact laws necessary and proper to effectuate its power under the Commerce Clause. *See, e.g.*, *Raich*, 545 U.S. at 22, 125 S. Ct. at 2209; *id.* at 34, 125 S. Ct. at 2216 (Scalia, J., concurring); *Katzenbach*, 379 U.S. at 301–302, 85 S. Ct. at 382.

commerce in that good.[95] From a doctrinal standpoint, we see no way to cabin the government's theory only to decisions not to purchase *health insurance*. If an individual's mere decision not to purchase insurance were subject to *Wickard*'s aggregation principle, we are unable to conceive of *any* product whose purchase Congress could not mandate under this line of argument.[96] Although any decision not to purchase a good or service entails commercial consequences, this does not warrant the facile conclusion that Congress may therefore regulate these decisions pursuant to the Commerce Clause. *See id.* at 580, 115 S. Ct. at 1640 (Kennedy, J., concurring) ("In a sense any conduct in this interdependent world of ours has an ultimate commercial origin or consequence, but we have not yet said the commerce power may reach so far.").

Thus, even assuming that decisions *not* to buy insurance substantially affect interstate commerce, that fact alone hardly renders them a suitable subject for

---

[95]Perhaps we can conceive of a purely intrastate good that is wholly insulated from the interstate market and, therefore, whose purchase Congress may not mandate even under the government's sweeping extension of *Wickard*'s aggregation principle. To the extent such hypothetical goods exist, their number is vanishingly small.

[96]The CBO suggested the possibility of this perilous course when it warned that an individual mandate to buy health insurance could "open the door to a mandate-issuing government taking control of virtually any resource allocation decision that would otherwise be left to the private sector . . . . In the extreme, a command economy, in which the President and the Congress dictated how much each individual and family spent on all goods and services, could be instituted without any change in total federal receipts or outlays." CBO MANDATE MEMO, *supra* p.115, at 9.

regulation. *See, e.g.*, *Morrison*, 529 U.S. at 617, 120 S. Ct. at 1754 ("We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct *based solely on that conduct's aggregate effect on interstate commerce*." (emphasis added)). Instead, what matters is the regulated subject matter's connection to interstate commerce. That nexus is lacking here. It is immaterial whether we perceive Congress to be regulating inactivity or a financial decision to forego insurance. Under any framing, the regulated conduct is defined by the *absence* of both commerce or even the "the production, distribution, and consumption of commodities"—the broad definition of economics in *Raich*. 545 U.S. at 25, 125 S. Ct. at 2211. To connect this conduct to interstate commerce would require a "but-for causal chain" that the Supreme Court has rejected, as it would allow Congress to regulate anything. *Morrison*, 529 U.S. at 615, 120 S. Ct. at 1752.

E.     **Broad Scope of Congress's Regulation**

The scope of Congress's regulation also affects the constitutional inquiry. Indisputably, the health insurance and health care industries involve, and substantially affect, interstate commerce, and Congress can regulate broadly in both those realms. Nonetheless, Congress, in exercising its commerce authority, must be careful not to sweep too broadly by including within the ambit of its

regulation activities that bear an insufficient nexus with interstate commerce. *See Morrison*, 529 U.S. at 613 & n.5, 120 S. Ct. at 1751–52 & n.5 (distinguishing invalidated statute from analogous statute requiring explicit interstate nexus); *Lopez*, 514 U.S. at 561–62, 115 S. Ct. at 1631 (same).

In this regard, the individual mandate's attempt to reduce the number of the uninsured and correct the cost-shifting problem is woefully overinclusive. The language of the mandate is not tied to those who do not pay for a portion of their health care (*i.e.*, the cost-shifters). It is not even tied to those who consume health care. Rather, the language of the mandate is unlimited, and covers even those who do not enter the health care market at all. Although overinclusiveness may not be fatal for constitutional purposes, the Supreme Court has indicated that it is a factor to be added to the constitutional equation.

For example, in *Lopez* the vast majority of the regulated behavior (firearm possession) *did* possess an interstate character.[97] However, the Supreme Court

---

[97]A staggering proportion of the firearms in America have been transported across state lines, and thus the possessions at issue in *Lopez* likely *did* have a sufficient nexus to interstate commerce—and thus, were within Congress's regulatory authority. In the wake of *Lopez*, many defendants challenged their prosecutions under the felons-with-firearms statute—18 U.S.C. § 1202(a), later recodified as 18 U.S.C. § 922(g)—that the Supreme Court distinguished from § 922(q) by virtue of its jurisdictional element. In one such case, the government's own expert witness testified that 95% of the firearms in the United States were transported across state lines. *See* Brent E. Newton, *Felons, Firearms, and Federalism: Reconsidering* Scarborough *in Light of* Lopez, 3 J. APP. PRAC. & PROCESS 671, 681–82 & n.53 (2001).

Instructively, Congress took its cue from the Supreme Court after *Lopez* and amended the Gun-Free School Zones Act to require an explicit interstate nexus on an individualized basis.

ultimately found this fact insufficient to save the statute. Rather, the Supreme Court commented that an interstate-tying element in the statute itself "would ensure, through case-by-case inquiry, that the [activity] in question affects interstate commerce."[98] *Lopez*, 514 U.S. at 561, 115 S. Ct. at 1631.

Here, the decision to forego insurance similarly lacks an established interstate tie or any "case-by-case inquiry." *See id.* Aside from the categories of exempted individuals, the individual mandate is applied across-the-board without regard to whether the regulated individuals receive, or have ever received, uncompensated care—or, indeed, seek any care at all, either now or in the future.[99] Thus, the Act contains no language "which might limit its reach to a discrete set of [activities] that additionally have an explicit connection with or effect on interstate commerce." *See id.* at 562, 115 S. Ct. at 1631.

The individual mandate sweeps too broadly in another way. Because the

---

Specifically, Congress added a jurisdictional element to ensure that the charged individual's particular firearm had moved in interstate or foreign commerce (or otherwise affected such commerce). *See* 18 U.S.C. § 922(q)(2)(A) ("It shall be unlawful for any individual knowingly to possess a firearm *that has moved in or that otherwise affects interstate or foreign commerce* at a place that the individual knows, or has reasonable cause to believe, is a school zone." (emphasis added)).

[98]The *Lopez* Court never stated that such an element was *required*, and nor do we. However, it is clearly a relevant constitutional factor that the Supreme Court instructs us to consider. The government's argument ignores it completely.

[99]Although health care consumption is pervasive, the plaintiffs correctly note that participation in the market for health care is far less inevitable than participation in markets for basic necessities like food or clothing.

Supreme Court's prior Commerce Clause cases all deal with already-existing activity—not the mere *possibility* of *future* activity (in this case, health care consumption) that could implicate interstate commerce—the Court never had to address any temporal aspects of congressional regulation. However, the premise of the government's position—that most people will, *at some point in the future*, consume health care—reveals that the individual mandate is even further removed from traditional exercises of Congress's commerce power.[100]

It is true that Congress may, in some instances, regulate individuals who are consuming health care but not themselves causing the cost-shifting problem. *Cf. Raich*, 545 U.S. at 17, 125 S. Ct. at 2206 ("We have never required Congress to legislate with scientific exactitude."); *id.* at 22, 125 S. Ct. at 2209 ("That the regulation ensnares some purely intrastate activity is of no moment."). As the plaintiffs acknowledged at oral argument, when the uninsured actually enter the

---

[100]The dissent attempts to sidestep the temporal leap problem by citing *Consolidated Edison Co. v. NLRB* for the proposition that Congress may take "reasonable preventive measures" to avoid future disruptions to interstate commerce. 305 U.S. 197, 222, 59 S. Ct. 206, 213 (1938). *Consolidated Edison*, of course, is wholly inapposite to this case, since Congress was regulating the labor practices of *utility companies* (1) fully engaged in the stream of commerce and (2) *presently* supplying economic services to instrumentalities of interstate commerce, such as railroads and steamships. *Id.* at 220–22, 59 S. Ct. at 213. Even so, the dissent's argument proves far too much. After all, by the dissent's reasoning, Congress could clearly reach the gun possession at issue in *Lopez*, since firearms are (1) objects of everyday commercial transactions and (2) are daily used to disrupt interstate commerce. *See Lopez*, 514 U.S. at 602–03, 115 S. Ct. at 1651 (Stevens, J., dissenting) ("Guns are both articles of commerce and articles that can be used to restrain commerce. Their possession is the consequence, either directly or indirectly, of commercial activity."). Indeed, Antonio Lopez himself was paid $40 to traffic the gun for which he was charged under § 922(q). *United States v. Lopez*, 2 F.3d 1342, 1345 (5th Cir. 1995).

stream of commerce and consume health care, Congress may regulate their activity at the point of consumption.

But the individual mandate does *not* regulate behavior at the point of consumption. Indeed, the language of the individual mandate does not truly regulate "how and when health care is paid for." 42 U.S.C. § 18091(a)(2)(A). It does not even require those who consume health care to pay for it with insurance when doing so. Instead, the language of the individual mandate in fact regulates a related, but different, subject matter: "when health insurance is purchased." *Id.* If an individual's participation in the health care market is uncertain, their participation in the insurance market is even more so.

In sum, the individual mandate is breathtaking in its expansive scope. It regulates those who have not entered the health care market at all. It regulates those who have entered the health care market, but have not entered the insurance market (and have no intention of doing so). It is overinclusive in *when* it regulates: it conflates those who presently consume health care with those who will not consume health care for many years into the future. The government's position amounts to an argument that the mere fact of an individual's existence substantially affects interstate commerce, and therefore Congress may regulate them at every point of their life. This theory affords no limiting principles in

which to confine Congress's enumerated power.

## F.     Government's Proposed Limiting Principles

"We pause to consider the implications of the Government's arguments." *Lopez*, 514 U.S. at 564, 115 S. Ct. at 1632. The government clearly appreciates the far-reaching implications of the individual mandate. The government has struggled to avoid the conclusion that Congress may order Americans' other economic decisions through the use of economic mandates. At oral argument, the government's counsel specifically disclaimed the argument that Congress could compel a person to purchase insurance solely on the basis of his financial decision to spend his money elsewhere. Rather, the government seems to view an economic mandate as an emergency tool of sorts, for use in extreme and unique situations and only to the extent the underlying regulated conduct meets a number of fact-based criteria.

The government submits that health care and health insurance are factually unique and not susceptible of replication due to: (1) the inevitability of health care need; (2) the unpredictability of need; (3) the high costs of health care; (4) the federal requirement that hospitals treat, until stabilized, individuals with emergency medical conditions, regardless of their ability to pay;[101] (5) and

---

[101] *See* EMTALA, 42 U.S.C. § 1395dd. In this regard, the plaintiffs point out that the government's contention amounts to a bootstrapping argument. Under the government's theory,

associated cost-shifting.

The first problem with the government's proposed limiting factors is their lack of *constitutional* relevance.[102] These five factual criteria comprising the government's "uniqueness" argument are not limiting principles rooted in any constitutional understanding of the commerce power. Rather, they are *ad hoc* factors that—fortuitously—happen to apply to the health insurance and health care industries. They speak more to the complexity of the problem being regulated than the regulated decision's relation to interstate commerce. They are not limiting principles, but limiting circumstances.

Apparently recognizing that these factors appear in many subjects worthy of regulation, the government acknowledged at oral argument that the mere presence of many of these factors is not sufficient. Presented with three examples of

---

Congress can enlarge its own powers under the Commerce Clause by legislating a market externality into existence, and then claiming an extra-constitutional fix is required.

[102]The Supreme Court has rejected similar calls for a reprieve from Commerce Clause restraints based upon the ostensible uniqueness or gravity of the problem being regulated. For instance, Justice Breyer's dissent in *Lopez* attempted to deflect the majority's focus on limiting principles—specifically, its statement that upholding § 922(q) would enable the federal government to "regulate any activity that it found was related to the economic productivity of individual citizens," 514 U.S. at 564, 115 S. Ct. at 1632—by arguing that § 922(q) "is aimed at curbing a *particularly acute threat*" and that "guns and education are incompatible" in a "*special way.*" *Id.* at 624, 115 S. Ct. at 1661 (Breyer, J., dissenting) (emphasis added). The dissent further opined that gun possession in schools embodied "*the rare case* . . . [when] a statute strikes at conduct that (when considered in the abstract) seems so removed from commerce, but which (practically speaking) has so significant an impact upon commerce." *Id.* at 624, 115 S. Ct. at 1662 (emphasis added). The majority dismissed these "suggested limitations," however, characterizing them as "devoid of substance." *Id.* at 564, 115 S. Ct. at 1632 (majority opinion).

industries characterized by some or all of these market deficiencies—elder care, other types of insurance, and the energy market—the government argued that an economic mandate in these three settings is distinguishable.

However, virtually all forms of insurance entail decisions about timing and planning for unpredictable events with high associated costs—insurance protecting against loss of life, disability from employment, business interruption, theft, flood, tornado, and other natural disasters, long-term nursing care requirements, and burial costs. Under the government's proposed limiting principles, there is no reason why Congress could not similarly compel Americans to insure against any number of unforeseeable but serious risks.[103] High costs and cost-shifting in premiums are simply not limited to hospital care, but occur when individuals are disabled, cannot work, experience an accident, need nursing care, die, and myriad other insurance-related contingencies.

This gives rise to a second fatal problem with the government's proposed limits: administrability. We are at a loss as to how such fact-based criteria can serve as the sort of "judicially enforceable" limitations on the commerce power

---

[103]The government essentially argues that anyone creates a cost-shifting risk by virtue of being alive, since they may one day be injured or sick and seek care that they do not pay for. Therefore, Congress can compel the purchase of health insurance, from birth to death, to protect against such risks. This expansive theory could justify the compelled purchase of innumerable forms of insurance, however. To give but one example, Congress could undoubtedly require every American to purchase liability insurance, lest the consequences of their negligence or inattention lead to unfunded costs (medical and otherwise) passed on to others in the future.

that the Supreme Court has repeatedly emphasized as necessary to that *enumerated* power. *Lopez*, 514 U.S. at 566, 115 S. Ct. at 1633; *see also Morrison*, 529 U.S. at 608 n.3, 120 S. Ct. at 1749 n.3 (rejecting dissent's "remarkable theory that the commerce power is without judicially enforceable boundaries"). We are loath to invalidate an act of Congress, and do so only after extensive circumspection. But the role that the Court would take were we to adopt the position of the government is far more troublesome. Were we to adopt the "limiting principles" proffered by the government, courts would sit in judgment over every economic mandate issued by Congress, determining whether the level of participation in the underlying market, the amount of cost-shifting, the unpredictability of need, or the strength of the moral imperative were enough to justify the mandate.

But the commerce power does not admit such limitations; rather it "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Gibbons*, 22 U.S. at 196. If Congress may compel individuals to purchase health insurance from a private company, it may similarly compel the purchase of other products from private industry, regardless of the "unique conditions" the government cites as warrant for Congress's regulation here. *See* Government's Opening Br. at 19.

Moreover, the government's insistence that we defer to Congress's fact

findings underscores the lack of any judicially enforceable stopping point to the government's "uniqueness" argument. Presumably, a future Congress similarly would be able to articulate a unique problem requiring a legislative fix that entailed compelling Americans to purchase a certain product from a private company. The government apparently seeks to set the terms of the limiting principles courts should apply, and then asks that we defer to Congress's judgment about whether those conditions have been met. The Supreme Court has firmly rejected such calls for judicial abdication in the Commerce Clause realm. *See Lopez*, 514 U.S. at 557 n.2, 115 S. Ct. at 1629 n.2 ("'[W]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court.'" (quoting *Heart of Atlanta Motel*, 379 U.S. at 273, 85 S. Ct. at 366 (Black, J., concurring))).

At root, the government's uniqueness argument relies upon a convenient sleight of hand to deflect attention from the central issue in the case: what is the nature of the conduct being regulated by the individual mandate, and may Congress reach it? Because an individual's decision to forego purchasing a product is so incongruent with the "activities" previously reached by Congress's commerce power, the government attempts to limit the individual mandate's far-

reaching implications. Accordingly, the government adroitly and narrowly re-

defines the regulated activity as the uninsured's health care *consumption* and

attendant *cost-shifting,* or the *timing and method of payment* for such

consumption.[104]

The government's reluctance to define the conduct being regulated as the

decision to forego insurance is understandable. After all, if the decision to forego

purchasing a product is deemed "economic activity" (merely because it is

inevitable that an individual in the future will consume in a related market), then

decisions *not* to purchase a product would be subject to the sweeping doctrine of

aggregation, and such no-purchase decisions of all Americans would fall within

the federal commerce power. Consequently, the government could no longer fall

back on "uniqueness" as a limiting factor, since Congress could enact purchase

mandates no matter how pedestrian the relevant product market.

As an inferior court, we may not craft new dichotomies—"uniqueness"

versus "non-uniqueness," or "cost-shifting" versus "non-cost-shifting"—not

recognized by Supreme Court doctrine. To do so would require us to fabricate out

---

[104]The dissent adopts the government's position. *See* Dissenting Op. at 227 (describing "the relevant conduct targeted by Congress" as "the uncompensated consumption of health care services by the uninsured"); *id.* at 235 (stating that "many of the[] uninsured currently consume health care services for which they cannot or do not pay" and "[t]his is, in every real and meaningful sense, classic economic *activity*"); *id.* at 214 ("In other words, the individual mandate is the means Congress adopted to regulate the *timing* and *method* of individuals' payment for the consumption of health care services.").

of whole cloth a five-factor test that lacks any antecedent in the Supreme Court's Commerce Clause jurisprudence. Thus, not only do the "uniqueness" factors lack judicial administrability, present Commerce Clause doctrine prohibits inferior courts, like us, from applying them anyway.

Ultimately, the government's struggle to articulate cognizable, judicially administrable limiting principles only reiterates the conclusion we reach today: there are none.

## G.    Congressional Findings

This brings us to the congressional findings. *See* 42 U.S.C. § 18091(a)(1)–(3). We look to congressional findings to help us "evaluate the legislative judgment that the activity in question substantially affected interstate commerce." *Lopez*, 514 U.S. at 549, 115 S. Ct. at 1632.

Here, tracking the language of Supreme Court decisions, the congressional findings begin with the statement that the individual insurance mandate "is commercial and economic in nature" and "substantially affects interstate commerce." 42 U.S.C. § 18091(a)(1). Of course, the relevant inquiry is not whether the regulation itself substantially affects interstate commerce but rather whether *the underlying activity* being regulated substantially affects interstate commerce.

Later on, the findings do ground the individual mandate in Congress's effort to address this multi-step cost-shifting scenario: (1) some uninsureds consume health care; (2) in turn, some of them do not pay their full medical costs and instead shift them to medical providers; (3) medical providers thereafter shift these costs to "private insurers"; and (4) private insurers then shift them to insureds through higher premiums.[105] *Id.* § 18091(a)(2). The average annual premium increase is $1,000 for insured families, *id.*, and $400 for individuals.[106] The findings state that the mandate will reduce the number of the uninsured and the $43 billion cost-shifting and thereby "lower health insurance premiums."[107] *Id.* § 18091(a)(2)(F).

Of course, "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." *Morrison*,

---

[105]The parties and *amici* use the shorthand terms "cost-shifting," "cost-shifters," or "free-riders" to describe these problems.

[106]*See* Families USA, *supra* note 8.

[107]Experts debate whether the Act will accomplish its premium-lowering objective. According to even the CBO, "Under PPACA and the Reconciliation Act, premiums for health insurance in the individual market will be somewhat higher than they would otherwise be . . . mostly because the average insurance policy in that market will cover a larger share of enrollees' costs for health care and provide a slightly wider range of benefits." CONG. BUDGET OFFICE, AN ANALYSIS OF HEALTH INSURANCE PREMIUMS UNDER THE PATIENT PROTECTION AND AFFORDABLE CARE ACT 8 (2009).

The CBO estimates the Act will cause costs for health insurance in the individual market to rise by 27% to 30% over current levels in 2016, due to the broadened coverage achieved by the insurance market reforms. *Id.* at 6. For the purpose of our analysis, however, we accept the congressional finding that cost-shifters lead to higher premiums.

529 U.S. at 614, 120 S. Ct. at 1752. Rather, the Supreme Court has insisted that courts examine congressional findings regarding substantial effects. *See Lopez*, 514 U.S. at 557 n.2, 115 S. Ct. at 1629 n.2 ("'[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.'" (quoting *Hodel*, 452 U.S. at 311, 101 S. Ct. at 2391 (Rehnquist, J., concurring))).

As a preliminary matter, we recount what the record reveals regarding the cost-shifting effects of the uninsured. To the extent the data show anything, the data demonstrate that the cost-shifters are largely persons who either (1) are exempted from the mandate, (2) are excepted from the mandate penalty, or (3) are now covered by the Act's Medicaid expansion.

For example, illegal aliens and other nonresidents are cost-shifters ($8.1 billion, or 18.9% of the $43 billion),[108] but they are exempted from the individual mandate entirely. 26 U.S.C. § 5000A(d)(3). Low-income persons are the largest segment of cost-shifters ($15 billion, or 34.8% of the $43 billion),[109] but they are covered by the Act's Medicaid expansion or excepted from the mandate penalty.

---

[108]*See* Br. of *Amici Curiae* Economists in Support of Plaintiffs at 11 & app. A (summarizing their calculations based on the MEPS data set).

[109]*See* Br. of *Amici Curiae* Economists in Support of Plaintiffs at 11 & app. A (summarizing their calculations based on the MEPS data set).

*Id.* § 5000A(e)(1), (2) (excepting individuals (1) whose premium contribution exceeds 8% of household income *or* (2) whose household income is below the specified income tax filing threshold). Previously, the uninsured with preexisting health conditions sought, but were denied, coverage and ended up in the past cost-shifting pool ($8.7 billion, or 20.1%).[110] However, the Act's insurance reforms now guarantee them coverage and move them out of the future cost-shifting pool. Already-insured persons who do not pay their out-of-pocket costs (such as co-payments and deductibles) are cost-shifters ($3.3 billion, or 7.6%),[111] but they are already covered by insurance without the mandate. In addition, the cost-shifter uninsureds who cannot pay the average $2,000 medical bill also cannot pay the average $4,500 premium,[112] yielding another disconnect.

In reality, the primary persons regulated by the individual mandate are not cost-shifters but *healthy individuals* who forego purchasing insurance. The Act

---

[110]*See* Br. of *Amici Curiae* Economists in Support of Plaintiffs at 11 & app. A (summarizing their calculations based on the MEPS data set).

[111]*See* Br. of *Amici Curiae* Economists in Support of Plaintiffs at 11 & app. A (summarizing their calculations based on the MEPS data set).

[112]As noted earlier, the uninsureds' average medical care costs were $2,000 in 2007 and $1,870 in 2008. Some uninsureds incur a larger expense, some a smaller expense, and some no expense at all. We use the average cited in the Brief of the *Amici Curiae* Economists in Support of the Government, at 16, which is based on the MEPS tables. The CBO estimates that in 2016 the annual premium for a bronze level plan, even in the Exchanges, will average $4,500–5,000 for individuals and $12,000–12,500 for a family policy. Letter from Douglas Elmendorf, Director, Cong. Budget Office, to Olympia Snowe, U.S. Senator (Jan. 11, 2010), *available at* http://www.cbo.gov/ftpdocs/108xx/doc10884/01-11-Premiums_for_Bronze_Plan.pdf.

confirms as much. To help private insurers, the congressional findings acknowledge that the individual mandate seeks to "broaden the health insurance risk pool to include healthy individuals," to "minimize adverse selection,"[113] to increase "the size of purchasing pools," and to promote "economies of scale." 42 U.S.C. § 18091(a)(2)(I), (J). The individual mandate forces healthy and voluntarily uninsured individuals to purchase insurance from private insurers and pay premiums *now* in order to subsidize the private insurers' costs in covering more unhealthy individuals under the Act's reforms. Congress sought to mitigate its reforms' regulatory costs on private insurers[114] by compelling healthy Americans *outside the insurance market* to enter the private insurance market and buy the insurers' products. This starkly evinces how the Act is forcing market entry by those outside the market.

Nevertheless, we need not, and do not, rely on the factual disparity between the persons regulated by the individual mandate and the cost-shifting problem.

---

[113]Distinguished economists have filed helpful briefs on both sides of the case. While they disagree on some things, they agree about the theory of adverse selection. They agree some relatively healthy people refrain from, or opt out of, buying health insurance more often than people who are unhealthy or sick seek insurance. This results in a smaller and less healthy pool of insured persons for private insurance companies. Br. of *Amici Curiae* Economists in Support of the Government at 17–18; Br. of *Amici Curiae* Economists in Support of Plaintiffs at 13–16.

[114]As explained above, the Act requires private insurers (1) to cover the unhealthy and (2) *to price that coverage*, not on actuarial risks or basic economic pricing decisions, but on community-rated premiums without regard to health status. 42 U.S.C. § 300gg-1(a).

After all, courts "need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce *in fact*, but only whether a '*rational basis*' exists for so concluding."[115] *Raich*, 545 U.S. at 22, 125 S. Ct. at 2208 (emphasis added). The government would have this be the end of the constitutional inquiry.

But the government skips important analytical steps. Rational basis review is not triggered by the mere fact of Congress's invocation of Article I power; rather, the Supreme Court has applied rational basis review to a more specific question under the Commerce Clause: whether Congress has a "rational basis" for concluding that the regulated "activities, *when taken in the aggregate*, substantially affect interstate commerce."[116] *Id.* (emphasis added). As discussed in subsection D, *supra*, courts must initially assess whether the subject matter

---

[115]Notably, the *Lopez* Court recognized the same "rational basis" level of review as *Raich*. *See Lopez*, 514 U.S. at 557, 115 S. Ct. at 1629 (stating that, since the New Deal, the Supreme Court has "undertaken to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce"). *Raich* did not adopt a more deferential review of congressional legislation than prior cases, as the Supreme Court itself acknowledged. *See* 545 U.S. at 22, 125 S. Ct. at 2208 (collecting cases).

[116]Every case the *Raich* Court cited for rational basis review is a substantial effects case. *See* 545 U.S. at 22, 125 S. Ct. at 2208 (citing *Lopez*, 514 U.S. at 557, 115 S. Ct. 1624; *Hodel*, 452 U.S. at 276–80, 101 S. Ct. 2352; *Perez*, 402 U.S. at 155–56, 91 S. Ct. 1357; *Katzenbach*, 379 U.S. at 299–301, 85 S. Ct. 377; *Heart of Atlanta Motel*, 379 U.S. at 252–53, 85 S. Ct. 348). In such contexts, courts will accord significant deference to Congress's assessment of whether an activity's cumulative effect on interstate commerce is "substantial" or some lesser quantum. This is an altogether separate question from (1) whether a regulated activity is amenable to aggregation analysis at all and (2) the extent of the inferential leap needed to connect the regulated activity to the effects on interstate commerce.

targeted by the regulation is suitable for aggregation in the first place. Relatedly,

courts, in the rational basis inquiry, must also examine whether the link between

the regulated activity and interstate commerce is too attenuated, lest there be no

discernible stopping point to Congress's commerce power.[117] *See Lopez*, 514 U.S.

at 562–68, 115 S. Ct. at 1630–34.

The wholesale deference the government would have us apply here cannot

be squared with the Supreme Court's decisions in *Morrison* and *Lopez*. Here,

"Congress' findings are substantially weakened by the fact that they rely so

heavily on a method of reasoning that [courts] have already rejected as

unworkable if we are to maintain the Constitution's enumeration of powers."

*Morrison*, 529 U.S. at 615, 120 S. Ct. at 1752. It is highly instructive that the

*Lopez* and *Morrison* Courts rejected a similar cost-shifting theory now

propounded by the government. In examining the actual relationship between gun

---

[117]*Compare Raich*, 545 U.S. at 22, 125 S. Ct. at 2209 ("[W]e have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA."), *Heart of Atlanta Motel*, 379 U.S. at 253, 85 S. Ct. at 355 (referring to "overwhelming evidence that discrimination by hotels and motels impedes interstate travel"), *and Wickard*, 317 U.S. at 128, 63 S. Ct. at 91 ("[A] factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions."), *with Morrison*, 529 U.S. at 615, 120 S. Ct. at 1752 (rejecting the government's invitation "to follow the but-for causal chain from the initial occurrence of violent crime . . . to every attenuated effect upon interstate commerce"), *and Lopez*, 514 U.S. at 564, 115 S. Ct. at 1632 ("[I]f we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate.").

possession and interstate commerce, the *Lopez* Court refused to accept what it referred to as the government's "cost of crime" theory. 514 U.S. at 564, 115 S. Ct. at 1632. It did so despite the government's argument that the "costs of violent crime are substantial, and, *through the mechanism of insurance, those costs are spread throughout the population.*" *Id.* at 563–64, 115 S. Ct. at 1632 (emphasis added).

Similarly, in *Morrison* the Supreme Court considered a stockpile[118] of congressional findings attesting to the link between domestic violence and medical costs frequently borne by third parties. *See, e.g.*, 529 U.S. at 629–36, 120 S. Ct at 1760–64 (Souter, J., dissenting); *see also id.* at 632, 120 S. Ct. at 1762 ("'Over 1 million women in the United States seek medical assistance each year for injuries sustained [from] their husbands or other partners.'" (quoting S. Rep. No. 101-545, at 37 (1990))); *id.* ("'[E]stimates suggest that we spend $5 to $10 billion a year on health care, criminal justice, and other social costs of domestic violence.'" (quoting S. Rep. No. 103-138, at 41 (1993))).

In *Morrison*, the Supreme Court also recounted Congress's express finding

---

[118]In *Morrison*, "[t]he congressional findings that accompanied VAWA were so voluminous that they were removed from the text of the statute and placed in a conference report to avoid cluttering the United States Code." Melissa Irr, Note, United States v. Morrison; *An Analysis of the Diminished Effect of Congressional Findings in Commerce Clause Jurisprudence and a Criticism of the Abandonment of the Rational Basis Test*, 62 U. PITT. L. REV. 815, 824 (2001).

144

that gender-motivated violence substantially affected interstate commerce "'by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; . . . by diminishing national productivity, *increasing medical and other costs*, and decreasing the supply of and the demand for interstate products.'" *Id.* at 615, 120 S. Ct. at 1752 (majority opinion) (emphasis added) (quoting H.R. Conf. Rep. No. 103-711, at 385 (1994)). The *Morrison* Court did not dispute the above figures about medical costs, but instead considered them largely extraneous to the threshold question of whether the subject matter of the regulation had a sufficient nexus to interstate commerce. *See id.* at 617, 120 S. Ct. at 1754.

In both *Lopez* and *Morrison*, the Supreme Court determined that the government's cost-shifting argument provided too attenuated a link to Congress's commerce power. Under such a cost-shifting theory, "it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign." *Lopez*, 514 U.S. at 564, 115 S. Ct. at 1632.

For example, we harbor few doubts that an individual's decisions about "marriage, divorce, and child custody," if aggregated, would have substantial

effects on interstate commerce. *See id.* at 564, 115 S. Ct. at 1632. Yet, the mere fact of an activity's substantial effects on interstate commerce does not thereby render that activity an appropriate subject for Congress's plenary commerce authority. Such a holding would require the Supreme Court to overturn *Lopez* and *Morrison*.

We see no reason why the inferential leaps in this case are any less attenuated than those in *Lopez* and *Morrison*. The cost-shifting accompanying the criminal acts of violence at issue in *Lopez* and *Morrison*—hospital bills borne by third parties, property damage and insurance consequences, law enforcement expenditures and incarceration costs—is at least as apparent as the multi-step cost-shifting scenario associated with the medically uninsured. Meanwhile, in all three cases, the regulated conduct giving rise to the cost-shifting is divorced from a commercial transaction or the "production, distribution, and consumption of commodities." *Raich*, 545 U.S. at 26, 125 S. Ct. at 2211.

At best, we can say that the uninsured *may*, at some point in the *unforeseeable future*, create that cost-shifting consequence. Yet this readily leads to a scenario where we must "pile inference upon inference" to sustain Congress's legislation, a practice the Supreme Court admonishes us to avoid. *See Lopez*, 514 U.S. at 567, 115 S. Ct. at 1634. If anything, the temporal aspects present here, but

not in *Lopez* or *Morrison*, render the regulated "activity" even *further* remote.[119]

We next explain how the individual mandate impairs important federalism concerns.

## H.      Areas of Traditional State Concern

Before examining the states' traditional role in regulating insurance and health care, we fully recognize that Congress has the power under the Commerce Clause to regulate broadly in those arenas. In fact, Congress has legislated expansively and constitutionally in the fields of insurance and health care. *See, e.g.*, Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936 (1996); Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Pub. L. No. 99-272, 100 Stat. 82 (1986); Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. 93-406, 88 Stat. 829 (1974); Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat.

---

[119]The dissent identifies an economic effect—cost-shifting—and essentially defines that as the activity being regulated. But the dissent's conflation of activity and effect is sheer question begging. It is no wonder, then, that the dissent makes the breathtaking assertion that there is not even a single inferential step needed to link the regulated activity here to an impact on commerce. As the dissent frames the issue, there is no lack of nexus between the regulated activity and its effects on interstate commerce because they are one and the same!

To the extent the dissent describes the conduct being regulated as the uncompensated consumption of health care services, the language of the mandate refers only to insurance and contains no reference to health care services, much less how health care services are consumed or paid for. The dissent can find no inferential leap because it has assumed away the very problem in this case, effectively treating the mandate as operating at the point of consumption. Under the dissent's re-framing of the issue, the VAWA's civil-remedy provision in *Morrison* could be regarded as regulating the "consumption of health care services," because such consumption inevitably and empirically flows from gender-motivated violence.

147

286 (1965) (establishing Medicare and Medicaid); Federal Food, Drug, and Cosmetic Act, Pub. L. No. 75-717, 52 Stat. 1040 (1938). It is clear that Congress has enacted comprehensive legislation regarding health insurance and health care. The Act is another such example. Yet, the narrow constitutional question here is whether one provision—§ 5000A—in that massive regulation goes too far.

For the individual mandate to be sustained, it must be enacted pursuant to a valid exercise of Article I power. It simply will not suffice to say that, because Congress has regulated broadly in a field, it may regulate in any fashion it pleases. The Constitution supplies Congress with various tools to effectuate its legislative power, but it also denies others. In assessing Congress's exercise of power, courts recognize that the *structural* limits embedded in the Constitution are of equal dignity to the express prohibitions—and may even be a more prevalent source of limitation. *See, e.g., Comstock*, 560 U.S. at __, 130 S. Ct. at 1968 (Kennedy, J., concurring) (rejecting notion that "the Constitution's express prohibitions" are "the only, *or even the principal*, constraints on the exercise of congressional power" (emphasis added)).[120]

---

[120]The Supreme Court reminds us that "the federal structure serves to grant and delimit the prerogatives and responsibilities of the States and the National Government vis-à-vis one another" and "action that exceeds the National Government's enumerated powers undermines the sovereign interests of States." *Bond*, 564 U.S. at __, __, 131 S. Ct. at 2364, 2366; *see also Gregory*, 501 U.S. at 458, 111 S. Ct. at 2399 ("This federalist structure of joint sovereigns preserves to the people numerous advantages. It assures a decentralized government that will be more sensitive to the diverse needs of a heterogenous society; it increases opportunity for citizen

The Supreme Court's Commerce Clause jurisprudence emphasizes that, in assessing the constitutionality of Congress's exercise of its commerce authority, a relevant factor is whether a particular federal regulation trenches on an area of traditional state concern. *See Morrison*, 529 U.S. at 611, 613, 615–16, 120 S. Ct. at 1750–51, 1753; *Lopez*, 514 U.S. at 561 n.3, 564–68, 115 S. Ct. at 1631 n.3, 1632–34. The Supreme Court has expressed concern that "Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority." *Morrison*, 529 U.S. at 615, 120 S. Ct. at 1752; *see also Raich*, 545 U.S. at 35–36, 125 S. Ct. at 2216–17 (Scalia, J., concurring); *Lopez*, 514 U.S. at 557, 567–68, 115 S. Ct. at 1628–29, 1634; *id.* at 577, 115 S. Ct. at 1638–39 (Kennedy, J., concurring) (stating that if Congress were to assume control over areas of traditional state concern, "the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory. The resultant inability to hold either branch of the government answerable to the citizens is more dangerous even than devolving too much authority to the remote central power" (citation omitted)). Coupled with this consideration, the Supreme Court recognizes that the Constitution "withhold[s]

---

involvement in democratic processes; it allows for more innovation and experimentation in government; and it makes government more responsive by putting the States in competition for a mobile citizenry.").

from Congress a plenary police power." *Lopez*, 514 U.S. at 566, 115 S. Ct. at 1633; *see also Morrison*, 529 U.S. at 618–19, 120 S. Ct. at 1754; *cf. Comstock*, 560 U.S. at __, 130 S. Ct. at 1964; *id.* at __, 130 S. Ct. at 1967 (Kennedy, J., concurring) (stating that the police power "belongs to the States and the States alone").

In addition, whether the regulated subject matter is an area of traditional state concern impacts three of the five *Comstock* factors pertinent to a Necessary and Proper Clause analysis: (1) whether there is a long history of federal involvement in this arena, (2) whether the statute accommodates or supplants state interests, and (3) the statute's narrow scope. 560 U.S. at __, 130 S. Ct. at 1965.

With these principles in mind, we examine whether insurance and health care qualify as areas of traditional state concern. Prior to the Supreme Court's 1944 decision in *South-Eastern Underwriters*, "the States enjoyed a virtually exclusive domain over the insurance industry." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 539, 98 S. Ct. 2923, 2928 (1978). Thus, *South-Eastern Underwriters* was "widely perceived as a threat to state power to tax and regulate the insurance industry." *United States Dep't of Treasury v. Fabe*, 508 U.S. 491, 499–500, 113 S. Ct. 2202, 2207 (1993); *see also Cantor v. Detroit Edison Co.*, 428 U.S. 579, 608 n.4, 96 S. Ct. 3110, 3126 n.4 (1976) (Blackmun, J., concurring)

("Congress' expressed concern [was that the result in *South-Eastern Underwriters*] would 'greatly impair or nullify the regulation of insurance by the States,' bringing to a halt their 'experimentation and investigation in the area.'"). "To allay those fears, Congress moved quickly to restore *the supremacy of the States in the realm of insurance regulation*." *Fabe*, 508 U.S. at 500, 113 S. Ct. at 2207 (emphasis added).

In 1945, a year after *South-Eastern Underwriters*, Congress passed the McCarran-Ferguson Act, 59 Stat. 33, ch. 20, 15 U.S.C. §§ 1011–1015.[121] The McCarran-Ferguson Act preserved state regulatory control over insurance, which was largely considered by Congress to be a "local matter." *W. & S. Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 653, 101 S. Ct. 2070, 2075 (1981) (quoting H.R. Rep. No. 143, at 2 (1945)). The passage of the McCarran-Ferguson Act signaled Congress's recognition of the states' historical role in regulating insurance within their boundaries—and its unwillingness to supplant their vital function as a source of experimentation. *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 429, 66 S. Ct. 1142, 1155 (1946) ("Obviously Congress' purpose [in passing

---

[121]The McCarran-Ferguson Act states: (1) "[t]he business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business," 15 U.S.C. § 1012(a), and (2) "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance," *id.* § 1012(b).

the McCarran-Ferguson Act] was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance."); *see also Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159, 179, 105 S. Ct. 2545, 2556 (1985) (O'Connor, J., concurring) ("The business of insurance is also of uniquely local concern . . . . [and] historically ha[s] been regulated by the States in recognition of the critical part [it] play[s] in securing the financial well-being of local citizens and businesses." (citations omitted)). Our Circuit has reached a similar conclusion. *Blue Cross & Blue Shield v. Nielsen*, 116 F.3d 1406, 1413 (11th Cir. 1997) ("Adjustment of the rights and interests of insurers, health care providers, and insureds is a subject matter that falls squarely within the zone of traditional state regulatory concerns.").

Thus, insurance qualifies as an area of traditional state regulation. This recognition counsels caution, and supplies reviewing courts with even greater cause for doubt when faced with an unprecedented economic mandate of dubious constitutional status. *Cf. Lopez*, 514 U.S. at 583, 115 S. Ct. at 1641 (Kennedy, J., concurring) ("The statute now before us forecloses the States from experimenting and exercising their own judgment in an area to which States lay claim by right of history and expertise, and it does so by regulating an activity beyond the realm of commerce in the ordinary and usual sense of that term.").

The health care industry also falls within the sphere of traditional state regulation. A state's role in safeguarding the health of its citizens is a quintessential component of its sovereign powers. The Supreme Court has declared that the "structure and limitations of federalism . . . allow the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Gonzales v. Oregon*, 546 U.S. 243, 270, 126 S. Ct. 904, 923 (2006) (quotation marks and citation omitted). Numerous Supreme Court decisions have identified the regulation of health matters as a core facet of a state's police powers. *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 715, 120 S. Ct. 2480, 2489 (2000) ("It is a traditional exercise of the States' police powers to protect the health and safety of their citizens." (quotation marks and citation omitted)); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569, 111 S. Ct. 2456, 2462 (1991) ("The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals."); *Head v. N.M. Bd. of Exam'rs in Optometry*, 374 U.S. 424, 428, 83 S. Ct. 1759, 1762 (1963) ("[T]he statute here involved is a measure directly addressed to protection of the public health, and the statute thus falls within the most traditional concept of what is compendiously known as the police power."); *Barsky v. Bd. of Regents*, 347 U.S. 442, 449, 74 S. Ct. 650, 654 (1954) ("It is elemental that a state has broad

153

power to establish and enforce standards of conduct within its borders relative to the health of everyone there. It is a vital part of a state's police power."); *Jacobson v. Massachusetts*, 197 U.S. 11, 25, 25 S. Ct. 358, 360 (1905) ("According to settled principles, the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety."); *see also Raich,* 545 U.S. at 42, 125 S. Ct. at 2221 (O'Connor, J., dissenting) ("This case exemplifies the role of States as laboratories. The States' core police powers have always included authority to define criminal law and to protect the health, safety, and welfare of their citizens.").[122]

Although the states and the federal government both play indispensable roles in regulating matters of health, modern Supreme Court precedents have confirmed the view that the health of a state's citizens is predominantly a state-based concern: "the regulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719, 105 S. Ct. 2371, 2378 (1985). The Supreme Court

---

[122]*Gibbons*, which represents one of the Supreme Court's earliest articulations of the states' reserved police powers, also provides insight into the traditionally local nature of health laws. In *Gibbons*, Chief Justice Marshall remarked that "[i]nspection laws, quarantine laws, *health laws of every description*, as well as laws for regulating the internal commerce of a State" together "form a portion of that immense mass of legislation, which embraces every thing within the territory of a State, not surrendered to the general government: all which can be most advantageously exercised by the States themselves." 22 U.S. at 203 (emphasis added).

similarly has stated that the narrower category of "health care" is an area of traditional state concern. *See, e.g.*, *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 387, 122 S. Ct. 2151, 2171 (2002) (referring to "'the field of health care'" as "'a subject of traditional state regulation'" (quoting *Pegram v. Herdrich*, 530 U.S. 211, 237, 120 S. Ct. 2143, 2158 (2000))); *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 661, 115 S. Ct. 1671, 1680 (1995) ("[G]eneral health care regulation . . . historically has been a matter of local concern.").

Here, it is undisputed that the individual mandate supersedes a multitude of the states' policy choices in these key areas of traditional state concern. Congress's encroachment upon these areas of traditional state concern is yet another factor that weighs in the plaintiffs' favor, and strengthens the inference that the individual mandate exceeds constitutional boundaries. The inference is particularly compelling here, where Congress has used an economic mandate to compel Americans to purchase and continuously maintain insurance from a private company.

We recognize the argument that, if states can issue economic mandates, Congress should be able to do so as well. Yes, some states have exercised their general police power to require their citizens to buy certain products—most

pertinently, for our purposes, health insurance itself.[123] But if anything, this gives us greater constitutional concern, not less. Indeed, if the federal government possesses the asserted power to compel individuals to purchase insurance from a private company forever, it may impose such a mandate on individuals in states that have elected *not* to employ their police power in this manner.[124] After all, if and when Congress actually operates within its enumerated commerce power, Congress, by virtue of the Supremacy Clause, may ultimately supplant the states. When this occurs, a state is no longer permitted to tailor its policymaking goals to the specific needs of its citizenry. This is precisely why it is critical that courts preserve constitutional boundaries and ensure that Congress only operates within the proper scope of its enumerated commerce power.

In sum, the fact that Congress has enacted this insurance mandate in an area of traditional state concern is a factor that strengthens the inference of a

---

[123] *See, e.g.*, MASS. GEN. LAWS ch. 111M § 2 (Massachusetts law requiring residents 18 years and older to "obtain and maintain creditable coverage so long as it is deemed affordable"); N.J. STAT. ANN. § 26:15-2 (New Jersey law requiring residents 18 years and younger to "obtain and maintain health care coverage that provides hospital and medical benefits").

[124] Some states have even passed legislation providing that their citizens may *not* be required to obtain or maintain health insurance. *See, e.g.*, Utah Code Ann. § 63M-1-2505.5; Va. Code Ann. § 38.2-3430.1:1; *see also* ARIZ. CONST. Art. XXVII, § 2 ("A law or rule shall not compel, directly or indirectly, any person, employer or health care provider to participate in any health care system."). The American Legislative Exchange Council, a nonprofit membership association of state legislators, filed a helpful *amicus* brief documenting the diverse array of policies implemented by states to provide their citizens with health coverage. *See* Br. of *Amicus Curiae* American Legislative Exchange Council in Support of Plaintiffs at 21–28.

constitutional violation. When this federalism factor is added to the numerous indicia of constitutional infirmity delineated above, we must conclude that the individual mandate cannot be sustained as a valid exercise of Congress's power to regulate activities that substantially affect interstate commerce.

We do not reach this conclusion lightly, and we recognize that "[d]ue respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *Morrison*, 529 U.S. at 607, 120 S. Ct. at 1748. But we believe a compelling showing has been made here, and "the federal balance is too essential a part of our constitutional structure and plays too vital a role in securing freedom for us to admit inability to intervene when one or the other level of Government has tipped the scales too far." *Lopez*, 514 U.S. at 578, 115 S. Ct. at 1639 (Kennedy, J., concurring) (citations omitted).

## I.    Essential to a Larger Regulatory Scheme

We lastly consider the government's separate contention that the individual mandate is a necessary and proper exercise of Congress's commerce power because it is essential to Congress's broader regulation of the insurance and health care markets.

The government's argument derives from a Commerce Clause doctrine of

recent vintage. In 1995, the *Lopez* Court commented that the Gun-Free School

Zones Act was "not an essential part of a larger regulation of economic activity, in

which the regulatory scheme could be undercut unless the intrastate activity were

regulated." *Id.* at 561, 115 S. Ct. at 1631 (majority opinion). Ten years later in

*Raich*, although plainly operating within the economic-noneconomic rubric

adopted in *Lopez* and *Morrison*, the Supreme Court adverted to the "essential part

of a larger regulation of economic activity" language in *Lopez* as a further reason

to sustain Congress's action.[125] However, several features of the individual

mandate materially distinguish this case from *Raich* and demonstrate why the

government's "essential to a broader regulation of commerce" argument fails here.

First, the Supreme Court has implied that the "larger regulatory scheme"

doctrine primarily implicates as-applied challenges as opposed to the facial

challenge at issue here. For instance, the Supreme Court has employed the "larger

regulatory scheme" doctrine when a plaintiff asserts that, although Congress's

statute is a permissible regulation within its commerce power, the statute cannot

be validly applied to his particular intrastate activity. *Raich*, 545 U.S. at 15, 23–24,

---

[125]In a concurring opinion, Justice Scalia stated that "Congress may regulate even *noneconomic local activity* if that regulation is a necessary part of a more general regulation of interstate commerce." *Raich*, 545 U.S. at 37, 125 S. Ct. at 2217 (Scalia, J., concurring) (emphasis added). As noted earlier, however, the majority opinion in *Raich* described the regulated activity as "the production, distribution, and consumption of commodities" and thus "quintessentially economic." *Id.* at 26, 125 S. Ct. at 2211 (majority opinion).

125 S. Ct. at 2204, 2209–10. In such an instance, the Supreme Court may determine that the failure to reach a plaintiff's intrastate activities would undermine Congress's efforts to police the interstate market. *Id.* at 28, 125 S. Ct. at 2212. However, the Supreme Court has to date never sustained a statute on the basis of the "larger regulatory scheme" doctrine in a facial challenge, where plaintiffs contend that the entire class of activity is outside the reach of congressional power.[126]

On this facial versus as-applied point, the *Raich* Court declared that "the statutory challenges at issue in [*Lopez* and *Morrison*] were markedly different from the challenge respondents pursue in the case at hand. Here, respondents ask us to excise individual applications of a concededly valid statutory scheme. In contrast, in both *Lopez* and *Morrison*, the parties asserted that a particular statute or provision fell outside Congress' commerce power in its entirety." *Id.* at 23, 125 S. Ct. at 2209. The Court deemed this facial versus as-applied distinction "pivotal," as "we have often reiterated that '[w]here the class of activities is

_____

[126] Although the *Lopez* Court was the first to *recognize* the "larger regulatory scheme" doctrine, it is arguable whether they actually *applied* it, in any real sense, in that case. Rather, the Supreme Court summarily stated that § 922(q) did not implicate that doctrine at all and "cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Lopez*, 514 U.S. at 561, 115 S. Ct. at 1631. Here, it would strain credulity to suggest that the plaintiffs' conduct "arises out of or is connected with a commercial transaction," since the very nature of their conduct is marked by the *absence* of a commercial transaction.

regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class.'" *Id.* (quoting *Perez*, 402 U.S. at 154, 91 S. Ct. at 1361). The plaintiffs here, of course, are not asking for courts to excise, as trivial, individual instances of a class—rather, the plaintiffs contend the mandate to purchase insurance from a private company falls outside of Congress's commerce power in its entirety.

But even accepting that this larger regulatory scheme doctrine fully applies in facial challenges, the government's argument still fails here. To see why, we discuss how the Supreme Court utilized the doctrine in the as-applied setting of *Raich*, the only instance in which a statute has been sustained by the larger regulatory scheme doctrine. The Supreme Court in *Raich* observed that, in enacting the CSA, "Congress devised a *closed regulatory system* making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA." *Id.* at 13, 125 S. Ct. at 2203 (emphasis added). By classifying marijuana as a Schedule I drug, Congress sought to eliminate *all* interstate traffic in the commodity. The Supreme Court concluded that "the diversion of homegrown marijuana tends to frustrate the federal interest in eliminating commercial transactions in the interstate market *in their entirety*." *Id.* at 19, 125 S. Ct. at 2207 (emphasis added).

160

Additionally, the fungible nature of the commodity—*i.e.*, the inability to distinguish intrastate marijuana from interstate marijuana—also undermined Congress's ability to enforce its concededly valid total CSA ban on commercial transactions in the interstate market. The *Raich* Court stated that "[g]iven the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere, and concerns about diversion into illicit channels, we have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a *gaping hole* in the CSA."[127] *Id.* at 22, 125 S. Ct. at 2209 (citation omitted) (emphasis added). Consequently, the *Raich* Court determined that Congress's regulation was justified by the possibility that the plaintiffs'

---

[127]The "gaping hole" identified by the Supreme Court was thrown into sharp relief by the *Raich* plaintiffs' lack of limiting principles. If Congress could not reach intrastate marijuana used for medical purposes, the *Raich* Court reasoned that it must also be true that intrastate marijuana used for *recreational* purposes could not be regulated either. 545 U.S. at 28, 125 S. Ct. at 2212. And if Congress could not reach intrastate marijuana authorized by state law, neither could it reach intrastate marijuana unauthorized by state law. *Id.* Moreover, if Congress could not reach intrastate marijuana when it is authorized by state law, then Congress's ability to police the interstate marijuana market would be wholly contingent on state decisions about whether or not to authorize marijuana use. Congress would effectively be at the mercy of states, even though "state action cannot circumscribe Congress' plenary commerce power." *Id.* at 29, 125 S. Ct. at 2213. It is easy to see how the *Raich* plaintiffs' arguments threatened to completely undermine the CSA's regulation of the interstate marijuana market, not to mention "turn the Supremacy Clause on its head." *Id.* at 29 n.38, 125 S. Ct. at 2213 n.38.

This stands in marked contrast with the case before us, where neither state law nor the plaintiffs' uninsured status undermine the ability of Congress to enforce its regulation of interstate commerce. Even without the mandate, the integrity of all other statutory provisions is maintained, and Congress's ability to enforce the Act is in no way jeopardized.

intrastate activities could frustrate or impede a validly enacted congressional statute regulating interstate commerce.

In this case, the government contends that the individual mandate is essential to its broader regulation of the insurance market. For example, the government submits that Congress's insurance industry reforms—specifically, its community-rating and guaranteed-issue reforms—will encourage individuals to delay purchasing private insurance until an acute medical need arises. Therefore, the government argues that unless the individual mandate forces individuals into the private insurance pool before they get sick or injured, Congress's insurance industry reforms will be unsustainable by the private insurance companies. The government emphasizes that the congressional findings state that the individual mandate "is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." 42 U.S.C. § 18091(a)(2)(I).

We first note the truism that the mere placement of a particular regulation in a broader regulatory scheme does not, *ipso facto*, somehow render that regulation *essential* to that scheme. It would be nonsensical to suggest that, in announcing its "larger regulatory scheme" doctrine, the Supreme Court gave Congress *carte blanche* to enact unconstitutional regulations so long as such enactments were part

of a broader, comprehensive regulatory scheme. We do not construe the Supreme Court's "larger regulatory scheme" doctrine as a magic words test, where Congress's statement that a regulation is "essential" thereby immunizes its enactment from constitutional inquiry. Such a reading would eviscerate the Constitution's enumeration of powers and vest Congress with a general police power.

Ultimately, we conclude that the Supreme Court's "larger regulatory scheme" doctrine embodies an observation put forth in the New Deal case of *Jones & Laughlin Steel Corp.*: "Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that *their control is essential or appropriate to protect that commerce from burdens and obstructions*, Congress cannot be denied the power to exercise that control." 301 U.S. at 37, 57 S. Ct. at 624 (emphasis added). Justice Scalia's concurring opinion in *Raich* suggests a similar interpretation. There, he stated that the "larger regulatory scheme" statement in *Lopez* "referred to those cases permitting the regulation of intrastate activities 'which *in a substantial way* interfere with or obstruct the exercise of the granted power.'" *Raich*, 545 U.S. at 36, 125 S. Ct. at 2217 (Scalia, J., concurring) (emphasis added) (quoting *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119, 62 S. Ct. 523, 526 (1942)). In

163

other words, the Necessary and Proper Clause enables Congress in some instances to reach intrastate activities that markedly burden or obstruct Congress's ability to regulate interstate commerce.

In *Raich*, the plaintiffs' intrastate activities—growing and consuming marijuana—obstructed and burdened Congress's total CSA ban on interstate marijuana traffic, both because the fungible nature of marijuana frustrated Congress's ability to police the interstate market and because evidence indicated that intrastate marijuana is often diverted into the interstate market. Yet it is evident that the conduct regulated by the individual mandate—an individual's decision not to purchase health insurance and the concomitant absence of a commercial transaction—in no way "burdens" or "obstructs" Congress's ability to enforce its regulation of the insurance industry. Congress's statutory reforms of health insurance products—such as guaranteed issue and community rating—do not reference or make their implementation in any way dependent on the individual mandate.

The individual mandate does not remove an obstacle to Congress's regulation of insurance companies. An individual's uninsured status in no way interferes with Congress's ability to regulate insurance companies. The uninsured and the individual mandate also do not prevent insurance companies' regulatory

164

compliance with the Act's insurance reforms. At best, the individual mandate is designed *not* to enable the execution of the Act's regulations, but to counteract the significant regulatory costs on insurance companies and adverse consequences stemming from the fully executed reforms. That may be a relevant political consideration, but it does not convert an unconstitutional regulation (of an individual's decision to forego purchasing an expensive product) into a constitutional means to ameliorate adverse cost consequences on private insurance companies engendered by Congress's broader regulatory reform of their health insurance products.[128]

The government's assertion that the individual mandate is "essential" to Congress's broader economic regulation is further undermined by components of the Act itself. In *Raich*, Congress devised a "closed regulatory system," *id.* at 13, 125 S. Ct. at 2203, designed to eliminate *all* interstate marijuana traffic. Here, by contrast, Congress itself carved out eight broad exemptions and exceptions to the individual mandate (and its penalty) that impair its scope and functionality. *See* 26

---

[128]The government argues that Congress has broad authority to select the means by which it enforces its comprehensive regulatory scheme. But this hardly entails that Congress may choose any and all means whatsoever. Indeed, Congress might have employed other unconstitutional means to render its community-rating and guaranteed-issue reforms more "effective." For example, it might order unreasonable searches and seizures of corporate documents to ensure that insurance companies were not discriminating against applicants with preexisting conditions. Surely this action would not cease being a Fourth Amendment violation merely because it is deemed essential to a broader regulatory scheme.

U.S.C. § 5000A(d)–(e). Even if the individual mandate remained intact, the "adverse selection" problem identified by Congress would persist not only with respect to these eight broad exemptions, but also with respect to *those healthy persons who choose to pay the mandate penalty*. Those who pay the penalty one year instead of purchasing insurance may still get sick the next year and *then* decide to purchase insurance, for which they could not be denied.

Additionally, Congress has hamstrung its own efforts to ensure compliance with the mandate by opting for toothless enforcement mechanisms. Eschewing the IRS's traditional enforcement tools, the Act waives all criminal penalties for noncompliance and prevents the IRS from using liens or levies to collect the penalty. *Id.* § 5000A(g)(2). Thus, to the extent the uninsureds' ability to delay insurance purchases would leave a "gaping hole" in Congress's efforts to reform the insurance market, Congress has seen fit to bore the hole itself.

## J.    Conclusion

For these reasons, we conclude that the individual mandate contained in the Act exceeds Congress's enumerated commerce power. This conclusion is limited in scope. The power that Congress has wielded via the Commerce Clause for the life of this country remains undiminished. Congress may regulate commercial actors. It may forbid certain commercial activity. It may enact hundreds of new

166

laws and federally-funded programs, as it has elected to do in this massive 975-page Act. But what Congress cannot do under the Commerce Clause is mandate that individuals enter into contracts with private insurance companies for the purchase of an expensive product from the time they are born until the time they die.

It cannot be denied that the individual mandate is an unprecedented exercise of congressional power. As the CBO observed, Congress "has never required people to buy any good or service as a condition of lawful residence in the United States." CBO MANDATE MEMO, *supra* p.115, at 1. Never before has Congress sought to *regulate* commerce by compelling non-market participants to *enter into* commerce so that Congress may regulate them. The statutory language of the mandate is not tied to health care consumption—past, present, or in the future. Rather, the mandate is to buy insurance now and forever. The individual mandate does not wait for market entry.

Because the Commerce Clause is an enumerated power, the Supreme Court's decisions all emphasize the need for judicially enforceable limitations on its exercise. The individual mandate embodies no such limitations, at least none recognized by extant Commerce Clause doctrine. If an individual's decision *not* to purchase an expensive product is subject to the sweeping doctrine of aggregation,

then that purchase decision will almost always substantially affect interstate commerce. The government's five factual elements of "uniqueness," proposed as constitutional limiting principles, are nowhere to be found in Supreme Court precedent. Rather, they are *ad hoc*, devoid of constitutional substance, incapable of judicial administration—and, consequently, illusory. The government's fact-based criteria would lead to expansive involvement by the courts in congressional legislation, requiring us to sit in judgment over when the situation is serious enough to justify an economic mandate.

This lack of limiting principles also implicates two overarching considerations within the Supreme Court's Commerce Clause jurisprudence: (1) preserving the federal-state balance and (2) withholding from Congress a general police power. *Morrison*, 529 U.S. at 617–19, 120 S. Ct. at 1754; *Lopez*, 514 U.S. at 566–68, 115 S. Ct. at 1633–34; *Jones & Laughlin Steel Corp.*, 301 U.S. at 30, 57 S. Ct. at 621. These concerns undergird the Constitution's dual sovereignty structure, ensuring that the federal government remains a government of enumerated powers.

As demonstrated at length throughout our opinion, Congress has broad power to deal with the problems of the uninsured, and it wielded that power pervasively in this comprehensive and sweeping Act. As to the individual mandate

provision, however, Congress exceeded its enumerated commerce power. The structure of the Constitution interposes obstacles by design, in order to prevent the arrogation of power by one branch or one sovereign. *See Gregory*, 501 U.S. at 458, 111 S. Ct. at 2400 ("Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front."). We cannot ignore these structural limits on the Commerce Clause because of the seriousness and intractability of the problem Congress sought to resolve in the Act.

The Supreme Court has often found itself forced to strike down congressional enactments even when the law is designed to address particularly difficult and universally acknowledged problems. For instance, in *Clinton v. City of New York*, 524 U.S. 417, 118 S. Ct. 2091 (1998), the Supreme Court addressed a problem of Congress's own creation—deficit spending. The Line Item Veto Act was "of first importance, for it seems undeniable the Act will tend to restrain persistent excessive spending." *Id.* at 449, 118 S. Ct. at 2108 (Kennedy, J., concurring). The problem the act addressed was momentous: "A nation cannot plunder its own treasury without putting its Constitution and its survival in peril."

*Id.*

Nevertheless, the Supreme Court invalidated the Line Item Veto Act, recognizing that the Constitution establishes restraints on the power of Congress to act, even in regards to the mechanism by which it withholds or allocates funding. The fact that constitutional tools sometimes "prove insufficient[] cannot validate an otherwise unconstitutional device" because "[t]he Constitution's structure requires a stability which transcends the convenience of the moment." *Id.* at 453, 118 S. Ct. at 2110; *see also New York v. United States*, 505 U.S. at 178, 112 S. Ct. at 2429 (noting that "[n]o matter how powerful the federal interest involved, the Constitution simply does not give Congress the authority" to supersede its constitutionally imposed boundaries); *INS v. Chadha*, 462 U.S. 919, 958–59, 103 S. Ct. 2764, 2788 (1983) ("In purely practical terms, it is obviously easier for action to be taken by one House without submission to the President; but it is crystal clear from the records of the Convention, contemporaneous writings and debates, that the Framers ranked other values higher than efficiency.").

In the same way, the difficulties posed by the insurance market and health care cannot justify extra-constitutional legislation. *See Printz*, 521 U.S. at 935, 117 S. Ct. at 2385 ("It matters not whether policymaking is involved, and no case-by-case weighing of the burdens or benefits is necessary; such [federal]

170

commands are fundamentally incompatible with our constitutional system of dual sovereignty.").

The federal government's assertion of power, under the Commerce Clause, to issue an economic mandate for Americans to purchase insurance from a private company for the entire duration of their lives is unprecedented, lacks cognizable limits, and imperils our federalist structure. We recognize that "[t]hese are not precise formulations, and in the nature of things they cannot be." *Lopez*, 514 U.S. at 567, 115 S. Ct. at 1634. That an economic mandate to purchase insurance from a private company is an expedient solution to pressing public needs is not sufficient. As the Supreme Court counseled in *New York v. United States*,

> The result may appear 'formalistic' in a given case to partisans of the measure at issue, because such measures are typically the product of the era's perceived necessity. But the Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day.

505 U.S. at 187, 112 S. Ct. at 2434. Although courts must give due consideration to the policy choices of the political branches, the judiciary owes its ultimate deference to the Constitution.[129]

---

[129]We are at a loss as to why the dissent spends a considerable portion of its opinion on the Fifth and Tenth Amendments. As mentioned earlier, the district court dismissed the plaintiffs' Fifth Amendment claim. *Florida v. HHS*, 716 F. Supp. 2d at 1161–62. That ruling is not on appeal.

# VI. CONSTITUTIONALITY OF INDIVIDUAL MANDATE UNDER THE TAX POWER

The government claims in the alternative that the individual mandate is a tax validly enacted pursuant to the Taxing and Spending Clause. The Clause provides in relevant part that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. CONST. art. 1, § 8, cl. 1. The government claims that the taxing power is comprehensive and plenary, and the fact that the individual mandate also has a concededly regulatory purpose is irrelevant, because "a tax 'does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed.'" Government's Opening Br. at 50 (quoting *United States v. Sanchez*, 340 U.S. 42, 44, 71 S. Ct. 108, 110 (1950)). The government claims that as long as a statute is "productive of

---

Furthermore, the plaintiffs' briefs on appeal raise no free-standing Tenth Amendment claim *as to the individual mandate*. Although the state plaintiffs' brief makes a single passing reference to the Tenth Amendment in the introduction, *see* States' Opening Br. at 3, the fact remains that the Tenth Amendment is not once cited or argued in the state plaintiffs' *individual mandate* discussion. *See* States' Opening Br. at 19–47. The private plaintiffs' brief also makes a single passing reference to the Tenth Amendment, but only in relation to how principles of federalism inform a Necessary and Proper Clause analysis. *See* Private Plaintiffs' Br. at 46.

Accordingly, we cannot consider a free-standing Tenth Amendment claim. *See, e.g.*, *Tanner Adver. Grp., L.L.C. v. Fayette Cnty.*, 451 F.3d 777, 785 (11th Cir. 2006) ("'The law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.'" (quoting *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004)) (brackets omitted)); *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) (finding issue waived, despite "four passing references" in Appellant's brief, because "a party seeking to raise a claim or issue on appeal must plainly and prominently so indicate").

some revenue," Congress may enact it under its taxing power. *Id*. (quoting

*Sonzinsky v. United States*, 300 U.S. 506, 514, 57 S. Ct. 554, 556 (1937)).

Furthermore, the government contends our review is limited because "the

constitutional restraints on taxing are few" and "[t]he remedy for excessive

taxation is in the hands of Congress, not the courts." *United States v. Kahriger*,

345 U.S. 22, 28, 73 S. Ct. 510, 513 (1953), *overruled on other grounds by*

*Marchetti v. United States*, 390 U.S. 39, 88 S. Ct. 697 (1968); *see also Kahriger*,

345 U.S. at 31, 73 S. Ct. at 515 ("Unless there are provisions, extraneous to any

tax need, courts are without authority to limit the exercise of the taxing power.").

Like every other court that has addressed this claim, we remain unpersuaded.

It is not surprising to us that all of the federal courts, which have otherwise

reached sharply divergent conclusions on the constitutionality of the individual

mandate, have spoken on this issue with clarion uniformity. Beginning with the

district court in this case, all have found, without exception, that the individual

mandate operates as a regulatory penalty, not a tax. *Florida v. HHS*, 716 F. Supp.

2d at 1143–44 ("I conclude that the individual mandate penalty is not a 'tax.' It is

(as the Act itself says) a penalty."); *U.S. Citizens Ass'n v. Sebelius*, 754 F. Supp.

2d 903, 909 (N.D. Ohio 2010) (concluding that the individual mandate is a

penalty, "agree[ing] with the thoughtful and careful analysis of Judge Vinson");

*Liberty Univ., Inc. v. Geithner*, 753 F. Supp. 2d 611, 629 (W.D. Va. 2010) ("After considering the prevailing case law, I conclude that the better characterization of the exactions imposed under the Act for violations of the employer and individual coverage provisions is that of regulatory penalties, not taxes."); *Virginia v. Sebelius*, 728 F. Supp. 2d 768, 782–88 (E.D. Va. 2010) (concluding that the individual mandate "is, in form and substance, a penalty as opposed to a tax"); *Goudy-Bachman v. HHS*, 764 F. Supp. 2d 684, 695 (M.D. Pa. 2011) ("The court finds that the individual mandate itself is not a tax . . . ."); *Mead v. Holder*, 766 F. Supp. 2d 16, 41 (D.D.C. 2011) ("[T]he Court concludes that Congress did not intend [the individual mandate] to operate as a tax, and therefore Defendants cannot rely on the General Welfare Clause as authority for its enactment.").

For good reason. The breadth of the taxing power, well noted by the government and its *amici*, fails to resolve the question we face: whether the individual mandate is a tax in the first place. The plain language of the statute and well-settled principles of statutory construction overwhelmingly establish that the individual mandate is not a tax, but rather a penalty. The legislative history of the Act further supports this conclusion. And as the Supreme Court has repeatedly recognized, there is a firm distinction between a tax and a penalty. *See, e.g.*, *United States. v. La Franca*, 282 U.S. 568, 572, 51 S. Ct. 278, 280 (1931) ("The

two words are not interchangeable one for the other.").

The government would have us ignore all of this and instead hold that any provision found in the Internal Revenue Code that will produce revenue may be characterized as a tax. This we are unwilling to do.

## A. Repeated Use of the Term "Penalty" in the Individual Mandate

"As in any case involving statutory construction, we begin with the plain language of the statute." *Hemispherx Biopharma, Inc. v. Johannesburg Consol. Invs.*, 553 F.3d 1351, 1362 (11th Cir. 2008) (citing *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S. Ct. 2051, 2056 (1980)). The plain language of the individual mandate is clear that the individual mandate is not a tax, but rather, as the statute itself repeatedly states, a "penalty" imposed on an individual for failing to maintain a minimum level of health insurance coverage in any month beginning in 2014. Title 26 U.S.C. § 5000A(a) requires "[a]n applicable individual" to "ensure that the individual . . . is covered under minimum essential coverage." 26 U.S.C. § 5000A(a). In order to enforce this requirement, Congress stated that "[i]f a taxpayer who is an applicable individual . . . fails to meet the requirement of subsection (a) for 1 or more months, then . . . there is hereby imposed on the taxpayer a *penalty* with respect to such failures." *Id.* § 5000A(b)(1) (emphasis added).

175

Nor could we construe Congress's choice of language as a careless one-time invocation of the word "penalty," because the remainder of the relevant provisions in § 5000A uses the same term over and over again, without exception and without ever describing the penalty as a "tax." *See, e.g.*, *id*. § 5000A(b)(3)(B) (individual "with respect to whom a *penalty* is imposed by this section" who files joint tax return "shall [along with individual's spouse] be jointly liable for such *penalty*" (emphasis added)); *id*. § 5000A(c)(1) (describing "[t]he amount of the *penalty* imposed by this section on any taxpayer for any taxable year" (emphasis added)); *id*. § 5000A(c)(2) (describing "the monthly *penalty* amount with respect to any taxpayer" (emphasis added)); *id*. § 5000A(g)(1) ("The *penalty* provided by this section shall be paid upon notice and demand by the Secretary . . . ." (emphasis added)); *id*. § 5000A(g)(2)(A) (providing that taxpayer "shall not be subject to any criminal prosecution or penalty" for failure "to timely pay any *penalty* imposed by this section" (emphasis added)); *id.* § 5000A(g)(2)(B) (providing that the Secretary shall not "file notice of lien" or "levy" on "any property of a taxpayer by reason of any failure to pay the *penalty* imposed by this section" (emphasis added)).

Thus, the text of the individual mandate unambiguously provides that it imposes a *penalty*. The penalty encourages compliance with the Act's requirement to obtain "minimum essential coverage" by imposing a monetary sanction on

176

conduct that violates that requirement. The text is not unclear and was carefully selected to denote a specific meaning. As the Supreme Court most recently recognized in *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 116 S. Ct. 2106 (1996), "'[a] tax is an enforced contribution to provide for the support of government; a penalty . . . is an exaction imposed by statute as punishment for an unlawful act.'" *Id.* at 224, 116 S. Ct. at 2113 (quoting *La Franca*, 282 U.S. at 572, 51 S. Ct. at 280). The Court further expounded upon *La Franca*: "We take *La Franca*'s statement of the distinction [between a tax and penalty] to be sufficient for the decision of this case; if the concept of penalty means anything, it means punishment for an unlawful act or omission. . . ." *Id*.; *see also Dep't of Revenue of Mont. v. Kurth Ranch*, 511 U.S. 767, 779–80, 114 S. Ct. 1937, 1946 (1994) ("Whereas fines, penalties, and forfeitures are readily characterized as sanctions, taxes are typically different because they are usually motivated by revenue-raising, rather than punitive, purposes."). It is clear that the terms "tax" and "penalty" "are not interchangeable one for the other . . . . and if an exaction be clearly a penalty it cannot be converted into a tax by the simple expedient of calling it such." *La Franca*, 282 U.S. at 572, 51 S. Ct. at 280.

## B. Designation of Numerous Other Provisions in the Act as "Taxes"

We add the truism that Congress knows full well how to enact a tax when it

chooses to do so. And the Act contains several provisions that are unmistakably taxes. The point is amply made by simply looking at four different provisions: (1) an Excise Tax on Medical Device Manufacturers, 26 U.S.C. § 4191(a) ("There is hereby imposed on the sale of any taxable medical device by the manufacturer, producer, or importer a *tax* equal to 2.3 percent of the price for which so sold." (emphasis added)); (2) an Excise Tax on High Cost Employer-Sponsored Health Coverage, *id*. § 4980I(a)(1)–(2) (if an employee receives "excess benefit," as defined in the statute, from employer-sponsored health coverage, "there is hereby imposed a *tax* equal to 40 percent of the excess benefit" (emphasis added)); (3) an Additional Hospital Insurance Tax for High-Income Taxpayers, amending *id*. § 3101(b) (as part of Federal Insurance Contributions Act, providing that "there is hereby imposed on the income of every individual a *tax* equal to 1.45 percent of the wages . . . received by him with respect to employment" (emphasis added));[130] and (4) an Excise Tax on Indoor Tanning Services, *id*. § 5000B(a) ("There is hereby imposed on any indoor tanning service a *tax* equal to 10 percent of the amount paid for such service . . . whether paid by insurance or otherwise" (emphasis added)).

---

[130]Indeed, this provision, which takes effect in 2013, is a 0.9% flat tax increase on an individual's wages, applicable to those earning annual wages over $200,000 ($250,000 in the case of a jointly-filed return, or $125,000 in the case of a married taxpayer filing a separate tax return). Act §§ 9015(a)(1), 10906(a), (c); HCERA, Pub. L. No. 111-152, § 1402(b)(1)(A), (3), 124 Stat. 1029, 1063 (2010), to be codified in 26 U.S.C. § 3101(b) (effective Jan. 1, 2013).

It is an unremarkable matter of statutory construction that we presume Congress did not indiscriminately use the term "tax" in some provisions but not in others. *See Duncan v. Walker*, 533 U.S. 167, 173, 121 S. Ct. 2120, 2125 (2001) ("It is well settled that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation marks and alteration omitted)). We have little difficulty concluding that Congress intended § 5000A to operate as a penalty.

The very nature of congressional findings about the individual mandate further amplifies that Congress designed and intended to design a penalty for the failure to comply and not a tax. The source of the power, asserted by Congress, to create the mandate is directly pegged to the Commerce Clause. *See, e.g.*, 42 U.S.C. § 18091(a)(1) ("The individual responsibility requirement provided for in this section . . . is commercial and economic in nature, and substantially affects interstate commerce . . . ."); *id*. § 18091(a)(2)(B) ("Health insurance and health care services are a significant part of the national economy. . . . Private health insurance spending . . . pays for medical supplies, drugs, and equipment that are shipped in interstate commerce. Since most health insurance is sold by national or regional health insurance companies, health insurance is sold in interstate commerce and

179

claims payments flow through interstate commerce.").

Indeed, the findings make clear that the goal of the individual mandate is not to raise revenue for the public fisc, but rather to, among other things, reduce the number of the uninsured and to create what Congress perceived to be effective health insurance markets that make health insurance more widely available. *Id*. § 18091(a)(2)(C)–(I); *see also id*. § 18091(a)(2)(J) ("The requirement is essential to creating effective health insurance markets that do not require underwriting and eliminate its associated administrative costs.").

The argument that Congress need not employ the label of "tax" or expressly invoke the Taxing and Spending Clause in order to enact a valid tax is surely true, insofar as it goes. *See Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144, 68 S. Ct. 421, 424 (1948) ("[T]he constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise."). The problem with the claim, however, is not that Congress simply failed to use the term "tax," or declined to invoke the Taxing and Spending Clause when explaining the constitutional basis for enacting the individual mandate. Rather, Congress repeatedly told us that the individual mandate is a "penalty" and expressly invoked its Commerce Clause power as the foundation for the mandate. The two are not the same thing. Ultimately, we are hard pressed to construe the statute in a manner that

180

would require us to ignore the plain text of the statute, the words repeatedly employed by Congress, well-settled principles of statutory construction, and well-settled law emphasizing the substantive distinction between a tax and a penalty.

## C.     Legislative History of the Individual Mandate

Even if the text were unclear—although it is not—and we were to resort to an examination of the legislative history, we would still find more of the same thing: Congress intended to impose a penalty for the failure to maintain health insurance.

Prior to the passage of the Act, earlier bills in both houses of Congress proposed an individual mandate accompanied by a "tax," as the district court noted. *See Florida v. HHS*, 716 F. Supp. 2d at 1134. Thus, for example, Section 401 of the "America's Affordable Choices Act of 2009," H.R. 3200, 111th Cong. (2009), which was introduced in the House of Representatives on July 14, 2009, provided that "there is hereby imposed a tax" on "any individual who does not meet the requirements of [maintaining minimum health insurance coverage] at any time during the taxable year." A later version of the House bill, the "Affordable Health Care for America Act," H.R. 3962, 111th Cong. § 501 (2009), passed the House of Representatives on November 7, 2009, and similarly referred to the individual mandate's enforcement mechanism as a "tax." On the Senate side, the "America's

Healthy Future Act," a precursor to the Act, also used the term "tax." *See* S. 1796, 111th Cong. § 1301 (2009) ("If an applicable individual fails to [maintain minimum health insurance coverage] there is hereby imposed a tax. . . .").

Notably, however, the final version of the Act abandoned the term "tax" in favor of the term "penalty." This is no mere semantic distinction, as "[f]ew principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded *in favor of other language*." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43, 107 S. Ct. 1207, 1218 (1987) (emphasis added) (quotation marks omitted).

The government relies on different pieces of the legislative history, particularly the statements of individual legislators, speaking both for and against the Act, who at various times referred to the individual mandate as a "tax." *See* Government's Opening Br. at 54 (citing 156 Cong. Rec. H1854, H1882 (daily ed. Mar. 21, 2010) (statement of Rep. Miller); 156 Cong. Rec. H1824, H1826 (daily ed. Mar. 21, 2010) (statement of Rep. Slaughter); 155 Cong. Rec. S13,751, S13,753 (daily ed. Dec. 22, 2009) (statement of Sen. Leahy); 155 Cong. Rec. S13,558, S13,581–82 (daily ed. Dec. 20, 2009) (statement of Sen. Baucus); 155 Cong. Rec. S12,768 (daily ed. Dec. 9, 2009) (statement of Sen. Grassley)). These assorted statements of individual legislators are of precious little value, because

they are in conflict with the plain text of the statute and with more reliable indicators of congressional intent. *See Huff v. DeKalb Cnty., Ga.*, 516 F.3d 1273, 1280 (11th Cir. 2008) ("'The best evidence of [legislative] purpose is the statutory text adopted by both Houses of Congress and submitted to the President. Where that contains a phrase that is unambiguous—that has a clearly accepted meaning in both legislative and judicial practice—we do not permit it to be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process.'" (alteration in original) (quoting *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98–99, 111 S. Ct. 1138, 1147 (1991))).

The government argues nevertheless that the individual mandate is still "a tax in both administration and effect." Government's Opening Br. at 54. It claims that in "passing on the constitutionality of a tax law," we should be "concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it." *Id*. (quoting *Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359, 363, 61 S. Ct. 586, 588 (1941)). That the individual mandate will produce some revenue and will be enforced by the Internal Revenue Service is enough, they say, to transmute the individual mandate's penalty provision into a tax.

We remain unpersuaded. Even on the government's own terms, the

individual mandate does not in "practical operation" act as a tax. *See Nelson*, 312

U.S. at 363, 61 S. Ct. at 588. The government specifically claims that the individual

mandate has the character of a tax because it will produce revenue. This

argument—which relies on undisputed projections by the CBO that the individual

mandate will generate some four to five billion dollars in annual revenue by the

end of this decade[131]—does little to address the distinction between a penalty and a

tax. This is because "[c]riminal fines, civil penalties, civil forfeitures, and taxes all

share certain features: They generate government revenues, impose fiscal burdens

on individuals, and deter certain behavior." *Kurth Ranch*, 511 U.S. at 778, 114 S.

Ct. at 1945. The Supreme Court has thus recognized, as indeed we must, that in our

world of less than perfect compliance, penalties generate revenue just as surely as

taxes.

Nor does the amount of projected revenue that will be collected under the

individual mandate—a significant sum, to be sure—render the mandate a tax. The

Supreme Court has never understood the *amount* of revenue generated by a

statutory provision to have definitional value. In *Sonzinsky*, the Court considered a

converse of the situation we face here, where a provision imposing a "$200 annual

---

[131]CBO, *Payments of Penalties for Being Uninsured Under the Patient Protection and Affordable Care Act* 3 (rev. Apr. 30, 2010) [hereinafter CBO, *Payments*], *available at* http://www.cbo.gov/ftpdocs/113xx/doc11379/Individual_Mandate_ Penalties-04-30.pdf.

license tax" on firearms dealers was challenged as "not a true tax, but a penalty imposed for the purpose of suppressing traffic in a certain noxious type of firearms." 300 U.S. at 511–12, 57 S. Ct. at 554–55. The tax was "productive of some revenue," but not much. *Id.* at 514 & n.1, 57 S. Ct. at 556 & n.1 (observing that 27 dealers paid the tax in 1934, and 22 paid in 1935). That did not stop the Supreme Court from upholding the provision as a tax. The Supreme Court later interpreted *Sonzinsky* as standing for the proposition that "a tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed," and that proposition "applies even though *the revenue obtained is obviously negligible*." *Sanchez*, 340 U.S. at 44, 71 S. Ct. at 110 (emphasis added).

While the government views these cases as supportive of its argument, because they demonstrate the breadth of Congress's taxing power, the cases merely hold "that an Act of Congress which *on its face* purports to be an exercise of the taxing power is not any the less so because the tax is burdensome or tends to restrict or suppress the thing taxed." *Sonzinsky*, 300 U.S. at 513, 57 S. Ct. at 556 (emphasis added). Thus, once Congress has expressly and unmistakably indicated that a provision is a tax, courts will not "[i]nquir[e] into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it." *Id.* at 513–14; 57 S. Ct. at 556. But that is not this case. Here we confront a statute that is

185

not "on its face" a tax, but rather a penalty. What's more, the district court correctly noted that the government lacks any case precedent squarely on point. *Florida v. HHS*, 716 F. Supp. 2d at 1140.

Even ignoring Congress's deliberate choice of the term "penalty," the individual mandate on its face imposes a monetary sanction on an individual who "fails to meet the requirement" to maintain "minimum essential coverage." 26 U.S.C. § 5000A(b)(1). As we see it, such an exaction appears in every important respect to be "punishment for an unlawful act or omission," which defines the very "concept of penalty." *CF & I Fabricators*, 518 U.S. at 224, 116 S. Ct. at 2113; *see also Virginia v. Sebelius*, 728 F. Supp. 2d at 786 ("The only revenue generated under the [individual mandate] is incidental to a citizen's failure to obey the law by requiring the minimum level of insurance coverage. The resulting revenue is 'extraneous to any tax need.'" (quoting *Kahriger*, 345 U.S. at 31, 73 S. Ct. at 515)).

The government also suggests that the individual mandate operates as a tax because it is housed in the Internal Revenue Code and is collected through taxpayers' annual returns. It is true that the individual mandate is located under the section of the Code titled "Miscellaneous Excise Taxes." Yet the Code itself makes clear that Congress's choice of where to place a provision in the Internal Revenue Code has no interpretive value: "No inference, implication, or presumption of

legislative construction shall be drawn or made by reason of the location or grouping of any particular section or provision or portion of this title. . . ." 26 U.S.C. § 7806(b); *see also Florida v. HHS*, 716 F. Supp. 2d at 1137 (citing same).

More significantly, not every provision in the Internal Revenue Code is a tax. Indeed, Congress placed in Chapter 68 of the Internal Revenue Code a panoply of civil *penalties*, running the gamut from broadly applicable (filing frivolous tax returns[132] or making unreasonable erroneous claims for a tax refund or credit[133]) to highly industry-specific (tampering with or failing to maintain security requirements for mechanical dye injection systems,[134] or selling or reselling adulterated diesel fuel that violates environmental standards[135]). In addition, the mandate's penalty is not treated like a tax because, as noted above, the IRS may not

---

[132]*See* 26 U.S.C. § 6702(a) (imposing "penalty of $5,000" on person who files "what purports to be a return of a tax imposed by this title" which either lacks "information on which the substantial correctness of the self-assessment may be judged" or "contains information that on its face indicates that the self-assessment is substantially incorrect").

[133]*See* 26 U.S.C. § 6676(a) ("If a claim for refund or credit with respect to income tax . . . is made for an excessive amount, unless it is shown that the claim for such excessive amount has a reasonable basis, the person making such claim shall be liable for a penalty in an amount equal to 20 percent of the excessive amount.").

[134]*See* 26 U.S.C. § 6715A(a)(1) ("If any person tampers with a mechanical dye injection system used to indelibly dye fuel . . . such person shall pay a penalty in addition to the tax (if any)."). The penalty is the greater of $25,000 or $10 for each gallon of fuel involved. *Id.* § 6715A(b)(1).

[135]*See* 26 U.S.C. § 6720A (imposing "penalty of $10,000" for each violation, "in addition to the tax on such [fuel]").

place liens, or levy or initiate criminal prosecution or impose any interest or criminal sanctions. All the IRS, practically speaking, may do is to offset the penalty against a tax refund. 26 U.S.C. § 5000A(g)(2)(A)–(B).

Although it is irrelevant for our purposes precisely where in the Internal Revenue Code Congress decided to place the individual mandate, *id.* § 7806(b), we observe that other chapters of the Internal Revenue Code include *penalty* provisions as well. *See, e.g.*, *id*. § 5761(a) (imposing "a penalty of $1,000" on any person—primarily manufacturers, importers, and retailers—who willfully fails to comply with a variety of statutory duties and taxes under Chapter 52 of the Internal Revenue Code related to tobacco products and cigarettes). And Chapter 75 of the Internal Revenue Code sets forth criminal penalties, which permit courts to impose substantial fines. *Id*. § 7206 (providing that those who commit tax fraud in a variety of ways "shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution"). While the entire list of penalties in the Internal Revenue Code is far too long to exhaust here, it is apparent that the placement of the individual mandate in the Internal Revenue Code is far from sufficient to convert the individual mandate into a "tax" and has limited value, if any at all, in determining whether the individual mandate is a tax

or a penalty.

After careful review of the statute, we conclude that the individual mandate is a civil regulatory penalty and not a tax. As a regulatory penalty, the individual mandate must therefore find justification in a different enumerated power. *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 393, 60 S. Ct. 907, 912 (1940) ("Congress may impose penalties in aid of the exercise of any of its enumerated powers."); *Virginia v. Sebelius*, 728 F. Supp. 2d at 788; *Florida v. HHS*, 716 F. Supp. 2d at 1143–44.

The individual mandate as written cannot be supported by the tax power.

## VII. SEVERABILITY

We now turn to whether the individual mandate, found in 26 U.S.C. § 5000A, can be severed from the remainder of the 975-page Act.

### A. Governing Principles

In analyzing this question, we start with the settled premise that severability is fundamentally rooted in a respect for separation of powers and notions of judicial restraint. *See Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329–30, 126 S. Ct. 961, 967–68 (2006). Courts must "strive to salvage" acts of Congress by severing any constitutionally infirm provisions "while leaving the remainder intact." *Id.* at 329, 126 S. Ct. at 967–68. "[T]he presumption is in favor of

severability." *Regan v. Time, Inc.*, 468 U.S. 641, 653, 104 S. Ct. 3262, 3269 (1984).

In the overwhelming majority of cases, the Supreme Court has opted to sever the constitutionally defective provision from the remainder of the statute. *See, e.g., Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. __, __, 130 S. Ct. 3138, 3161–62 (2010) (holding tenure provision severable from Sarbanes-Oxley Act); *New York v. United States*, 505 U.S. at 186–187, 112 S. Ct. at 2434 (holding take-title provision severable from Low-Level Radioactive Waste Policy Amendments Act of 1985); *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684–97, 107 S. Ct. 1476, 1479–86 (1987) (holding legislative veto provision severable from Airline Deregulation Act of 1978); *Chadha*, 462 U.S. at 931–35, 103 S. Ct. at 2774–76 (holding legislative veto provision severable from Immigration and Nationality Act); *Buckley v. Valeo*, 424 U.S. 1, 108–09, 96 S. Ct. 612, 677 (1976) (holding campaign expenditure limits severable from public financing provisions in Federal Election Campaign Act of 1971).[136]

Indeed, in the Commerce Clause context, the Supreme Court struck down an

---

[136]The paucity of case law supporting the plaintiffs' severability position is underscored by the lack of citation to any modern case where the Supreme Court found a legislative act inseverable. Indeed, the most recent such case cited by the plaintiffs was decided over 75 years ago, before modern severability law had even been established. *See* Private Plaintiffs' Br. at 59–62 (citing *R.R. Ret. Bd. v. Alton R. Co.*, 295 U.S. 330, 55 S. Ct. 758 (1935); *Williams v. Standard Oil Co.*, 278 U.S. 235, 49 S. Ct. 115 (1929); *Pollock v. Farmers' Loan & Trust Co.*, 158 U.S. 601, 15 S. Ct. 912 (1895), *superseded by* U.S. CONST. amend. XVI).

important provision of a statute and left the remainder of the statute intact. In *Morrison*, the Court invalidated only one provision—the civil remedies provision for victims of gender-based violence. *Morrison*, 529 U.S. at 605, 627, 120 S. Ct. at 1747, 1759. The Supreme Court did not invalidate the entire VAWA—or the omnibus Violent Crime Control and Law Enforcement Act of 1994, of which it was part—even though the text of the two bills did not contain a severability clause.

As these cases amply demonstrate, the Supreme Court has declined to invalidate more of a statute than is absolutely necessary. Rather, "when confronting a constitutional flaw in a statute, we try to limit the solution to the problem." *Ayotte*, 546 U.S. at 328, 126 S. Ct. at 967. Because "[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people," courts should "act cautiously" and "refrain from invalidating more of the statute than is necessary." *Regan*, 468 U.S. at 652, 104 S. Ct. at 3269.

The Supreme Court's test for severability is "well-established": "Unless it is *evident* that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is *fully operative as a law*." *Alaska Airlines*, 480 U.S. at 684, 107 S. Ct. at 1480 (quotation marks omitted) (emphasis added). As the Supreme Court remarked in *Chadha*, divining legislative intent in the absence of a

severability or non-severability clause can be an "elusive" enterprise. 462 U.S. at 932, 103 S. Ct. at 2774.

## B.    Wholesale Invalidation

Applying these principles, we conclude that the district court erred in its decision to invalidate the entire Act. Excising the individual mandate from the Act does not prevent the remaining provisions from being "fully operative as a law." As our exhaustive review of the Act's myriad provisions in Appendix A demonstrates, the lion's share of the Act has nothing to do with private insurance, much less the mandate that individuals buy insurance. While such wholly unrelated provisions are too numerous to bear repeating, representative examples include provisions establishing reasonable break time for nursing mothers, 29 U.S.C. § 207(r); epidemiology-laboratory capacity grants, 42 U.S.C. § 300hh-31; an HHS study on urban Medicare-dependent hospitals, *id.* § 1395ww note; restoration of funding for abstinence education, *id.* § 710; and an excise tax on indoor tanning salons, 26 U.S.C. § 5000B.

In invalidating the entire Act, the district court placed undue emphasis on the Act's lack of a severability clause. *See Florida ex rel. Bondi v. HHS*, No. 3:10-CV-91-RV/EMT, __ F. Supp. 2d __, 2011 WL 285683, at *35–36 (N.D. Fla. Jan. 31, 2011). Supreme Court precedent confirms that the "ultimate determination of

severability will rarely turn on the presence or absence of such a clause." *United States v. Jackson*, 390 U.S. 570, 585 n.27, 88 S. Ct. 1209, 1218 n.27 (1968). Rather, "Congress' silence is just that—silence—and does not raise a presumption against severability." *Alaska Airlines*, 480 U.S. at 686, 107 S. Ct. at 1481.

Nevertheless, the district court emphasized that an early version of Congress's health reform bill did contain a severability clause. Congress's failure to include such a clause in the final bill, the district court reasoned, "can be viewed as strong evidence that Congress recognized the Act could not operate *as intended* without the individual mandate." *Florida v. HHS*, 2011 WL 285683, at *36. The district court pushes this inference too far.

First, both the Senate and House legislative drafting manuals state that, in light of Supreme Court precedent in favor of severability, severability clauses are unnecessary unless they specifically state that all or some portions of a statute should *not* be severed. *See* Office of Legislative Counsel, U.S. Senate, *Legislative Drafting Manual*, § 131 (Feb. 1997) (providing that "a severability clause is unnecessary" but distinguishing a "nonseverability clause," which "provides that if a specific portion of an Act is declared invalid, the whole Act or some portion of the Act shall be invalid"); Office of Legislative Counsel, U.S. House of Representatives, *House Legislative Counsel's Manual on Drafting Style*, § 328

(Nov. 1995) (stating that "a severability clause is unnecessary unless it provides in detail which related provisions are to fall, and which are not to fall, if a specified key provision is held invalid").

Second, the clause present in one early version of the Act was a general severability clause, not a non-severability clause. *See* H.R. Rep. No 111-299, pt. 3, at 17 § 155 (2009), *reprinted in* 2010 U.S.C.C.A.N. 474, 537 ("If any provision of this Act . . . is held to be unconstitutional, the remainder of the provisions of this Act . . . shall not be affected."). Thus, according to Congress's own drafting manuals, the severability clause was unnecessary, and its removal should not be read as any indicator of legislative intent *against* severability. Rather, the removal of the severability clause, in short, has no probative impact on the severability question before us.

In light of the stand-alone nature of hundreds of the Act's provisions and their manifest lack of connection to the individual mandate, the plaintiffs have not met the heavy burden needed to rebut the presumption of severability. We therefore conclude that the district court erred in its wholesale invalidation of the Act.

## C.    Severability of Individual Mandate from Two Insurance Reforms

The severability inquiry is not so summarily answered, however, with

respect to two of the private insurance industry reforms.[137] The two reforms are: guaranteed issue, 42 U.S.C. § 300gg-1 (effective Jan. 1, 2014); and the prohibition on preexisting condition exclusions, *id.* § 300gg-3.

Our pause over the severability of these two reforms is due to the fact that the congressional findings speak in broad, general terms except in one place that states, as noted earlier, that the individual mandate "is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." *Id.* § 18091(a)(2)(I). The findings in that paragraph add that if there were no mandate, "many individuals would wait to purchase health insurance until they needed care."[138] *Id.*

As discussed earlier, a significant number of the uninsured with preexisting conditions voluntarily tried to buy insurance but were denied coverage or had those

---

[137]For ease of discussion, we refer to those two provisions collectively as the "two reforms."

[138]Section 18091(a)(2)(I) provides, in its entirety:
Under sections 2704 and 2705 of the Public Health Service Act (as added by section 1201 of this Act) [to be codified in 42 U.S.C. §§ 300gg-3, 300gg-4], if there were no requirement, many individuals would wait to purchase health insurance until they needed care. By significantly increasing health insurance coverage, the requirement, together with the other provisions of this Act, will minimize this adverse selection and broaden the health insurance risk pool to include healthy individuals, which will lower health insurance premiums. The requirement is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold.
42 U.S.C. § 18091(a)(2)(I).

195

conditions excluded, resulting in uncompensated health care consumption and cost-shifting. Congress also found that insurers' $90 billion in underwriting costs in identifying unhealthy entrants represented 26% to 30% of premium costs. *Id.* § 18091(a)(2)(J). The two reforms reduce the number of the uninsured and underwriting costs by guaranteeing issue and prohibiting preexisting condition exclusions. To benefit consumers, Congress has improved health insurance products and required insurers to cover consumers who need their products the most.

It is not uncommon that government regulations beneficial to consumers impose additional costs on the industry regulated. These two reforms obviously have significant negative effects on the business costs of insurers because they require insurers to accept unhealthy entrants, raising insurers' costs. The individual mandate, in part, seeks to mitigate the reforms' costs on insurers by requiring the healthy to buy insurance and pay premiums to insurers to subsidize the insurers' costs in covering the unhealthy. Further, if there were no mandate, the argument goes, the healthy people can wait until they are sick to obtain insurance, knowing they could not then be turned away.[139]

---

[139]When a medical need arises, individuals cannot literally purchase insurance on the way to the hospital. Rather, the Act permits insurers to restrict enrollment to a specific open or special enrollment period. 42 U.S.C. § 300gg-1(b) (effective Jan. 1, 2014). Individuals therefore must wait for an enrollment period. And once an individual applies for insurance, the Act allows up to

In this regard, our severability concern is not over whether the two reforms can "fully operate as a law." They can. Rather, our severability concern is only whether "it is evident" that Congress "would not have enacted" the two insurance reforms *without* the individual mandate. *Alaska Airlines*, 480 U.S. at 684, 107 S. Ct. at 1480.

At the outset, we note that Congress could easily have included in the Act a non-severability clause stating that the individual mandate should not be severed from the two reforms. Under the legislative drafting manuals, the one instance in which a severability clause is important is where "it provides in detail which related provisions are to fall, and which are not to fall, if a specified key provision is held invalid." Office of Legislative Counsel, U.S. House of Representatives, *House Legislative Counsel's Manual on Drafting Style*, § 328; *accord* Office of Legislative Counsel, U.S. Senate, *Legislative Drafting Manual*, § 131. Congress did not include any such non-severability clause in the Act, however.

It is also telling that none of the insurance reforms, including even guaranteed issue and coverage of preexisting conditions, contain any cross-reference to the individual mandate or make their implementation dependent on the mandate's continued existence. *See United States v. Booker*, 543 U.S. 220, 260,

---

a 90-day waiting period for group coverage eligibility. *Id.* § 300gg-7 (effective Jan. 1, 2014). We can find no limit in the Act on the waiting period insurers can have in the individual market.

197

125 S. Ct. 738, 765 (2005) (stating that 18 U.S.C. § 3742(e) "contains critical cross-references to the (now-excised) § 3553(b)(1) and consequently must be severed and excised for similar reasons"); *Alaska Airlines*, 480 U.S. at 688–89, 107 S. Ct. at 1482 ("Congress did not link specifically the operation of the first-hire provisions to the issuance of regulations."). Indeed, § 300gg-3's prohibition on preexisting condition exclusions was implemented in 2010 with respect to enrollees under 19, despite the individual mandate not taking effect until 2014. This is a far cry from cases where the Supreme Court has ruled provisions inseverable because it would require courts to engage in quasi-legislative functions in order to preserve the provisions. *See, e.g., Randall v. Sorrell*, 548 U.S. 230, 262, 126 S. Ct. 2479, 2500 (2006) (declining to sever Vermont's campaign finance contribution limits because doing so "would require [the Court] to write words into the statute"); *see also Free Enter. Fund*, 561 U.S. at __, 130 S. Ct. at 3162 (cautioning courts against "blue-pencil[ing]").

"[T]he remedial question we must ask" is "which alternative adheres more closely to Congress' original objective" in passing the Act: (1) the Act without the individual mandate but otherwise intact; or (2) the Act without the individual mandate and also without these two insurance reforms. *See Booker*, 543 U.S. at 263, 125 S. Ct. at 766–67.

198

As discussed earlier, a basic objective of the Act is to make health insurance coverage accessible and thereby to reduce the number of uninsured persons. *See, e.g.*, 42 U.S.C. § 18091(a)(2) (stating the Act will "increase the number and share of Americans who are insured" and "significantly reduc[e] the number of the uninsured"). Undoubtedly, the two reforms seek to achieve those objectives. All other things being equal, then, a version of the Act that contains these two reforms would hew more closely to Congress's likely intent than one that lacks them.

But without the individual mandate, not all things are equal. We must therefore look to the consequences of the individual mandate's absence on the two reforms. *See Booker*, 543 U.S. at 260, 125 S. Ct. at 765 (considering whether excision of one part of statute would "pose a critical problem"); *Regan*, 468 U.S. at 653, 104 S. Ct. at 3269 (asking whether "the policies Congress sought to advance by enacting § 504 can be effectuated even though the purpose requirement is unenforceable"). In doing so, several factors loom large.

First, the Act retains many other provisions that help to accomplish some of the same objectives as the individual mandate. *See Booker*, 543 U.S. at 264, 125 S. Ct. at 767 ("The system remaining after excision, while lacking the mandatory features that Congress enacted, retains other features that help to further these objectives."); *New York v. United States*, 505 U.S. at 186, 112 S. Ct. at 2434

199

("Common sense suggests that where Congress has enacted a statutory scheme for an obvious purpose, and where Congress has included a series of provisions operating as incentives to achieve that purpose, the invalidation of one of the incentives should not ordinarily cause Congress' overall intent to be frustrated.").

For example, Congress included other provisions in the Act, apart from and independent of the individual mandate, that also serve to reduce the number of the uninsured by encouraging or facilitating persons (including the healthy) to purchase insurance coverage. These include: (1) the extensive health insurance reforms; (2) the new Exchanges; (3) federal premium tax credits, 26 U.S.C. § 36B; (4) federal cost-sharing subsidies, 42 U.S.C. § 18071; (5) the requirement that Exchanges establish an Internet website to provide consumers with information on insurers' plans, *id.* § 18031(d)(4)(D); (6) the requirement that employers offer insurance or pay a penalty, 26 U.S.C. § 4980H; and (7) the requirement that certain large employers automatically enroll new and current employees in an employer-sponsored plan unless the employee opts out, 29 U.S.C. § 218A, just to name a few.

Second, the individual mandate has a comparatively limited field of operation vis-à-vis the number of the uninsured. In *Alaska Airlines*, the Supreme Court found that the unconstitutional legislative veto provision of the Airline Deregulation Act (permitting Congress to veto the Labor Secretary's implementing

200

regulations) was severable because, among other things, the statute left "little of substance to be subject to a veto." 480 U.S. at 687, 107 S. Ct. at 1481. The Supreme Court noted the "ancillary nature" of the Labor Secretary's obligations and the "limited substantive discretion" afforded the Secretary.[140] *Id.* at 688, 107 S. Ct. at 1482. Thus, the limited field of operation of an unconstitutional statutory provision furnishes evidence that Congress likely would have enacted the statute without it. *Cf. Booker*, 543 U.S. at 249, 125 S. Ct. at 759 (considering whether "the scheme that Congress created" would be "so transform[ed] . . . that Congress likely would not have intended the Act as so modified to stand").

Here, as explained above, the operation of the individual mandate is limited by its three exemptions, its five exceptions to the penalty, and its stripping the IRS of tax liens, interests, or penalties and leaving virtually no enforcement mechanism. Even with the mandate, a healthy individual can pay a penalty and wait until becoming sick to purchase insurance.

Further, the individual mandate's operation and effectiveness are limited by

---

[140]The Supreme Court stated:

> With this subsidiary role allotted to the Secretary, the veto provision could affect only the relatively insignificant actions he might take in connection with the duty-to-hire program. There is thus little reason to believe that Congress contemplated the possibility of vetoing any of these actions and one can infer that Congress would have been satisfied with the duty-to-hire provisions even without preserving the opportunity to veto the DOL's regulations.

*Alaska Airlines*, 480 U.S. at 688, 107 S. Ct. at 1482 (footnote omitted).

201

the fact that, although the individual mandate requires individuals to obtain insurance coverage, the mandate itself does not require them to obtain the "essential health benefits package" or, indeed, any particular level of benefits at all. Although the chosen term "minimum essential coverage" appears to suggest otherwise, when the lofty veneer of the term is stripped away, one finds that the actual "coverage" the individual mandate deems "essential" is nothing more than coverage "essential" to satisfying the individual mandate.

The multiple features of the individual mandate all serve to weaken the mandate's practical influence on the two insurance product reforms.[141] They also weaken our ability to say that Congress considered the individual mandate's existence to be a *sine qua non* for passage of these two reforms. There is tension, at least, in the proposition that a mandate engineered to be so porous and toothless is such a linchpin of the Act's insurance product reforms that they were clearly not intended to exist in its absence.

We are not unmindful of Congress's findings about the individual mandate. But in the end, they do not tip the scale away from the presumption of severability. As observed above, the findings in § 18091(a)(2) track the language of the

---

[141]Studies by the CBO bear this out. Even with the individual mandate, the CBO estimates that in 2016, there will still be more than 21 million non-elderly persons who remain uninsured, the majority of whom will not be subject to the penalty. *See* CBO, *Payments*, *supra* note 131, at 1.

Supreme Court's Commerce Clause decisions. But the severability inquiry is separate, and very different, from the constitutional analysis. The congressional language respecting Congress's constitutional authority does not govern, and is not particularly relevant to, the different question of severability (which focuses on whether Congress would have enacted the Act's *other insurance market reforms* without the individual mandate).

An example makes the point. Section 18091(a)(2)(H) of the same congressional findings provides:

> Under the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1001 et seq.), the Public Health Service Act (42 U.S.C. 201 et seq.), and this Act, the Federal Government has a significant role in regulating health insurance. The requirement is an essential part of this larger regulation of economic activity, and the absence of the requirement would undercut Federal regulation of the health insurance market.

42 U.S.C. § 18091(a)(2)(H). By its text, § 18091(a)(2)(H) states that the individual mandate is essential to "this larger regulation of economic activity"—that is, "regulating health insurance," which it does through ERISA and the Public Health Service Act. If applied to severability, this would mean that Congress intended the individual mandate to be "essential" to, and thus inseverable from, ERISA (enacted in 1974) and the entire Public Health Service Act (or at least all parts of those statutes that regulate health insurance). This is an absurd result for which no party

argues.[142]

These congressional findings do not address the one question that is relevant to our severability analysis: whether Congress would not have enacted the two reforms *but for* the individual mandate. Just because the invalidation of the individual mandate may render these provisions *less desirable*, it does not ineluctably follow that Congress would find the two reforms *so* undesirable without the mandate as to prefer not enacting them at all. The fact that one provision may have an impact on another provision is not enough to warrant the inference that the provisions are inseverable. This is particularly true here because the reforms of health insurance help consumers who need it the most.

In light of all these factors, we are not persuaded that it is *evident* (as opposed to possible or reasonable) that Congress would not have enacted the two reforms in the absence of the individual mandate.[143] In so concluding, we are

---

[142]A second illustration of the danger in relying too much on these statements in isolation is that the same congressional findings also state—not once, but six times—that the individual mandate operates "*together with the other provisions of this Act*" to reduce the number of the uninsured, lower health insurance premiums, improve financial security for families, minimize adverse selection, and reduce administrative costs. *See* 42 U.S.C. § 18091(a)(2)(C), (E), (F), (G), (I), (J) (emphasis added). Congress itself states that *all* the provisions of the Act operate together to achieve its goals. On this reasoning, the entire Act would be invalidated along with the individual mandate. As discussed above, this conclusion is invalid.

[143]While we discuss the two reforms specifically, our conclusion—that the individual mandate is severable—is the same as to the other insurance product reforms, such as community rating and discrimination based on health status.

mindful of our duty to "refrain from invalidating more of the statute than is necessary."[144] *Regan*, 468 U.S. at 652, 104 S. Ct. at 3269; *see also Booker*, 543 U.S. at 258–59, 125 S. Ct. at 764 ("[W]e must retain those portions of the Act that are (1) constitutionally valid, (2) capable of functioning independently, and (3) consistent with Congress' basic objectives in enacting the statute." (quotation marks and citations omitted)). And where it is not evident Congress would not have enacted a constitutional provision without one that is unconstitutional, we must allow any further—and perhaps even necessary—alterations of the Act to be rendered by Congress as part of that branch's legislative and political prerogative. *See Free Enter. Fund*, 561 U.S. at __, 130 S. Ct. at 3162 ("[S]uch editorial freedom—far more extensive than our holding today—belongs to the Legislature, not the Judiciary. Congress of course remains free to pursue any of these options going forward."). We therefore sever the individual mandate from the remaining sections of the Act.

## VIII. CONCLUSION

---

[144]We acknowledge that the government, in arguing for the individual mandate's constitutionality, stated summarily that the individual mandate cannot be severed from the Act's guaranteed issue and community rating provisions because the individual mandate "is integral to those sections that . . . provide that insurers must extend coverage and set premiums without regard to pre-existing medical conditions." Government's Reply Br. at 58. But as explained above, whether a statutory provision is "integral" or "essential" to other provisions for Commerce Clause analytical purposes is a question distinct from severability. And in any event, the touchstone of severability analysis is legislative intent, not arguments made during litigation.

We first conclude that the Act's Medicaid expansion is constitutional. Existing Supreme Court precedent does not establish that Congress's inducements are unconstitutionally coercive, especially when the federal government will bear nearly all the costs of the program's amplified enrollments.

Next, the individual mandate was enacted as a regulatory penalty, not a revenue-raising tax, and cannot be sustained as an exercise of Congress's power under the Taxing and Spending Clause. The mandate is denominated as a penalty in the Act itself, and the legislative history and relevant case law confirm this reading of its function.

Further, the individual mandate exceeds Congress's enumerated commerce power and is unconstitutional. This economic mandate represents a wholly novel and potentially unbounded assertion of congressional authority: the ability to compel Americans to purchase an expensive health insurance product they have elected not to buy, and to make them re-purchase that insurance product every month for their entire lives. We have not found any generally applicable, judicially enforceable limiting principle that would permit us to uphold the mandate without obliterating the boundaries inherent in the system of enumerated congressional powers. "Uniqueness" is not a constitutional principle in any antecedent Supreme Court decision. The individual mandate also finds no refuge in the aggregation

doctrine, for decisions to *abstain* from the purchase of a product or service, whatever their cumulative effect, lack a sufficient nexus to commerce.[145]

The individual mandate, however, can be severed from the remainder of the Act's myriad reforms. The presumption of severability is rooted in notions of judicial restraint and respect for the separation of powers in our constitutional system. The Act's other provisions remain legally operative after the mandate's excision, and the high burden needed under Supreme Court precedent to rebut the presumption of severability has not been met.

Accordingly, we affirm in part and reverse in part the judgment of the district court.

**AFFIRMED in part and REVERSED in part.**

---

[145]Our respected dissenting colleague says that the majority: (1) "has ignored the broad power of Congress"; (2) "has ignored the Supreme Court's expansive reading of the Commerce Clause"; (3) "presume[s] to sit as a superlegislature"; (4) "misapprehends the role of a reviewing court"; and (5) ignores that "as nonelected judicial officers, we are not afforded the opportunity to rewrite statutes we don't like." *See* Dissenting Op. at 208–209, 243. We do not respond to these contentions, especially given (1) our extensive and exceedingly careful review of the Act, Supreme Court precedent, and the parties' arguments, and (2) our holding that the Act, despite significant challenges to this massive and sweeping federal regulation and spending, falls within the ambit and prerogative of Congress's broad commerce power, except for one section, § 5000A. We do, however, refuse to abdicate our constitutional duty when Congress has acted beyond its enumerated Commerce Clause power in mandating that Americans, from cradle to grave, purchase an insurance product from a private company.

MARCUS, Circuit Judge, concurring in part and dissenting in part[1]:

Today this Court strikes down as unconstitutional a central piece of a comprehensive economic regulatory scheme enacted by Congress. The majority concludes that Congress does not have the commerce power to require uninsured Americans to obtain health insurance or otherwise pay a financial penalty. The majority does so even though the individual mandate was designed and intended to regulate quintessentially economic conduct in order to ameliorate two large, national problems: first, the substantial cost shifting that occurs when uninsured individuals consume health care services -- as virtually all of them will, and many do each year -- for which they cannot pay; and, second, the unavailability of health insurance for those who need it most -- those with pre-existing conditions and lengthy medical histories.

In the process of striking down the mandate, the majority has ignored many years of Commerce Clause doctrine developed by the Supreme Court. It has ignored the broad power of Congress, in the words of Chief Justice Marshall, "to prescribe the rule by which commerce is to be governed." Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 196 (1824). It has ignored the undeniable fact that Congress' commerce power has grown exponentially over the past two centuries, and is now

---

[1] I concur only in Parts I (standing), III (Medicaid expansion), and VI (taxing power) of the majority opinion.

generally accepted as having afforded Congress the authority to create rules regulating large areas of our national economy. It has ignored the Supreme Court's expansive reading of the Commerce Clause that has provided the very foundation on which Congress already extensively regulates both health insurance and health care services. And it has ignored the long-accepted instruction that we review the constitutionality of an exercise of commerce power not through the lens of formal, categorical distinctions, but rather through a pragmatic one, recognizing, as Justice Holmes put it over one hundred years ago, that "commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business." Swift & Co. v. United States, 196 U.S. 375, 398 (1905).

The approach taken by the majority has also disregarded the powerful admonitions that acts of Congress are to be examined with a heavy presumption of constitutionality, that the task at hand must be approached with caution, restraint, and great humility, and that we may not lightly conclude that an act of Congress exceeds its enumerated powers. The circumspection this task requires is underscored by recognizing, in the words of Justice Kennedy, the long and difficult "history of the judicial struggle to interpret the Commerce Clause during the transition from the economic system the Founders knew to the single, national market still emergent in our own era." United States v. Lopez, 514 U.S. 549, 568

(1995) (Kennedy, J., concurring).

The plaintiffs and, indeed, the majority have conceded, as they must, that Congress has the commerce power to impose precisely the <u>same</u> mandate compelling the <u>same</u> class of uninsured individuals to obtain the <u>same</u> kind of insurance, or otherwise pay a penalty, as a necessary condition to receiving health care services, at the time the uninsured seek these services. Nevertheless, the plaintiffs argue that Congress cannot do now what it plainly can do later. In other words, Congress must wait until each component transaction underlying the cost-shifting problem occurs, causing huge increases in costs both for those who have health care insurance and for health care providers, before it may constitutionally act. I can find nothing in logic or law that so circumscribes Congress' commerce power and yields so anomalous a result.

Although it is surely true that there is no Supreme Court decision squarely on point dictating the result that the individual mandate is within the commerce power of Congress, the rationale embodied in the Court's Commerce Clause decisions over more than 75 years makes clear that this legislation falls within Congress' interstate commerce power. These decisions instruct us to ask whether the target of the regulation is economic in nature and whether Congress had a rational basis to conclude that the regulated conduct has a substantial effect on interstate commerce.

210

It cannot be denied that Congress has promulgated a rule by which to comprehensively regulate the timing and means of payment for the virtually inevitable consumption of health care services. Nor can it be denied that the consumption of health care services by the uninsured has a very substantial impact on interstate commerce -- the shifting of substantial costs from those who do not pay to those who do and to the providers who offer care. I therefore respectfully dissent from the majority's opinion insofar as it strikes down the individual mandate.

## I.

## A.

A considerable portion of the American population -- estimated at 50 million -- lacks any form of health care insurance.[2] The individual mandate was designed

---

[2] In 2009, the total number of uninsured was estimated at 50.7 million, or about 16.7% of the total population. U.S. Census Bureau, U.S. Dep't of Commerce, Income, Poverty, and Health Insurance Coverage in the United States: 2009, at 23 tbl.8 (2010), available at http://www.census.gov/prod/2010pubs/p60-238.pdf. What's more, the population of uninsured is not confined to those with low incomes. The Census Bureau found that the estimated income brackets for the uninsured are as follows:

> (1) less than $25,000: 15.5 million uninsured, about 26.6% of the total population in this income bracket;
> (2) $25,000 to $49,999: 15.3 million, about 21.4%;
> (3) $50,000 to $74,999: 9.4 million, about 16.0%;
> (4) $75,000 or more: 10.6 million, about 9.1%.

Id.

to ameliorate twin problems related to the uninsured as a class: (1) huge cost shifting from the uninsured, who often don't pay for their health care services, to those with health insurance and to health care providers; and (2) the inability of many uninsured individuals to obtain much-needed health insurance coverage because they are effectively blacklisted on account of their pre-existing conditions or medical histories. Congress sought to address these problems by requiring non-exempted individuals to pay a penalty, or "shared responsibility payment," on their tax returns for any month, beginning in 2014, in which they fail to maintain "minimum essential coverage." 26 U.S.C. § 5000A(a)-(b). And while remaining uninsured is not an option under the Act (at least to avoid paying a penalty), individuals are offered a variety of choices when it comes to satisfying the individual mandate's "minimum essential coverage" requirement. Many insurance plans will satisfy the individual mandate. These plans fall into five general categories, some of which are further divided into subcategories: (1) government-sponsored programs; (2) eligible employer-sponsored plans; (3) plans purchased on the individual market; (4) grandfathered health plans; or (5) any "other coverage" recognized by the Secretary of Health and Human Services ("HHS") in coordination with the Secretary of the Treasury. Id. § 5000A(f)(1).

As for the first problem Congress sought to address, it is undeniable that,

despite lacking health insurance, the uninsured are still substantial participants in the market for health care services. And when the uninsured do seek medical care, they often fail to pay all or even most of their costs. On average -- and these figures are not disputed -- the uninsured pay only 37% of their health care costs out of pocket, while third parties pay another 26% on their behalf.[3] The remaining costs are uncompensated -- they are borne by health care providers and are passed on in the form of increased premiums to individuals who already participate in the insurance market.

Congress' findings reflect its determination that this problem -- the uncompensated consumption of health care services by the uninsured -- has national economic consequences that require a national solution through comprehensive federal regulation. See 42 U.S.C. § 18091. As part of the empirical foundation for the individual mandate, Congress quantified the costs associated with the free-riding and cost-shifting problems that result from the provision of uncompensated health care to the uninsured:

---

[3] These figures come from a study cited by both the plaintiffs and the government: Families USA, Hidden Health Tax: Americans Pay a Premium 2 (2009) [hereinafter Hidden Health Tax], available at http://familiesusa2.org/assets/pdfs/hidden-health-tax.pdf. And again, the problem of uncompensated care is not confined to those of limited means. Even in households at or above the median income, people without health insurance pay, on average, less than half the cost of the medical care they consume. See Bradley Herring, The Effect of the Availability of Charity Care to the Uninsured on the Demand for Private Health Insurance, 24 J. Health Econ. 225, 229-31 (2005).

> The cost of providing uncompensated care to the uninsured was $43,000,000,000 [$43 billion] in 2008. To pay for this cost, health care providers pass on the cost to private insurers, which pass on the cost to families. This cost-shifting increases family premiums by on average over $1,000 a year. By significantly reducing the number of the uninsured, the [individual mandate], together with the other provisions of this Act, will lower health insurance premiums.

Id. § 18091(a)(2)(F) (emphases added).

The Act thus seeks to regulate the payment for health care consumption through the mechanism of health insurance. As Congress found, the individual mandate "regulates activity that is commercial and economic in nature: economic and financial decisions about how and when health care is paid for, and when health insurance is purchased." Id. § 18091(a)(2)(A) (emphasis added). In other words, the individual mandate is the means Congress adopted to regulate the timing and method of individuals' payment for the consumption of health care services.

As for the second problem of millions of uninsured individuals' being unable to obtain health insurance, Congress sought to dramatically reform the health insurance market by regulating the insurers themselves. The Act bars insurers from using many of the tools they had previously employed to protect themselves against the large costs imposed by high-risk individuals. Thus, insurers may no longer deny coverage or charge higher premiums because of an individual's pre-existing conditions or medical history. Id. §§ 300gg(a)(1), 300gg-3(a), 300gg-4(a); Act §

2702(a) (to be codified at 42 U.S.C. § 300gg-1(a)).  Under the "community rating"
provision, insurers may only vary premiums based on (i) whether the plan covers
an individual or a family, (ii) rating area, (iii) age, and (iv) tobacco use.  42 U.S.C.
§ 300gg(a)(1).  And under the "guaranteed issue" provisions, insurers must accept
every employer or individual who applies for coverage through the individual or
group markets.  Act § 2702(a) (to be codified at 42 U.S.C. § 300gg-1(a)).  Notably,
insurers may no longer offer plans that limit or exclude benefits for individuals'
pre-existing conditions, 42 U.S.C. § 300gg-3(a), nor may they refuse to cover
individuals on the basis of (i) health status, (ii) medical condition (including both
physical and mental illnesses), (iii) claims experience, (iv) receipt of health care,
(v) medical history, (vi) genetic information, (vii) evidence of insurability
(including conditions arising out of acts of domestic violence), (viii) disability, or
(ix) any other health status factor recognized by the Secretary of HHS, id. § 300gg-
4(a).

Congress determined that the individual mandate was essential to the
effective implementation of the Act's insurer regulations -- that is, "to creating
effective health insurance markets in which improved health insurance products
that are guaranteed issue and do not exclude coverage of pre-existing conditions
can be sold."  Id. § 18091(a)(2)(I).  Congress further found that waiting until the

uninsured actually consume health care services before regulating them would effectively be a day late and a dollar short. See id. ("[I]f there were no [individual mandate], many individuals would wait to purchase health insurance until they needed care."); Liberty Univ., Inc. v. Geithner, 753 F. Supp. 2d 611, 634-35 (W.D. Va. 2010) ("As Congress stated in its findings, the individual coverage provision is 'essential' to th[e] larger regulatory scheme because without it, individuals would postpone [acquiring] health insurance until they need substantial care, at which point the Act would obligate insurers to cover them at the same cost as everyone else. This would increase the cost of health insurance and decrease the number of insured individuals -- precisely the harms that Congress sought to address . . . ."); Gov't Br. at 19 (citing testimony before Congress that a "health insurance market could never survive or even form if people could buy their insurance on the way to the hospital" (internal quotation marks omitted)).

Congress also made findings supporting the proposition that the markets for health insurance and health care services are deeply and inextricably bound together and indicated clearly that it sought to regulate across them both. Congress understood that health insurance and health care consumption are linked as a factual matter. Health insurance is the means by which most of our national health care costs are paid for; in 2009, private and government insurance financed

approximately 75% of health care spending.  Gov't Br. at 9 (citing non-disputed data from the Centers for Medicare and Medicaid Services ("CMS")).  Moreover, Congress expressly connected the increased participation in the health insurance market that it expected to result from the individual mandate with "increasing the supply of, and demand for, health care services."  42 U.S.C. § 18091(a)(2)(C).  On a more basic level, Congress also understood that "[h]ealth insurance is not bought for its own sake; it is bought to pay for medical expenses."  Gov't Br. at 39 (citing M. Moshe Porat et al., Market Insurance Versus Self Insurance: The Tax-Differential Treatment and Its Social Cost, 58 J. Risk & Ins. 657, 668 (1991); Martin S. Feldstein, The Welfare Loss of Excess Health Insurance, 81 J. Pol. Econ. 251, 253 (1973) [hereinafter Welfare Loss] ("Health insurance is purchased not as a final consumption good but as a means of paying for the future stochastic purchases of health services.")); see also Brief for Econ. Scholars as Amici Curiae Supporting the Government ("Gov't Econ. Br.") at 12 ("Medical care is the set of services that make one healthier, or prevent deterioration in health.  Health insurance is a mechanism for spreading the costs of that medical care across people or over time, from a period when the cost would be overwhelming to periods when costs are more manageable.").

B.

217

1.

Congress' commerce power to regulate is, as Chief Justice Marshall taught us almost two hundred years ago, the power "to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." Gibbons, 22 U.S. at 196. It is precisely this power to prescribe rules governing commerce that Congress lawfully exercised in enacting the individual mandate.

It is clear that Congress' rule-making power extends to both the health insurance and health care markets, areas of commerce that Congress has long regulated and regulated heavily. First, the parties all agree (as they must) that Congress' commerce power lawfully extends to the regulation of insurance in general, as the Supreme Court concluded more than 60 years ago in United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 552-53 (1944). Indeed, Congress expressly relied on this proposition in enacting the individual mandate. See 42 U.S.C. § 18091(a)(3) (citing South-Eastern Underwriters as a basis for Congress' authority to regulate insurance under the Commerce Clause).[4]

---

[4] In response to South-Eastern Underwriters, Congress enacted the McCarran-Ferguson Act, which provides that state laws regulating insurance will not be "invalidate[d], impair[ed], or supersede[d]" by federal law, unless the federal law "specifically relates to the business of insurance." 15 U.S.C. § 1012(b). But this

Second, in light of Congress' undeniable power under the Commerce Clause to regulate the business of insurance generally, it follows -- and again there is no dispute -- that Congress may also regulate health insurance in particular, which is, after all, a subset of the insurance market. See Charles Fried, Written Testimony Before the Senate Judiciary Committee Hearing on "The Constitutionality of the Affordable Care Act" 1 (Feb. 2, 2011), available at http://judiciary.senate.gov/pdf/11-02-02%20Fried%20Testimony.pdf. In fact, Congress has extensively exercised its commerce power to regulate the health insurance market for many years, long before the Act was passed. For example, Congress enacted the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829 (1974), which is a massive piece of legislation regulating the operation of employee benefit plans, including retirement plans, pension plans, and employer-provided health insurance plans. Congress

---

enactment in no way affects or diminishes the Court's clear holding in South-Eastern Underwriters that Congress may, concurrently with the states, regulate the business of insurance under the Commerce Clause. What's more, Congress has hardly abdicated its role in regulating the insurance business. See Humana Inc. v. Forsyth, 525 U.S. 299, 311, 314 (1999) (holding that federal RICO statute -- which is itself grounded in the Commerce Clause -- may be applied to insurers because it is not precluded by the McCarran-Ferguson Act); id. at 308 ("We reject any suggestion that Congress intended to cede the field of insurance regulation to the States . . . ."). Rather, the McCarran-Ferguson Act sought "to protect state regulation primarily against inadvertent federal intrusion -- say, through enactment of a federal statute that describes an affected activity in broad, general terms, of which the insurance business happens to constitute one part." Barnett Bank of Marion Cnty., N.A. v. Nelson, 517 U.S. 25, 39 (1996).

expressly pegged the broad scope of ERISA's coverage to its Commerce Clause power. 29 U.S.C. § 1001(b) ("It is hereby declared to be the policy of this chapter to protect interstate commerce . . . ."); see also id. § 1003(a). Among other things, the regulatory provisions in Title I of ERISA, 29 U.S.C. § 1001 et seq., set forth "uniform minimum standards to ensure that employee benefit plans are established and maintained in a fair and financially sound manner." U.S. Dep't of Labor, Health Benefits, Retirement Standards, and Workers' Compensation: Employee Benefit Plans, http://www.dol.gov/compliance/guide/erisa.htm (last visited Aug. 10, 2011). Title I of ERISA governs "most private sector employee benefit plans," with the most significant exceptions being "plans established or maintained by government entities or churches." Id.; see also Williams v. Wright, 927 F.2d 1540, 1545 (11th Cir. 1991) (concluding that ERISA regulates even "plans covering only a single employee").

Congressional efforts to regulate health insurance did not end with ERISA. Congress passed the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Pub. L. No. 99-272, 100 Stat. 82 (1986), which contains a wide variety of provisions relating to health care and health insurance. As for health insurance, the most significant reforms were amendments to ERISA, which added "continuation coverage" provisions that allow employees to continue receiving

employer-sponsored health insurance for a period following the end of their employment in order to prevent gaps in health insurance coverage. 29 U.S.C. §§ 1161, 1162. And in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936 (1996), Congress amended the Public Health Service Act to add insurance portability provisions that prohibit group health plans -- including ERISA plans -- from discriminating against individual participants and beneficiaries based on health status, that require insurers to offer coverage to small businesses, and that limit pre-existing condition exclusions. See 29 U.S.C. §§ 1181-1183.

Under its commerce power, Congress has also repeatedly regulated the content of private health insurers' policies. See, e.g., Mental Health Parity Act of 1996, Pub. L. No. 104-204, § 702, 110 Stat. 2874, 2944 (1996) (regulating limits on mental health benefits); Newborns' and Mothers' Health Protection Act of 1996, Pub. L. No. 104-204, § 603, 110 Stat. 2874, 2935 (1996) (requiring maternity coverage to provide at least a 48-hour hospital stay); Women's Health and Cancer Rights Act of 1998, Pub. L. No. 105-277, § 902, 112 Stat. 2681, 2681-436 (1998) (requiring certain plans to offer benefits related to mastectomies); Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, Pub. L. No. 110-343, § 512, 122 Stat. 3765, 3881 (2008) (providing for parity between

mental health/substance abuse disorder benefits and medical/surgical benefits).

Third, it is equally clear that Congress' power under the Commerce Clause likewise extends to the regulation of the provision and consumption of health care services. Indeed, for many years, Congress has substantially regulated both health care providers and the commodities that those providers may use. As far back as 1946, Congress enacted the Hospital Survey and Construction Act (also known as the "Hill-Burton Act"), Pub. L. No. 79-725, 60 Stat. 1040 (1946), which appropriated funds for the construction of new hospitals in the post-World War II economy. The Hill-Burton Act required hospitals receiving federal construction or renovation funds to provide care to "all persons residing in the territorial area" and to provide a "reasonable volume" of free care to indigent patients. See 42 U.S.C. § 291c(e).

The requirement that hospitals provide free care was strengthened and broadened, when, as part of COBRA, Congress enacted the Emergency Medical Treatment and Active Labor Act ("EMTALA"). COBRA, Pub. L. No. 99-272, § 9121, 100 Stat. 82, 164 (1986). EMTALA requires all hospitals that receive Medicare funds to screen and stabilize, if possible, any patient who comes in with an "emergency medical condition." 42 U.S.C. § 1395dd(a)-(b); see also Roberts v. Galen of Va., Inc., 525 U.S. 249, 250-51 (1999) (per curiam). EMTALA also

222

restricts the ability of hospitals to transfer a patient until he is stable or a medical determination is made that transfer is necessary. 42 U.S.C. § 1395dd(c). EMTALA's provisions are backed by both civil fines and a private cause of action for those harmed by a hospital's failure to comply. Id. § 1395dd(d).

Congress has also regulated health care providers (and, as mentioned, health care insurers) through HIPAA. The definition of "health care provider" under HIPAA is extraordinarily broad, covering any "person or organization who furnishes, bills, or is paid for health care in the normal course of business." 45 C.F.R. § 160.103. And in 2009, Congress expanded HIPAA's coverage even further to include "business associates" of health care providers and health insurers. See Health Information Technology for Economic and Clinical Health Act, Pub. L. No. 111-5, §§ 13401, 13404, 123 Stat. 115, 260, 264 (2009); 45 C.F.R. § 160.103. In addition to the insurance portability provisions, HIPAA includes a number of privacy provisions that "govern[] the use and disclosure of protected health information" by health care providers and health insurers, Sneed v. Pan Am. Hosp., 370 F. App'x 47, 50 (11th Cir. 2010) (per curiam) (unpublished), as well as protect the privacy of employees' health information against inquiries by their employers. HIPAA even regulates what information health care providers may communicate to one another. See generally 45 C.F.R. §§ 164.102-164.534; 42 U.S.C. § 1320d-2.

223

HIPAA also requires health care providers to follow several administrative requirements, including the development of physical and technical privacy safeguards and employee training.  See 45 C.F.R. §§ 164.308, 164.310, 164.312.

Fourth, Congress has extensively regulated under its commerce power the commodities used in the health care services market, most notably drugs and medical devices.  For example, in the Food, Drug, and Cosmetics Act, Congress delegated to the Food and Drug Administration the authority to screen and approve drugs and medical devices for use in commerce, and to regulate their continued use once approved.  See, e.g., 21 U.S.C. §§ 351, 352, 355(a), 360c, 360e, 360j(e).

Fifth, the majority and all the parties also agree that Congress' commerce power extends to the regulation of the price to be paid for the consumption of health care services.  Medicare is the most pervasive example.  Since 1983, the Medicare program has set the fees it pays to hospitals through a prospective payment system that assigns a fixed amount to each service provided rather than reimbursing hospitals for their actual costs.  See United States v. Whiteside, 285 F.3d 1345, 1346 (11th Cir. 2002).  In 1989, Congress also set a federally determined fee schedule for Medicare payments to physicians.  Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6102, 103 Stat. 2106, 2169 (1989).  In this way, Congress directly sets the prices for health care services paid

224

for under Medicare.[5]

Beyond Congress' already substantial regulation of the price of health care services through Medicare and Medicaid, under controlling precedent Congress may lawfully regulate prices for all manner of health care consumption, however wise or unwise that regulation may be.  In fact, the Supreme Court has said that Congress may regulate or even fix prices in interstate markets, either directly or by engaging in the "stimulation of commerce" through regulation.  Wickard v. Filburn, 317 U.S. 111, 128 (1942) ("It is well established . . . that the power to regulate commerce includes the power to regulate the prices at which commodities in that commerce are dealt in and practices affecting such prices."); accord Gonzales v. Raich, 545 U.S. 1, 18-19 (2005); see also Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 394 (1940) (holding that Congress could not only regulate price, but could also attach "other conditions to the flow of a commodity

---

[5]  While Medicaid prices are not as directly regulated at the federal level, Congress has legislated in a number of ways that affect the prices to be paid to health care providers and others under the Medicaid program.  Most notable is the Medicaid Drug Rebate Program, created by the Omnibus Budget Reconciliation Act of 1990.  The program provides that, if drug companies want their products to be covered by Medicaid, they must provide detailed price information to, and enter into a national rebate agreement with, the Secretary of HHS.  42 U.S.C. § 1396r-8.  Congress has thus regulated prescription drug prices under Medicaid by requiring drug companies to provide discounts to states -- in the form of rebates -- for their Medicaid drug purchases.  See generally Iowa Dep't of Human Servs. v. Ctrs. for Medicare & Medicaid Servs., 576 F.3d 885, 886-87 (8th Cir. 2009).

in interstate [commerce]"); id. ("To regulate the price for . . . transactions is to regulate commerce itself, and not alone its antecedent conditions or its ultimate consequences." (quoting Carter v. Carter Coal Co., 298 U.S. 238, 326 (1936) (Cardozo, J., dissenting in part and concurring in the judgment in part))).

Sixth, and perhaps most significantly, Congress' commerce power includes the power to prescribe rules cutting across the two linked markets of health insurance and health care services. Both the congressional intent to link the two and the empirical relation between the purchase of health insurance and the consumption of health care services are clear. Accordingly, in determining whether Congress has lawfully exercised its commerce power, courts must examine "the entire transaction, of which [the] contract [for insurance] is but a part, in order to determine whether there may be a chain of events which becomes interstate commerce." South-Eastern Underwriters, 322 U.S. at 547. I am hard pressed to see how the relevant "chain of events" here does not include the substantial consumption of health care services by the uninsured.

2.

The plaintiffs assert, nevertheless, that in enacting the individual mandate Congress was limited to regulating a single industry at a single point in time -- in other words, it could only look at the health insurance market standing alone. In

the plaintiffs' view, Congress could not mandate the purchase of insurance as a means of ameliorating a national problem arising in the related but distinct market for health care services. The majority appears to have adopted this view, concluding that the relevant conduct targeted by Congress is not the uncompensated consumption of health care services by the uninsured, but rather only the decision to forego health insurance. Maj. Op. at 126, 136. This approach is wooden, formalistic, and myopic. The plaintiffs and the majority would view the uninsured in a freeze-framed still, captured, like a photograph, in a single moment in time. They contend that Congress cannot constitutionally regulate the uninsured as a class at that single moment, because at that moment any particular uninsured individual may be healthy, may be sitting in his living room, or may be doing nothing at all. The only way the plaintiffs and the majority can round even the first base of their argument against the mandate is by excluding from Congress' purview, for no principled reason that I can discern, the cost-shifting problems that arise in the health care services market.

This blinkered approach cannot readily be squared with the well-settled principle that, in reviewing whether Congress has acted within its enumerated powers, courts must look at the nature of the problem Congress sought to address, based on economic and practical realities. See Swift & Co., 196 U.S. at 398

("[C]ommerce among the states is not a technical legal conception, but a practical one, drawn from the course of business."); Wickard, 317 U.S. at 123-24 ("[R]ecognition of the relevance of the economic effects in the application of the Commerce Clause . . . has made the mechanical application of legal formulas no longer feasible."); NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 41-42 (1937) (observing that "interstate commerce itself is a practical conception"); N. Am. Co. v. SEC, 327 U.S. 686, 705 (1946) ("Congress is not bound by technical legal conceptions. Commerce itself is an intensely practical matter. To deal with it effectively, Congress must be able to act in terms of economic and financial realities." (citation omitted)); Lopez, 514 U.S. at 571, 574 (Kennedy, J., concurring) (favoring a pragmatic approach to Congress' commerce power grounded in "broad principles of economic practicality" and a "practical conception of commercial regulation"); Raich, 545 U.S. at 25 n.35. When the individual mandate is viewed through a more pragmatic and less stilted lens, it is clear that Congress has addressed a substantial economic problem: the uninsured get sick or injured, seek health care services they cannot afford, and shift these unpaid costs onto others.

Moreover, despite their contention that Congress is limited to regulating in a single industry, the plaintiffs nevertheless concede that Congress may use its rule-

making power to regulate the <u>market for health insurance</u> as a vehicle or means to address the cost-shifting problems arising in the <u>market for health care services</u>. They have conceded, both in their briefs and at oral argument, that Congress may constitutionally regulate the consumption of health care services by the uninsured at the <u>time</u> they actually seek medical care. The plaintiffs acknowledge -- as does the majority -- that Congress may constitutionally require the uninsured to obtain health care insurance on the hospital doorstep, or that Congress may otherwise impose a penalty on those who attempt to consume health care services without insurance. States Br. at 31-32 ("Supreme Court precedent allows Congress to regulate [the practice of consuming health care services without insurance] -- for example, by imposing restrictions or penalties on individuals who attempt to consume health care services without insurance."); Maj. Op. at 129-30 ("[W]hen the uninsured actually enter the stream of commerce and consume health care, Congress may regulate their activity at the point of consumption."); <u>see also</u> <u>Florida ex rel. Bondi v. U.S. Dep't of Health & Human Servs.</u>, No. 3:10-cv-91-RV/EMT, 2011 WL 285683, at *26 (N.D. Fla. Jan. 31, 2011) ("Congress plainly has the power to regulate [the uninsured] . . . at the time that they initially seek

229

medical care[], a fact with which the plaintiffs agree.").[6]  Thus, all of the parties

agree that, at the time of health care consumption, Congress may lawfully cut

across a distinct market and impose a financial penalty designed to compel the

uninsured to obtain health insurance.  And Congress may do so even where the

uninsured would otherwise voluntarily choose to finance the consumption of health

care services out of pocket, without buying insurance.

If the plaintiffs had argued that Congress cannot constitutionally force

anyone to buy health insurance at any time as a means of paying for health care,

they at least would have evinced the virtue of consistency.  But instead, the

plaintiffs' concession undermines their claim that Congress has exceeded its rule-

making power by regulating in one industry to address a problem found in another,

at least where the two industries are so closely bound together.  After all, even at

the point of consuming health care services, individuals may wish to remain

"inactive" in the health insurance market.  But the plaintiffs and the majority

_____

[6]  At oral argument, counsel for the state plaintiffs was explicitly asked whether, at
the point of health care consumption, Congress "could compel an individual who doesn't
have health insurance to either pay a penalty or obtain insurance at that time," to which
counsel responded that "[i]n the health care market, at the time of consumption, yes."
And at the district court hearing on the government's motion to dismiss, counsel for the
plaintiffs made a similar concession.  In response to the district court's question, "Well,
the government could impose this penalty at the point of service at the doctor's office or
the hospital and say, if you do not have insurance, you are subject to a penalty?," counsel
for the plaintiffs responded, "I believe the government would be able to do it, Your
Honor."  RE 334-35.

concede that Congress may nevertheless compel individuals at that point to purchase a private insurance product.

Despite this concession, the plaintiffs contend that the regulation of commerce necessarily presupposes a pre-existing voluntary activity to be regulated. The plaintiffs' activity/inactivity dichotomy, however, is nowhere to be found in the text of the Commerce Clause, nor in the jurisprudence surrounding it. The language of the Commerce Clause itself draws no distinction between activity and inactivity. The seven operative words speak broadly about Congress' power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. The power to regulate is the power "to prescribe the rule by which commerce is to be governed." Gibbons, 22 U.S. at 196. And while the power of Congress is limited to specific objects, it is "plenary as to those objects." Id. at 197. Creating an artificial doctrinal distinction between activity and inactivity is thus novel and unprecedented, resembling the categorical limits on Congress' commerce power the Supreme Court swept away long ago.

The plaintiffs claim, nevertheless, that the individual mandate exceeds Congress' commerce power because it improperly conscripts uninsured individuals -- who are presently inactive in the health insurance market -- to unwillingly enter the stream of commerce to purchase health insurance they would not otherwise

231

choose to buy. The plaintiffs and the majority would have Congress wait at the water's edge until the uninsured literally enter the emergency room. In other words, they say, Congress may not legislate prophylactically, but instead must wait until the cost-shifting problem has boiled over, causing huge increases in costs for those who have health care insurance (through increased premiums), and for those who provide health care services.

At bottom, the plaintiffs' argument seems to boil down only to a temporal question: can Congress, under the Commerce Clause, regulate how and when health care services are paid for by requiring individuals -- virtually all of whom will consume health care services and most of whom have done so already -- to pay <u>now</u> for those services through the mechanism of health insurance? As I see it, the answer to whether Congress can make this temporal jump under its Commerce Clause power is yes.

There is no doctrinal basis for requiring Congress to wait until the cost-shifting problem materializes for each uninsured person before it may regulate the uninsured as a class. The majority's imposition of a strict temporal requirement that congressional regulation only apply to individuals who first engage in specific market transactions in the health care services market is at war with the idea that Congress may adopt "reasonable preventive measures" to avoid <u>future</u> disruptions

232

of interstate commerce.  Consol. Edison Co. v. NLRB, 305 U.S. 197, 222 (1938) ("[I]t cannot be maintained that the exertion of federal power must await the disruption of [interstate or foreign] commerce."); see also Katzenbach v. McClung, 379 U.S. 294, 301 (1964) (quoting same, and noting that "Congress was not required to await the total dislocation of commerce"); Stevens v. United States, 440 F.2d 144, 152 (6th Cir. 1971) ("It is not necessary for Congress to await the total dislocation of commerce before it may provide reasonable preventive measures for the protection of commerce." (citing Katzenbach, 379 U.S. at 301)), limited on other grounds by United States v. Bass, 404 U.S. 336 (1971); NLRB v. Sunshine Mining Co., 110 F.2d 780, 784 (9th Cir. 1940).  In Consolidated Edison, the Supreme Court explained that, through the National Labor Relations Act -- which regulates labor practices -- "Congress did not attempt to deal with particular instances" in which interstate commerce was disrupted, concluding that Congress did not need to wait until labor practices actually disrupted interstate commerce before it could regulate.[7]  305 U.S. at 222.  In other words, Congress may lawfully

_____

[7]  The majority opinion misapprehends this point.  See Maj. Op. at 129 n.100. Consolidated Edison is cited along with Katzenbach to make this simple point: Congress need not wait until an economic problem has erupted and the national economy is disrupted before it may act prophylactically, under its commerce power, to address an obvious and apparent economic problem.  That Consolidated Edison specifically involved the regulation of labor practices or that Katzenbach (along with Heart of Atlanta) specifically involved the regulation of innkeepers and restaurateurs is beside the point. This principle of Commerce Clause jurisprudence is general, and it remains binding law.

regulate present conduct to prevent future disruptions of interstate commerce from occurring.

What's more, and even more basic, here the disruption of interstate commerce is <u>already</u> occurring. The majority inexplicably claims that the individual mandate regulates "the mere <u>possibility</u> of <u>future</u> activity," Maj. Op. at 129, but as we speak, the uninsured are consuming health care services in large numbers and shifting costs onto others. By ignoring the close relationship between the health insurance and health care services markets, the plaintiffs and the majority seek to avoid the hard fact that the uninsured as a class are actively consuming substantial quantities of health care services <u>now</u> -- not just next week, next month, or next year. The uninsured make more than 20 million visits to emergency rooms each year; 68% of the uninsured had routine checkups in the past five years; and 50% had one in the past two years.[8] <u>See</u> U.S. Dep't of HHS, New Data Say Uninsured Account for Nearly One-Fifth of Emergency Room Visits (July 15, 2009), <u>available at</u> http://www.hhs.gov/news/press/2009pres/07/20090715b.html; June E. O'Neill &

---

[8] The plaintiffs do not contest the validity of these data. Indeed, at oral argument, counsel for the state plaintiffs conceded that these visits to the emergency room constitute economic activity that Congress may lawfully regulate.

234

Dave M. O'Neill, Emp't Policies Inst., Who Are the Uninsured? An Analysis of America's Uninsured Population, Their Characteristics and Their Health 20-21 & tbl.9 (2009), available at http://epionline.org/studies/oneill_06-2009.pdf; see also Hidden Health Tax, supra, at 2 (observing that the uninsured consumed $116 billion worth of health care services in 2008); Gov't Econ. Br. at 10 ("57 percent of the 40 million people uninsured in all of 2007 used medical services that year." (emphasis added)); NFIB Br. at 5 (citing same 57% statistic).  In addition, there were more than two million hospitalizations -- not just emergency room visits, but actual admissions to a hospital -- of the uninsured in 2008 alone.  U.S. Dep't of HHS, ASPE Research Brief, The Value of Health Insurance: Few of the Uninsured Have Adequate Resources To Pay Potential Hospital Bills 5 (2011), available at http://aspe.hhs.gov/health/reports/2011/valueofinsurance/rb.pdf.

In light of these undisputed figures, there can be little question that substantial numbers of uninsured Americans are currently active participants in the health care services market, and that many of these uninsured currently consume health care services for which they cannot or do not pay.  This is, in every real and meaningful sense, classic economic activity, which, as Congress' findings tell us, has a profound effect on commerce.  See Thomas More Law Ctr. v. Obama, -- F.3d --, 2011 WL 2556039, at *24 (6th Cir. June 29, 2011) (Sutton, J., concurring) ("No

matter how you slice the relevant market -- as obtaining health care, as paying for health care, as insuring for health care -- all of these activities affect interstate commerce, in a substantial way.").[9] Once the artificial barrier drawn between the health insurance and health care services markets breaks down, the plaintiffs' inactivity argument collapses. And there can be no doubt that Congress rationally linked the two markets. Its very findings accompanying the mandate detail at length the impact that going uninsured has on the broader availability of health insurance <u>and</u> on the costs associated with the consumption of health care services. <u>See</u> 42 U.S.C. § 18091(a)(2). I observe again that "[h]ealth insurance is purchased not as a final consumption good but as a means of paying for the future stochastic purchase of health care services." Welfare Loss, <u>supra</u>, at 253. And virtually all of us will have the misfortune of having to consume health care services at some unknown point for some unknown malady and at some uncertain price. Each of us remains susceptible to sudden and unpredictable injury. No one can opt out of illness, disability, and death. These, we all must accept, are facts of life. Thus,

---

[9] Contrary to the majority's assertion, <u>see</u> Maj. Op. at 147 n.119, the conduct being regulated by Congress is the <u>consumption</u> of health care services by the uninsured. And it is the very act of consuming health care services by those who do not pay for them that has the natural and probable effect of shifting costs to those who do -- what occurs when I consume a good, and leave you with the bill. In every real sense, the <u>conduct</u> being regulated is analytically and conceptually distinct from its <u>effects</u> on interstate commerce.

even if I were to accept the plaintiffs' distinction between activity and inactivity, the facts undermine the distinction here. The inevitable consumption of health care services by the uninsured is sufficient activity to subject them to congressional regulation.

3.

The plaintiffs and the majority also object to the mandate on different grounds -- that it is "overinclusive" insofar as it applies to: "those who do not enter the health care market at all" ("non-consumers"), and those who consume health care services but pay for their services in full and thus do not shift costs ("non-cost-shifters"). Maj. Op. at 127.

The majority understates the point when it acknowledges that "overinclusiveness may not be fatal for constitutional purposes." Id. Indeed, the Supreme Court has made it abundantly clear that Congress is not required to "legislate with scientific exactitude." Raich, 545 U.S. at 17. Rather, "[w]hen Congress decides that the total incidence of a practice poses a threat to a national market, it may regulate the entire class." Id. (emphases added) (internal quotation marks omitted). As Justice Holmes put it in Westfall v. United States, 274 U.S. 256 (1927), "when it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented [Congress] may do so." Id. at

237

259. There is simply no requirement under the Commerce Clause that Congress choose the least restrictive means at its disposal to accomplish its legitimate objectives. Nor is there a requirement that Congress target only those uninsured individuals who will consume health care services at a particular point in time or just those who will be unable to pay for the health care services they consume. Congress concluded that the "total incidence" of health care consumption by the uninsured threatened the <u>national</u> health insurance and health care services markets. It was free to regulate the "entire class" of the uninsured.[10]

Moreover, even if I were to accept the notion that Congress, in regulating commerce, was obliged to somehow draw the class more narrowly, the subclass of

---

[10] The Court in <u>Raich</u> specifically approved of Congress' legislating across a broad class when "enforcement difficulties" would attend drawing the class more narrowly. <u>Raich</u>, 545 U.S. at 22. The Court said, "[g]iven the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere, and concerns about diversion into illicit channels, we have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA." <u>Id.</u> (citation and footnote omitted). When it may be difficult to distinguish between categories of conduct, especially when the categories are fluid, Congress may enlarge the regulated class. Here, too, Congress may broadly regulate uninsured individuals because it may be difficult to distinguish between cost-shifters and non-cost-shifters. And the categories are fluid -- a non-consumer or non-cost-shifter today may become a cost-shifter tomorrow, especially if a catastrophic injury befalls him. Moreover, the majority concedes that Congress may regulate <u>all</u> of the uninsured -- cost-shifters and non-cost-shifters alike -- at the point of consumption. <u>See</u> Maj. Op. at 129-30. Thus, by the majority's own lights, Congress' inclusion of non-cost-shifters within the mandate's reach does not create a constitutional infirmity.

238

"non-consumers" -- those individuals who will never enter the health care services market at all -- is surely minuscule.  The plaintiffs emphasize that it is "not strictly true" that everyone will participate in the health care services market.  States Br. at 30.  But the only elaboration the plaintiffs offer on this point is that some individuals will not participate because of "religious scruples" or the vaguely-put "individual circumstances."  Id.  As for the first, it does not get the plaintiffs very far, because religious groups that opt out of the health care services or health insurance markets may also seek exemption from the individual mandate.  26 U.S.C. § 5000A(d)(2).  And as for "individual circumstances," presumably what the plaintiffs mean is that a few individuals either will fortuitously avoid ill health altogether, or -- more likely -- will fail to consume health care services due to an immediately fatal accident or the like.  I am unable to draw a relevant constitutional distinction between the virtual inevitability of health care consumption and the absolute, 100% inevitability of health care consumption.  There is less of a chance that an individual will go through his entire life without ever consuming health care services than there is that he will win the Irish Sweepstakes at the very moment he is struck by lightning.  Nor are there more than a minuscule number of Americans who could afford to take on the financial risk of a personal medical catastrophe out of their own pockets.  Yet, on the basis of these slight mathematical possibilities

239

would the majority bring down the individual mandate and all that may fall with it.

Congress has wide regulatory latitude to address "the extent of financial risk-taking in the health care services market," Gov't Reply Br. at 15, which in its view is "a threat to a national market," Raich, 545 U.S. at 17. The fact that an exceedingly small set of individuals may go their whole lives without consuming health care services or can afford to go it alone poses no obstacle to Congress' ability under the Commerce Clause to regulate the uninsured as a class.

Similarly, a group of economists who filed an amicus brief in support of the plaintiffs object to the individual mandate by disputing the substantiality of the cost-shifting impact the mandate seeks to address. First, they claim that the individual mandate targets the young and healthy and that the annual costs of uncompensated care for those individuals is much less than $43 billion. See Brief for Economists as Amici Curiae Supporting the Plaintiffs ("Plaintiffs Econ. Br.") at 3, 10, 13. The point is unpersuasive, because it conflates the scope of the individual mandate with its relative benefits for different population groups. The individual mandate applies to all non-exempted individuals, 26 U.S.C. § 5000A(a), and while the young and healthy may benefit less than other groups from having health insurance, "[i]t is of the essence of regulation that it lays a restraining hand on the selfinterest of the regulated and that advantages from the regulation

240

commonly fall to others," <u>Wickard</u>, 317 U.S. at 129. Balancing different groups' competing economic interests is not a constitutional concern for the courts to calibrate, but rather is "wisely left under our system to resolution by the Congress under its more flexible and responsible legislative process." <u>Id.</u> Moreover, the argument that the mandate targets the young and healthy and that, therefore, this Court should only look at the economic impact on interstate commerce of <u>those</u> individuals is not even consistent with the plaintiffs' own suggestion that the individual mandate regulates "<u>everyone</u> at <u>every</u> moment of their lives, from cradle to grave." States Br. at 29.

The economists also suggest that even if we look at the $43 billion figure as a whole, that amount is less than 1.8% of overall annual health care spending (which Congress found was $2.5 trillion, or 17.6% of the national economy, in 2009, 42 U.S.C. § 18091(a)(2)(B)), and, therefore, the "alleged cost-shifting problem" is relatively modest and fails to justify the individual mandate. Plaintiffs Econ. Br. at 9-10. The argument is unconvincing. It would be novel indeed to examine whether a problem "substantially affects" interstate commerce by comparing the economic impact of the problem to the total size of the regulated market. The argument would also lead to the perverse conclusion that Congress has <u>less</u> regulatory power the larger the national market at issue. But in any event,

241

there can be no doubt that $43 billion is a substantial amount by any accounting. Even the economists (as well as the district court) recognize that the amount is "not insignificant." Plaintiffs Econ. Br. at 10; accord Florida, 2011 WL 285683, at *26 (noting that $43 billion "is clearly a large amount of money"). In this connection, I am reminded of the comment often attributed to the late Illinois Senator Everett McKinley Dirksen: "A billion here, a billion there, and pretty soon you're talking about real money."

Relying heavily on the economists' brief, the majority goes even further and subjects Congress' findings to an analysis that looks startlingly like strict scrutiny review. The majority engages in a breakdown of who among the uninsured are responsible for the $43 billion, presumably in order to show that the mandate will not be the most efficacious means of ameliorating the cost-shifting problem. See Maj. Op. at 139-41. For instance, the majority claims that low-income individuals and illegal aliens (or other nonresidents) together are responsible for around half of the total cost shifting, yet are exempted from either the mandate or its penalty. Id. at 139-40. But even on the majority's own terms, a substantial number of cost-shifters are not exempted from the mandate or its penalty, and there was nothing irrational about Congress' decision to subject to the mandate those individuals who could reasonably afford health insurance in the first place.

242

More fundamentally, however, as I see it, the majority's searching inquiry throughout its opinion into whether the individual mandate fully solves the problems Congress aimed to solve, or whether there may have been more efficacious ways to do so, probes far beyond the proper scope of a court's Commerce Clause review. The majority suggests any number of changes to the legislation that would, it claims, improve it. Thus, for example, the majority offers that Congress should have legislated with a finer scalpel by inserting some element in the statute calling for a "case-by-case inquiry" of each regulated individual's conduct. Id. at 128 (internal quotation marks omitted). And the majority would have the IRS enforce the mandate more aggressively. See id. at 166; id. at 202 (describing the mandate as "porous and toothless").

Quite simply, the majority would presume to sit as a superlegislature, offering ways in which Congress could have legislated more efficaciously or more narrowly. This approach ignores the wide regulatory latitude afforded to Congress, under its Commerce Clause power, to address what in its view are substantial problems, and it misapprehends the role of a reviewing court. As nonelected judicial officers, we are not afforded the opportunity to rewrite statutes we don't like, or to craft a legislative response more sharply than the legislative branch of government has chosen. What we are obliged to do is to determine whether the

congressional enactment falls within the boundaries of Art. 1, § 8, cl. 3. In examining the constitutionality of legislation grounded in Congress' commerce power, "[w]e need not determine whether [the regulated] activities, taken in the aggregate, substantially affect interstate commerce in fact." Raich, 545 U.S. at 22 (emphasis added). Rather, all we need to do -- indeed, all we are permitted to do -- is determine "whether a 'rational basis' exists for so concluding." Id. The courts are not called upon to judge the wisdom or efficacy of the challenged statutory scheme. See, e.g., id. at 9 ("The question before us, however, is not whether it is wise to enforce the statute in these circumstances."); Wickard, 317 U.S. at 129 ("And with the wisdom, workability, or fairness[] of the plan of regulation we have nothing to do."). As Justice Cardozo put it, "[w]hether wisdom or unwisdom resides in the scheme of [the statute at issue], it is not for us to say. The answer to such inquiries must come from Congress, not the courts." Helvering v. Davis, 301 U.S. 619, 644 (1937); see also Thomas More Law Ctr., 2011 WL 2556039, at *33 (Sutton, J., concurring) ("Time assuredly will bring to light the policy strengths and weaknesses of using the individual mandate as part of this national legislation, allowing the peoples' political representatives, rather than their judges, to have the primary say over its utility." (emphasis added)).

The majority says, nevertheless, that we are compelled to approach the

individual mandate with "caution" and with "greater cause for doubt," Maj. Op. at 152, because insurance and health care are "areas of traditional state concern," id. at 150. While it is true that insurance and health care are, generally speaking, areas of traditional state regulation, this observation in no way undermines Congress' commerce power to regulate concurrently in these areas. The sheer size of the programs Congress has created underscores the extensiveness of its regulation of the health insurance and health care industries. "In 2010, 47.5 million people were covered by Medicare . . . ." 2011 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds 4 (2011), available at http://www.cms.gov/ReportsTrustFunds/downloads/tr2011.pdf. Medicaid is similarly massive. As of December 2008, approximately 44.8 million people were covered by Medicaid. The Kaiser Commission on Medicaid and the Uninsured, Medicaid Enrollment in 50 States 1 (2010), available at http://www.kff.org/medicaid/upload/7606-05.pdf. And as the government points out, Medicare and Medicaid accounted for roughly $750 billion of federal spending in 2009 alone. Gov't Br. at 10. It would surely come as a great shock to Congress, or, for that matter, to the 47.5 million people covered by Medicare, the 44.8 million people covered by Medicaid, and the overwhelming number of employers, health insurers, and health care providers regulated by ERISA, COBRA, and HIPAA, to

learn that, because the health care industry also "falls within the sphere of traditional state regulation," Maj. Op. at 153, Congress was somehow skating on thin constitutional ice when it enacted these laws.

4.

In the course of its opinion, the majority also attaches great significance to the unprecedented nature of the legislation before us. It is surely true that, as the district court concluded, the individual mandate is a novel exercise of Congress' Commerce Clause power. <u>Florida</u>, 2011 WL 285683, at *20-21. But the mere fact of its novelty does not yield its unconstitutionality. <u>See</u> <u>Garcia v. Vanguard Car Rental USA, Inc.</u>, 540 F.3d 1242, 1252 (11th Cir. 2008) (upholding, under the Commerce and Necessary and Proper Clauses, the constitutionality of the Graves Amendment, 49 U.S.C. § 30106, even though it was a "novel" statute employing the "relatively novel" theory that the rental car market should be protected "by deregulating it"). Every new proposal is in some way unprecedented before it is tried. And to draw the line against any new congressional enactment simply because of its novelty ignores the lessons found in the Supreme Court's Commerce Clause cases. For example, in <u>Wickard</u> the Court squarely recognized that the case presented an unprecedented expansion of the Commerce Clause power before then embracing that expansion. 317 U.S. at 120 ("Even today, when this power has

246

been held to have great latitude, there is no decision of this Court that such activities ["local" activities such as production, manufacturing, and mining] may be regulated where no part of the product is intended for interstate commerce or intermingled with the subjects thereof."). The truth is that any ruling this Court issues on the individual mandate's constitutionality is necessarily a departure from existing case law because the legislation and the issues presented are new. That the Supreme Court has never before upheld a regulation of this kind can hardly be decisive; it has never rejected one either.

Indeed, when measured against the kinds of sweeping changes we have seen in the past, the individual mandate is far from a cataclysmic expansion of Congress' commerce power. Even the briefest examination of the growth of Congress' commerce power over the past 75 years makes the point. Facing the practical realities of an emergent, highly integrated national economy, the Supreme Court abandoned the categorical and formalistic distinctions that it had erected initially, in favor of a pragmatic view of commerce drawn from the course of business. The Court had previously held that broad categories of economic life, such as agriculture, insurance, labor, manufacturing, mining, and production were antecedent to commerce itself, which was once viewed as being limited to the movement of the fruits of those antecedent activities in and among the states. But a

more pragmatic view began to take hold by the mid-1930s.  The Court's earlier

restrictive view of commerce did not survive the New Deal-era cases, where the

Supreme Court swiftly brought all of these categories within the lawful ambit of

Congress' commerce power.  See, e.g., Jones & Laughlin Steel, 301 U.S. at 40 ("It

is thus apparent that the fact that the employees here concerned were engaged in

production is not determinative.  The question remains as to the effect upon

interstate commerce of the labor practice involved."); United States v. Darby, 312

U.S. 100, 115-17 (1941) ("[W]e conclude that the prohibition of the shipment

interstate of goods produced under the forbidden substandard labor conditions is

within the constitutional authority of Congress."); Wickard, 317 U.S. at 124-25

("Whether the subject of the regulation in question was 'production,'

'consumption,' or 'marketing'  [of wheat] is . . . not material for purposes of

deciding the question of federal power before us. . . . [E]ven if appellee's activity

be local and though it may not be regarded as commerce, it may still, whatever its

nature, be reached by Congress if it exerts a substantial economic effect on

interstate commerce . . . ."); South-Eastern Underwriters, 322 U.S. at 553 ("No

commercial enterprise of any kind which conducts its activities across state lines

has been held to be wholly beyond the regulatory power of Congress under the

Commerce Clause. We cannot make an exception of the business of insurance.").

248

The Court did not stop there. It expanded the scope of Congress' commerce power from the regulation of the "intercourse" of goods moving across borders to the regulation of wholly intrastate conduct that substantially affected interstate commerce. See Darby, 312 U.S. at 119-20 & n.3. Indeed, Wickard involved a jump arguably far greater than the one we face today. In order to regulate price, Congress could penalize conduct -- Filburn's growing wheat above a fixed quota for his own personal consumption -- absent any indicia that Filburn would ever enter into the interstate wheat market. Justice Jackson, writing for the Court, recognized this as a novel exercise of the commerce power. Wickard, 317 U.S. at 120. The Court held that Congress could nonetheless regulate the price of wheat by restricting its production, even on a small farm where it was grown purely for personal consumption. And, according to the Court, if the regulation had the natural and probable effect of "forcing some farmers into the market to buy what they could provide for themselves" absent the regulation, so be it. Id. at 129 (emphasis added).

In Wickard, the Court expanded Congress' commerce power further still, concluding that the impact or effect on interstate commerce is not measured case by case, or person by person, but rather in an aggregated way. Id. at 127-28. That Filburn's "own contribution to the demand for wheat may be trivial by itself is not

enough to remove him from the scope of federal regulation where, as here, his contribution, <u>taken together with that of many others similarly situated</u>, is far from trivial." <u>Id.</u> (emphasis added); <u>see also</u> <u>Darby</u>, 312 U.S. at 123 ("[Congress] recognized that in present day industry, competition by a small part may affect the whole and that the total effect of the competition of many small producers may be great."); <u>NLRB v. Fainblatt</u>, 306 U.S. 601, 606 (1939) ("The power of Congress to regulate interstate commerce is plenary and extends to all such commerce be it great or small."). Building upon earlier inklings of an aggregation principle found in <u>Darby</u> and <u>Fainblatt</u>, the Court firmly established that Congress may regulate classes of local activities that, only in the aggregate, have a substantial effect on interstate commerce.[11]

In a pair of notable civil rights cases, <u>Heart of Atlanta Motel, Inc. v. United States</u>, 379 U.S. 241 (1964), and <u>Katzenbach</u>, 379 U.S. 294, the Supreme Court continued to read the Commerce Clause in an expansive way. The Court upheld nondiscrimination legislation, grounded in the Commerce Clause, that required

---

[11] The majority attempts to skirt the breadth of the aggregation principle by claiming that an "individual's mere decision not to purchase insurance" is not subject to aggregation. Maj. Op. at 125. But again, the majority has shot at the wrong target. Congress is regulating the uninsured's uncompensated consumption of health care services. And under <u>Wickard</u> and <u>Raich</u>, we are instructed to measure the effect on interstate commerce not case-by-case or person-by-person, but rather in the aggregate and taken as a whole.

hoteliers and restaurateurs to enter into economic transactions with racial minorities (indeed, with individuals of any race, color, religion, or national origin) on the same terms as any other patrons (or exit their respective businesses altogether). The Court underscored that "the power of Congress to promote interstate commerce also includes the power to regulate the local incidents thereof, including local activities in both the States of origin and destination, which might have a substantial and harmful effect upon that commerce." Heart of Atlanta, 379 U.S. at 258. The Court concluded that, having entered the stream of commerce, these sellers could be forced by Congress to engage in economic transactions into which they would not otherwise enter.

The plaintiffs are quick to point out, however, that the Commerce Clause has not simply expanded unabated. In rejecting the constitutionality of the individual mandate, the plaintiffs and the majority rely heavily upon Lopez, 514 U.S. 549, and United States v. Morrison, 529 U.S. 598 (2000), the only two Supreme Court cases in the past 75 years to hold that an act of Congress exceeded its commerce power. Neither Lopez, where the Court struck down a statute criminalizing the possession of a firearm within 1000 feet of a school, nor Morrison, where the Court struck down a statute creating a federal civil remedy for victims of gender-motivated felonious acts of violence, answers the question we face today.

Indeed, in <u>Raich</u>, 545 U.S. 1, decided five years after <u>Morrison</u>, the Supreme Court reaffirmed the vitality of <u>Wickard</u>, and specifically applied its holding in a challenge to the constitutionality of the Controlled Substances Act ("CSA"). The Court emphatically distinguished <u>Lopez</u> and <u>Morrison</u>, observing that the statutes at issue in those cases were singular prohibitions regulating wholly noneconomic criminal behavior. The CSA, on the other hand, was characterized as "a lengthy and detailed statute creating a comprehensive framework for regulating the production, distribution, and possession of five classes of 'controlled substances.'" <u>Raich</u>, 545 U.S. at 24. The Court found that, "[u]nlike those at issue in <u>Lopez</u> and <u>Morrison</u>, the activities regulated by the CSA are quintessentially economic." <u>Id.</u> at 25.

Thus, much as in <u>Raich</u>, while <u>Lopez</u> and <u>Morrison</u> remind us that there are discernible limits on Congress' commerce power, the limits drawn in those two cases are of limited help in this one. As a panel of this Circuit recently stated, "<u>Raich</u> makes clear that when a statute regulates economic or commercial activity, <u>Lopez</u> and <u>Morrison</u> are inapposite." <u>Garcia</u>, 540 F.3d at 1252. Indeed, when "we are not . . . dealing with a single-subject statute whose single subject is itself non-economic (e.g., possession of a gun in a school zone or gender-motivated violence)," <u>Morrison</u> and <u>Lopez</u> have little applicability and instead "<u>Raich</u> guides

252

our analysis." United States v. Maxwell ("Maxwell II"), 446 F.3d 1210, 1216 n.6 (11th Cir. 2006); see also United States v. Paige, 604 F.3d 1268, 1273 (11th Cir. 2010) (per curiam). Lopez and Morrison each involved an effort to regulate noneconomic activity (criminal conduct); in neither instance did Congress seek to broadly regulate an entire industry; and, unlike in this case, the criminal conduct regulated in those cases was only linked to interstate commerce in a highly attenuated fashion that required piling inference upon inference. Whatever problems there may be with the constitutionality of the individual mandate, they cannot be found in Lopez or Morrison. See Part II.A, infra.

The historical growth of Congress' commerce power powerfully suggests that, contrary to the arguments advanced by the plaintiffs, upholding the individual mandate would be far from a cosmic expansion of the boundaries of the Commerce Clause. These past expansions have not been random, accidental, or in any way contrary to first principles or an original understanding of the Constitution. As the Supreme Court has observed, "[t]he Federal Government undertakes activities today that would have been unimaginable to the Framers." United States v. Comstock, -- U.S. --, 130 S. Ct. 1949, 1965 (2010) (quoting New York v. United States, 505 U.S. 144, 157 (1992)). Indeed, the Framers purposely drafted "a Constitution capable of such resilience through time." Id.; see also McCulloch v.

253

Maryland, 17 U.S. (4 Wheat.) 316, 415 (1819) (describing the Constitution as a document "intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs").

The long and short of it is that Congress has promulgated a rule (the individual mandate) by which to comprehensively regulate the timing and means of payment for the virtually inevitable consumption of health care services, and to thereby regulate commerce. The individual mandate was enacted as part of a broad scheme to regulate health insurance and health care services, industries already heavily regulated by Congress. Congress made express legislative findings detailing the economic problems it saw, and how the mandate would ameliorate those problems. And the substantial impact on interstate commerce cannot be denied. Article 1, § 8, cl. 3 requires no more than this.

## C.

The individual mandate is also a valid means under the Necessary and Proper Clause to further the regulatory end of the Act's insurance reforms. "It has been long recognized that Congress has the power to pass laws or regulations necessary and proper to carrying out [its] commerce clause power." United States v. Ambert, 561 F.3d 1202, 1211 (11th Cir. 2009). Under the Necessary and Proper Clause, Congress is empowered "[t]o make all Laws which shall be necessary and proper for carrying

into Execution the foregoing [Art. 1, § 8] Powers." U.S. Const. art. 1, § 8, cl. 18. Both the Supreme Court and this Circuit have said that "in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is <u>rationally related</u> to the implementation of a constitutionally enumerated power." <u>Comstock</u>, 130 S. Ct. at 1956 (emphasis added); <u>United States v. Belfast</u>, 611 F.3d 783, 804 (11th Cir. 2010).

The constitutionality of the "end" -- that is, the Act's insurer regulations -- is both clear and unchallenged, as even the district court recognized. <u>Florida</u>, 2011 WL 285683, at *32 ("[T]he end of regulating the health care insurance industry (including preventing insurers from excluding or charging higher rates to people with pre-existing conditions) is clearly legitimate and within the scope of the constitution." (internal quotation marks omitted)). Once it has identified a legitimate and constitutional end, Congress has an expansive choice of means. As Chief Justice Marshall enduringly articulated "[i]n language that has come to define the scope of the Necessary and Proper Clause," <u>Comstock</u>, 130 S. Ct. at 1956:

> Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.

McCulloch, 17 U.S. at 421.  In addition, Chief Justice Marshall broadly defined the term "necessary."  It does not mean "absolutely necessary," but rather only "convenient, or useful" or "conducive" to the "beneficial exercise" of one or more of Congress' enumerated powers.  Comstock, 130 S. Ct. at 1956 (quoting McCulloch, 17 U.S. at 413, 414, 418).

It is clear under this expansive definition of "necessary," the validity of which was recently reaffirmed by the Supreme Court in Comstock, that requiring the purchase of health insurance is "convenient," "useful," or "conducive" to effectively implementing the Act's insurer regulations.  As the states that tried to effectuate guaranteed issue and community rating reforms without some form of individual mandate attest, trying to do the former without the latter simply does not work.  See, e.g., Brief for Am. Ass'n of People with Disabilities et al. as Amici Curiae Supporting the Government at 5-6 ("Kentucky, Maine, New Hampshire, New Jersey, New York, Vermont, and Washington enacted legislation that required insurers to guarantee issue to all consumers in the individual market, but did not have a minimum coverage provision. . . . All seven states suffered from sky-rocketing insurance premium costs, reductions in individuals with coverage, and reductions in insurance products and providers." (footnote omitted)); Brief for Governor of Wash. as Amicus Curiae Supporting the Government at 2 ("Washington knows firsthand the necessity of

universal coverage because of the problems it experienced when it eliminated barriers to insurance coverage, like preexisting condition restrictions, without also imposing a minimum coverage requirement."); Brief for Law Professors as Amici Curiae Supporting the Government at 17 ("[A]fter Kentucky enacted reform, all but two insurers (one State-run) abandoned the State.").[12] In this light, the individual mandate is "necessary" to the end of regulating insurers' underwriting practices without running insurers out of business entirely -- a point the district court recognized. Florida, 2011 WL 285683, at *33 ("The defendants have asserted again and again that the individual mandate is absolutely 'necessary' and 'essential' for the Act to operate as it was intended by Congress. I accept that it is.").

The plaintiffs also claim that the individual mandate exceeds Congress' power because it is not "proper" -- that is, because it is inconsistent with "the letter and the spirit of the constitution." McCulloch, 17 U.S. at 421. I have little doubt that the individual mandate is also "proper." It violates no other provision of the

---

[12] During a hearing before the House Ways and Means Committee, an economist stated that "imposition of community-rated premiums and guaranteed issue on a market of competing private health insurers will inexorably drive that market into extinction, unless these two features are coupled with . . . a mandate on individual[s] to be insured." Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H. Comm. on Ways and Means, 111th Cong. 13 (2009) (statement of Dr. Uwe Reinhardt, Professor, Princeton University). In other words, without a mandate, these two insurer reforms would result in adverse selection, increased premiums, decreased enrollment, and fleeing insurers -- in short, the insurance market would "implode." See id. at 13 n.4.

257

Constitution.[13]  Cf. Comstock, 130 S. Ct. at 1957 ("[T]he present statute's validity under provisions of the Constitution other than the Necessary and Proper Clause is an issue that is not before us. . . . [Therefore], the relevant inquiry is simply whether the means chosen are reasonably adapted to the attainment of a legitimate end under the commerce power . . . ." (internal quotation marks omitted)).  And the mandate is undoubtedly "rationally related" to the end of effectuating the Act's guaranteed issue and community rating reforms.  Id. at 1956; Belfast, 611 F.3d at 804.  The mandate arguably renders the insurer regulations practically and economically feasible.  Congress found that without the mandate, "many individuals would wait to purchase health insurance until they needed care," 42 U.S.C. § 18091(a)(2)(I) -- that is, until they were sick, which would impose enormous costs on insurers and drive them out of the market.  And having observed the failed experience of those states that tried to enact insurer reforms without an individual mandate, Congress rationally concluded that one way to prevent this problem was to require that non-exempted individuals enter the insurance risk pool.  The Necessary and Proper Clause requires nothing more.

II.

---

[13]  I address the plaintiffs' suggestions that the individual mandate violates the Fifth or Tenth Amendments in Part II.B, infra.

More fundamentally, the plaintiffs have offered two arguments that, they say, undermine the government's position that Congress' commerce power can justify prescribing a rule that compels an individual to buy health insurance. First, they argue that if Congress has the constitutional authority to enact the individual mandate, then there is virtually no limit on its authority, and Art. 1, § 8, cl. 3 of the Constitution (whether standing alone or in concert with the Necessary and Proper Clause) would be transformed into a grant of general police power. Second, they offer, although largely implicitly, that the individual mandate really infringes upon notions of individual liberty and popular sovereignty found either in the Fifth or Tenth Amendments to the Constitution. I take up each argument in turn.

A.

1.

Perhaps at the heart of the plaintiffs' objection to the mandate -- adopted by the majority opinion in conclusion, if not in reasoning[14] -- is the notion that allowing the

---

[14]  The majority comes perilously close to abandoning the central foundation -- the dichotomy between activity and inactivity -- on which the plaintiffs and the district court rely for their position that upholding the individual mandate would convert the Commerce Clause into an unlimited general police power. See Maj. Op. at 109 ("[W]e are not persuaded that the formalistic dichotomy of activity and inactivity provides a workable or persuasive enough answer in this case."). As I understand the position taken by the plaintiffs and the district court, it is this: if the Commerce Clause affords Congress the power to conscript the unwilling uninsured to enter the stream of commerce and buy insurance, then Congress could also conscript any American to buy any private product at a time and under circumstances not of his own choosing. In other words, the plaintiffs

individual mandate to stand will convert Congress' commerce power into a plenary federal police power, admitting of no limits and knowing of no bounds. The parade of horribles said to follow ineluctably from upholding the individual mandate includes the federal government's ability to compel us to purchase and consume broccoli, buy General Motors vehicles, and exercise three times a week. However, acknowledging the constitutionality of the individual mandate portends no such impending doom.

At the outset, there is always a danger in evaluating the constitutionality of legislation actually before us solely on the basis of conjecture about what the future may hold. The plaintiffs' heavy reliance on "floodgate fears" and a "parade of dreadfuls calls to mind wise counsel: 'Judges and lawyers live on the slippery slope of analogies; they are not supposed to ski it to the bottom.'" Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 194 n.16 (1999) (quoting Robert Bork, The Tempting of America: The Political Seduction of the Law 169 (1990)). Federal courts may only be called on to resolve ripe controversies, and it is difficult and

---

say, the individual mandate extends the Commerce Clause beyond its outer limits precisely because it allows the government to conscript the inactive and unwilling. Without drawing the distinction between activity and inactivity, I am at a loss to understand the argument that sustaining the individual mandate would transmute the limited power contained in Art. 1, § 8, cl. 3 of the Constitution into an unlimited general police power. For reasons that remain inexplicable to me, the majority opinion seems to suggest that the individual mandate is a "bridge too far" -- in the words of the district court -- not because it conscripts the inactive, but rather for some inchoate reason stated at the highest order of abstraction.

hazardous for courts to prejudge the next case or the one after that in a vacuum, devoid of a factually developed record sharpened in the crucible of the adversarial process. See Baker v. Carr, 369 U.S. 186, 204 (1962) ("[C]oncrete adverseness . . . sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions[.]").  As courts of limited jurisdiction, we ought not lose sight of the legislation before us, viewed in the context of the discrete issues and facts presented.  I have little doubt that the federal courts will be fully capable of addressing future problems raised in future cases in the fullness of time.

But a more basic answer is this: upholding the individual mandate leaves fully intact all of the existing limitations drawn around Congress' Commerce Clause power. To begin with, Congress is limited by the constitutional text and Supreme Court doctrine largely to prescribing rules regulating economic behavior that has a substantial effect on interstate commerce.  These powerful limits afford no problem in this case, because Congress has undeniably prescribed a rule (the individual mandate) to regulate economic behavior (consumption of health care services by the uninsured) that has a powerful impact on how, when, and by whom payment is made for health care services.  Indeed, the conduct regulated by the Act is even more "quintessentially economic" in nature than the cultivation, possession, and personal use of controlled substances, see Raich, 545 U.S. at 25, or the cultivation of wheat for

261

personal consumption, see Wickard, 317 U.S. at 119.

In Lopez and Morrison, the Supreme Court began to flesh out some of the outer limits surrounding Art. I, § 8, cl. 3. Chief Justice Rehnquist, writing for the Court in both instances, posited a series of "significant considerations," none of which pose any problem in this case. See Morrison, 529 U.S. at 609-12. First, he observed that the regulated conduct at issue in Lopez and Morrison was plainly of a noneconomic nature -- again, the possession of a handgun within 1000 feet of a school in Lopez, and gender-motivated felonious acts of violence in Morrison. See id. at 610 ("[A] fair reading of Lopez shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case."). Here, in sharp contrast, Congress has prescribed a rule governing purely economic behavior. As I've noted already, the Act addresses an economic problem of enormous dimension -- $43 billion of annual cost shifting from the uninsured to insured individuals and health care providers, 42 U.S.C. § 18091(a)(2)(F) -- by prescribing an economic rule governing the timing and method of payment for health care services. In short, the first problem identified in Lopez and Morrison -- that the statutes reached purely intrastate, noneconomic behavior -- is not found in this case, and thus the mandate does not, at least for this reason, penetrate beyond the outer limits of Congress' Commerce Clause power.

A second powerful consideration identified by the Court in both Lopez and

Morrison was that the nexus between the criminal conduct regulated by the legislation and its impact -- even if taken in the aggregate -- on interstate commerce was remote and wholly attenuated, and on its own terms provided no limiting principle surrounding the exercise of Congress' commerce power. In both Lopez and Morrison, the government relied on a lengthy inferential chain of causal reasoning in order to show that the criminal conduct regulated had a substantial effect on interstate commerce. In Lopez -- where Congress had made no factual findings regarding the effects upon interstate commerce of gun possession in a school zone -- the government had to argue, among other things, that the possession of firearms near schools had the natural effect of disrupting the educational process, and that this disruption, over time, would in turn lower the economic productivity of our citizens, causing an adverse effect on the national economy. See Lopez, 514 U.S. at 563-64. It's no surprise, then, that the Court found the critical link to interstate commerce wanting, and concluded that if this chain of reasoning were an acceptable means of bridging the gap between the regulated conduct and commerce, precious little would fall outside the ambit of Congress' commerce power. Id. at 564. By the same token, in Morrison, the Court found wanting Congress' chain of reasoning -- that felonious acts of violence against women would, inter alia, cause lost hours in the workplace and drive up hospital costs and insurance premiums, which in turn would have an adverse effect on the national

263

economy.  See Morrison, 529 U.S. at 615.  The problem remained the same as in Lopez, even though in Morrison, Congress had sought to draw the causal inferences itself through express factual findings.  Again, the causal reasoning that was required to link the regulated criminal conduct to interstate commerce was lengthy and attenuated.  And again, the very method of reasoning offered by Congress afforded no limitations on its commerce power.  Id. at 615-16.

In this case, no such complex and attenuated causal story is necessary to locate the regulated conduct's nexus with interstate commerce.  Here, the substantial effect on commerce occurs directly and immediately when the uninsured consume health care services in large numbers, do not pay for them in full or maybe even at all, and thereby shift powerful economic costs onto insured individuals and health care providers (as Congress found they do).  The nexus between the regulated conduct and interstate commerce could not be more direct.  I am at a loss to find even a single "inferential leap[]," Maj. Op. at 146, required to link them.  Moreover, Congress unambiguously and in considerable detail drew the connection between the regulated conduct and its substantial effect on interstate commerce through extensive findings of fact.  See 42 U.S.C. § 18091.  Contrary to the majority's claim, here there is no need "to pile inference upon inference," Lopez, 514 U.S. at 567, to draw the critical nexus, and, therefore, we face no unlimited exercise of congressional power for that reason.

Moreover, in sharp contrast to <u>Lopez</u> and <u>Morrison</u>, we are confronted today with a comprehensive economic statute, not a one-off, criminal prohibition. <u>See</u> <u>Raich</u>, 545 U.S. at 23-24 (drawing a sharp distinction between "brief, single-subject statute[s]" divorced from a larger regulatory scheme and "lengthy and detailed statute[s] creating a comprehensive framework for regulating" an entire market). The individual mandate is "an essential part of a larger regulation of economic activity," without which "the regulatory scheme would be undercut," <u>Lopez</u>, 514 U.S. at 561, and the Supreme Court has endorsed the constitutionality of such comprehensive, economic regulatory schemes, <u>Raich</u>, 545 U.S. at 24-25; <u>see also</u> <u>Hodel v. Indiana</u>, 452 U.S. 314, 329 n.17 (1981) ("A complex regulatory program such as established by the [Surface Mining] Act can survive a Commerce Clause challenge without a showing that every single facet of the program is independently and directly related to a valid congressional goal. It is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies this test."); <u>Raich</u>, 545 U.S. at 36 (Scalia, J., concurring in the judgment) ("Though the conduct in <u>Lopez</u> was not economic, the Court nevertheless recognized that it could be regulated as 'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'" (quoting <u>Lopez</u>, 514 U.S. at 561)). And,

265

according to Eleventh Circuit precedent, "where Congress comprehensively regulates economic activity, it may constitutionally regulate intrastate activity, whether economic or not, so long as the inability to do so would undermine Congress's ability to implement effectively the overlying economic regulatory scheme." Maxwell II, 446 F.3d at 1215 (footnote omitted).

The majority, in an effort to distance itself from this precedent, suggests that, because Raich involved an as-applied challenge, the inquiry into whether challenged legislation is an "essential part of a larger regulation of economic activity" is only appropriate in as-applied challenges, as opposed to facial ones. Maj. Op. at 158-60. In other words, the majority seems to be saying that, because "the Supreme Court has to date never sustained a statute on the basis of the 'larger regulatory scheme' doctrine in a facial challenge," id. at 159, it is irrelevant to the question of the individual mandate's constitutionality that the mandate is an essential part of a larger economic regulatory scheme. There is no doctrinal basis for this view. In Lopez itself, the Court applied this principle in the context of a facial challenge. In Raich, the Court plainly recognized that, unlike the challenge it faced, the challenges to the constitutionality of the Gun-Free School Zones Act in Lopez, and, for that matter, to Title III of the Violence Against Women Act in Morrison, were facial challenges. Justice Stevens, writing for the majority in Raich, said: "Here, respondents ask us to excise individual

266

applications of a concededly valid statutory scheme. In contrast, in both Lopez and Morrison, the parties asserted that a particular statute or provision fell outside Congress' commerce power in its entirety," the very definition of a facial challenge. Raich, 545 U.S. at 23 (emphasis added). Indeed, Justice Thomas, dissenting, likewise expressly recognized that "[i]n Lopez and Morrison, the parties asserted facial challenges." Id. at 71 (Thomas, J., dissenting). And of course in Lopez, the Court, for the first time, applied this very doctrine, explaining that even though the Gun-Free School Zones Act targeted purely local, noneconomic behavior, the Court could have upheld it nonetheless if it had been an "essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Lopez, 514 U.S. at 561. Moreover, a panel of this Court has recently explained in binding precedent that "what distinguished Raich from Morrison and Lopez . . . was the comprehensiveness of the economic component of the regulation," Maxwell II, 446 F.3d at 1214 -- not whether the challenge was facial or as-applied.

Furthermore, the majority's view that the individual mandate is not an essential part of the Act's concededly economic regulatory scheme, see Maj. Op. at 162-66, cannot be squared with the economic realities of the health insurance business or the legislative realities of the Act. Nor can this view be squared with the contrary

267

judgment reached by Congress on this very point. Thus, for example, the majority appears to simply cast aside Congress' finding that the individual mandate "is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." 42 U.S.C. § 18091(a)(2)(I). In Maxwell II, we explained that "courts have only a limited role in second-guessing" Congress' judgments about whether leaving a class of conduct outside of federal control would "undercut[] Congress's unquestioned authority to regulate the broader interstate market." 446 F.3d at 1215 (internal quotation marks omitted). Faced with evidence that the insurance industry would collapse if the Act's guaranteed issue and community rating provisions were implemented without the individual mandate, Congress had more than "a rational basis for concluding," Raich, 545 U.S. at 19, that the individual mandate was essential to the success of the Act's concededly valid and quintessentially economic insurer reforms.[15] In short, the real and substantial limits on the commerce

---

[15] Although the majority seems to take comfort in only striking down the individual mandate, see Maj. Op. at 207 n.145, all of the parties have agreed that the individual mandate is so essential to the principal insurer reforms that, at least for severability purposes, the guaranteed issue and community rating provisions necessarily rise and fall with the individual mandate, Gov't Reply Br. at 58 ("As plaintiffs note, the federal government acknowledged below [and continues to acknowledge] that the guaranteed-issue and community-rating provisions due to take effect in 2014 . . . cannot be severed from the minimum coverage requirement. The requirement is integral to those sections that go into effect along with it in 2014 and provide that insurers must extend coverage and set premiums without regard to pre-existing medical conditions . . . .");

power set forth by the Supreme Court in <u>Lopez</u> and <u>Morrison</u> would be left wholly intact if we were to uphold the individual mandate.

Because the impact on interstate commerce of the conduct that Congress sought to regulate through the individual mandate is so clear and immediate, this case is readily distinguishable from many of the plaintiffs' suggested hypothetical horribles, which suffer from the inference-piling reasoning condemned in <u>Lopez</u> and <u>Morrison</u>. Thus, for example, in arguing that Congress could force us to purchase broccoli, the plaintiffs necessarily reason as follows: everyone is a participant in the food market; if people buy more broccoli, they will eat more broccoli; eating more broccoli will, in the long run, improve people's health; this, in turn, will improve overall worker productivity, thus affecting our national economy. Such reasoning violates the cautionary note that "under the Government's 'national productivity' reasoning, Congress could regulate any activity that it found was related to the economic productivity of individual citizens . . . . Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate." <u>Lopez</u>, 514 U.S. at 564. By contrast, the economic

---

States Br. at 63 (stating that the individual mandate cannot be severed from "the core, interrelated health insurance reforms"); NFIB Br. at 60-61 (stating that the mandate and the principal insurer provisions "truly are the heart of the Act," and highlighting the government's concession that the mandate and the insurer reforms "must stand or fall together" (internal quotation marks omitted)).

problem that Congress sought to address through the individual mandate does not depend on any remote or long-term effects on economic productivity stemming from individuals' health care choices; indeed, the mandate does not compel individuals to seek health care at all, much less any particular form of it. Instead, Congress rationally found that the uninsured's inevitable, substantial, and often uncompensated consumption of health care services -- of any form -- <u>in and of itself</u> substantially affects the national economy.

2.

Moreover, this case does not open the floodgates to an unbounded Commerce Clause power because the particular factual circumstances are truly unique, and not susceptible to replication elsewhere. This factual uniqueness would render any holding in this case limited. I add the unremarkable observation that the holding of every case is bounded by the peculiar fact pattern arising therein. <u>See</u> <u>Licciardello v. Lovelady</u>, 544 F.3d 1280, 1288 n.8 (11th Cir. 2008) ("Our holding, as always, is limited to the facts before us."); <u>see also</u> <u>United States v. Hunter</u>, 172 F.3d 1307, 1310 (11th Cir. 1999) (Carnes, J., concurring) ("The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision.").

The health care services market is characterized by five relevant factors, which,

when taken in concert, uniquely converge to create a truly <u>sui generis</u> problem: (1) the unavoidable need that virtually all of us have to consume medical care; (2) the unpredictability of that need; (3) the high costs associated with the consumption of health care services; (4) the inability of providers to refuse to provide care in emergency situations; and, largely as a result of the previous four factors, (5) the very significant cost shifting that underlies the way medical care is paid for in this country. Gov't Econ. Br. at 1.

These are not just five fortuitous descriptors of the health care market, elevated to artificial constitutional significance. Over the last 75 years the Supreme Court has emphatically and repeatedly counseled a pragmatic approach to Commerce Clause analysis, grounded in a "practical" conception of commercial regulation, "drawn from the course of business." <u>Swift & Co.</u>, 196 U.S. at 398; <u>accord</u> <u>Raich</u>, 545 U.S. at 25 n.35; <u>Lopez</u>, 514 U.S. at 571, 574 (Kennedy, J., concurring); <u>Wickard</u>, 317 U.S. at 123-24; <u>Jones & Laughlin Steel</u>, 301 U.S. at 41-42. Legislation enacted pursuant to Congress' Commerce Clause power cannot be evaluated in a vacuum, but only in light of the peculiar problems Congress sought to address, what Congress chose to regulate, how Congress chose to regulate, and the connection between the regulated conduct and the problem Congress sought to resolve. Courts must always engage in the "hard work" of "identify[ing] objective markers for confining the analysis in Commerce

271

Clause cases." <u>Raich</u>, 545 U.S. at 47 (O'Connor, J., dissenting). Far from being "<u>ad hoc</u>" and "illusory," Maj. Op. at 168, these factual criteria are relevant descriptors, drawn from the course of business, of the economic realities Congress confronted. They are, therefore, precisely what the Court has instructed us to consider in the Commerce Clause analysis. And given these unique characteristics of the health care market and the peculiar way these characteristics converge, the individual mandate was part of a practical solution to the cost-shifting problem Congress sought to address.

The first and most basic of these factors is that no individual can opt out of the health care services market, and thus virtually everyone will consume health care services. Individual participation in the health care services market is properly, therefore, a question of <u>when</u> and <u>how</u> individuals will consume and pay for such services, not <u>whether</u> they will consume them. The plaintiffs are correct that there are other markets that, if defined broadly enough, no one may opt out of, such as the markets for food, transportation, and shelter. But the hypothetical mandates -- that Congress can force individuals to buy broccoli, GM cars, or homes -- do not follow. Neither those markets nor their hypothetical mandates resemble the market and mandate here.

In the first place, unlike the needs for food, transportation, and shelter -- which

272

are always present and have largely predictable costs -- illness and injury are wholly unpredictable. Individuals who never intend to consume health care, unlike those who never intend to purchase GM cars or broccoli or a home, will nonetheless do so because of accidents, illnesses, and all the vagaries to which one's health is subject. Indeed, the economists concluded that even the most sophisticated methods of predicting medical spending can explain only 25-35% of the variation in the costs incurred by different individuals; "the vast bulk of [medical] spending needs cannot be forecast in advance." Gov't Econ. Br. at 10-11.

In addition, while the costs associated with obtaining food, transportation, and shelter are susceptible to budgeting, this is not the case for health care, which can be so expensive that most everyone must have some access to funds beyond their own resources in order to afford them. Id. at 11-12 (explaining that unpredicted medical costs can eclipse the financial assets of "all but the very well-to-do"); see also Gov't Reply Br. at 15 ("The 'frequency, timing and magnitude' of a given individual's demand for health care are unknowable." (quoting Jennifer Prah Ruger, The Moral Foundations of Health Insurance, 100 Q.J. Med. 53, 54-55 (2007))). Moreover, there are lower cost alternatives to purchasing a house or a car, such as renting an apartment, leasing an automobile, or relying on public transportation. There are no realistic alternatives or less expensive substitutes for treating cancer, a heart attack,

or a stroke, or for performing a needed organ transplant or hip replacement. Even routine medical procedures, such as MRIs, CT scans, colonoscopies, mammograms, and childbirth, cost more than many Americans can afford. Gov't Econ. Br. at 11. This is not to say that individuals may not budget and plan as best they can for their health care costs, as many surely do, but the combination of uncertain timing, unpredictable malady, and potentially astronomical cost can nonetheless leave individuals wholly unable to pay for the health care services they consume. Indeed, Congress found that "62 percent of all personal bankruptcies are caused in part by medical expenses." 42 U.S.C. § 18091(a)(2)(G).

Largely because of these first three factors -- that health care costs are inevitable, unpredictable, and often staggeringly high -- the health care services market, unlike other markets, is paid for predominantly through the mechanism of insurance.[16] Gov't Br. at 9 (citing CMS data that payments by private and government insurers comprise 75% of national health care spending). Insurance is thus already intimately linked to the health care services market. People do not similarly insure

---

[16] The unpredictability and wide variation in health care costs demonstrate why the majority's comparison of average health care costs to the average insurance premium misses the point. Maj. Op. at 140. Individuals pay $4500 in insurance premiums not to avoid the $2000 average annual medical bill, but to avoid the extreme medical bill. Indeed, the whole point of insurance is to make spending more regular and predictable. Comparing the "average" medical bill with the "average" insurance premium is hollow -- insurance is purchased for the very reason that one cannot count on receiving the "average" medical bill every year.

against the risk that they will need food or shelter, because these needs are apparent and predictable, and people can reliably budget for them. Although the purchase of a car or a home may often be too expensive for many individuals to afford out of pocket, it would be fanciful indeed to suggest that individuals would insure against the sudden and unpredictable purchase of a home or automobile. The plaintiffs admit that "[r]egulations are 'plainly adapted' if they invoke 'the ordinary means of execution.'" NFIB Br. at 42 (quoting McCulloch, 17 U.S. at 409, 421). Insurance is the "ordinary means" of paying for health care services. Thus, a mandate to purchase insurance is more appropriately suited to address the problems of non-payment and cost shifting in the health care services market than it would be to address problems in other markets that do not similarly rely on insurance as the primary method of payment.

The fourth important factor distinguishing the health care market from all other markets -- and peculiarly contributing to the cost shifting that Congress sought to address through the mandate -- is the fact that individuals may consume health care services without regard to their ability to pay and often without ever paying for them. Unlike any other sellers in any other marketplace, nearly all hospitals are required by law to provide emergency services to anyone, regardless of ability to pay. See EMTALA, 42 U.S.C. § 1395dd. If an individual shows up at the emergency room doorstep with a broken neck from an automobile accident or bleeding from a gunshot

wound, or if an individual suffers a heart attack or a stroke, hospitals will not turn him

away. Even aside from the federal obligation imposed by EMTALA, by my count, at

least ten of the plaintiff states have statutes on the books requiring hospitals with

emergency rooms to provide emergency treatment to those in need of it, regardless of

ability to pay.[17] Still other plaintiff states have state court judicial rulings imposing

similar requirements.[18] And even absent any <u>legal</u> duty, many hospitals provide free

or deeply discounted care as part of their charitable mission, even when the patient's

need does not rise to the level of an emergency. See <u>Thornton v. Sw. Detroit Hosp.</u>,

895 F.2d 1131, 1132 (6th Cir. 1990) (observing in the application of EMTALA that

"American hospitals have a long tradition of giving emergency medical aid to anyone

---

[17] <u>See</u> Fla. Stat. Ann. § 395.1041(1); Idaho Code Ann. § 39-1391b; La. Rev. Stat. Ann. § 40:2113.4(A); Nev. Rev. Stat. Ann. § 439B.410(1); 35 Pa. Stat. Ann. § 449.8(a); S.C. Code Ann. § 44-7-260(E); Tex. Health & Safety Code Ann. § 311.022(a); Utah Code Ann. § 26-8a-501(1); Wash. Rev. Code § 70.170.060(2); Wis. Stat. Ann. § 256.30(2); <u>see also</u> Gov't Br. at 35 (citing testimony before Congress in 1986 that at least 22 states had enacted statutes or issued regulations requiring provision of emergency medical services regardless of ability to pay, and observing that state court rulings impose a common law duty on doctors and hospitals to provide emergency care).

[18] <u>See, e.g.</u>, <u>Thompson v. Sun City Cmty. Hosp., Inc.</u>, 688 P.2d 605, 610 (Ariz. 1984) ("[A]s a matter of public policy, licensed hospitals in this state are required to accept and render emergency care to all patients who present themselves in need of such care. . . . This standard of care has, in effect, been set by statute and regulation embodying a public policy which requires private hospitals to provide emergency care that is 'medically indicated' without consideration of the economic circumstances of the patient in need of such care."); <u>Walling v. Allstate Ins. Co.</u>, 455 N.W.2d 736, 738 (Mich. Ct. App. 1990) ("[L]iability on the part of a private hospital may be based upon the refusal of service to a patient in a case of unmistakable medical emergency.").

in need who appeared on the emergency room doorstep"). One expert from the Heritage Foundation persuasively illustrated this distinction between health care and other markets when recommending in 1989 that the government impose a mandate "to obtain adequate [health] insurance":

> If a young man wrecks his Porsche and has not had the foresight to obtain insurance, we may commiserate but society feels no obligation to repair his car. But health care is different. If a man is struck down by a heart attack in the street, Americans will care for him whether or not he has insurance. If we find that he has spent his money on other things rather than insurance, we may be angry but we will not deny him services -- even if that means more prudent citizens end up paying the tab.

Stuart M. Butler, Heritage Found., The Heritage Lectures 218: Assuring Affordable Health Care for All Americans 6 (1989);[19] see also Gov't Br. at 37.

This obligation of health care providers to provide free medical care creates market imperfections that fall under a variety of labels: "an externality (a situation where one person's actions or inactions affect[] others), a free-rider problem (where people buy [or consume] a good and leave the costs to others), or a Samaritan's

---

[19] The Heritage Foundation has filed an amicus brief in support of the plaintiffs making clear that this excerpt does not reflect the policy of the Heritage Foundation or even the current beliefs of the speaker; both strongly dispute the efficacy and the constitutionality of the individual mandate. Brief for Heritage Found. as Amicus Curiae Supporting the Plaintiffs at 5-6. I do not doubt the sincerity of this position, and use this statement not to imply that the Heritage Foundation has blessed the individual mandate but rather only for the statement's own value as a persuasively articulated description of an important distinction between health insurance, health care, and other markets.

dilemma (where people choose not to be prepared for emergencies, knowing that others will care for them if needed)." Gov't Econ. Br. at 14-15. Individuals who decline to purchase health insurance are not held to the full economic consequence of that choice, as society does not refuse medical care to a patient in need, even when its cost far exceeds the individual's ability to pay. The ability of health care market participants to demand services without paying for them bolsters Congress' rational conclusion that the individual mandate -- which helps to assure payment for services in advance -- is peculiarly suited to addressing a unique economic problem in the health care market.[20]

Finally, the four factors described above converge to cause a fifth unique factor of the health care market: the substantial cost shifting from the uninsured to current

---

[20] Contrary to the plaintiffs' suggestion, it is not problematic that Congress' own legislation -- EMTALA -- may have contributed to the very market conditions that it sought to address in the Act. Significantly, EMTALA predated the individual mandate by over two decades, and was enacted for reasons wholly unrelated to the mandate. Moreover, EMTALA did not create a new federal obligation out of whole cloth and then impose it on health care providers; rather, it supplemented numerous state laws and overarching social judgments that the sick and injured should be cared for regardless of ability to pay. Nor should we be concerned that Congress might similarly enact legislation requiring companies to give away cars, food, or housing, and then accompany that legislation with a mandate prescribing the pre-purchase of a mechanism for financing those items. Not only is it wholly unrealistic that Congress would require companies to give away free cars or housing (even if it could do so) simply so that it could then impose an insurance requirement on those items, but cars and houses are also products not already predominantly financed through insurance. An insurance mandate thus would not be a well-suited means to regulate payment in those markets.

participants in the health insurance market and to health care providers. This cost shifting does not occur in other markets, even those in which we all participate, such as transportation, food, or housing. When an individual purchases a home or a car, the purchaser pays all of the cost (whether upfront or over time through a loan or mortgage). My neighbor will not help cover my costs of purchasing a home by paying a higher price for his own house. And I will not pay more for my car, simply because my neighbor cannot afford to buy one for himself. The costs in those markets are borne by the individual purchaser alone. Again, in sharp contrast, the uninsured shift substantial costs to the insured and to health care providers, because the uninsured in the aggregate consume health care services in large numbers and yet bear only a small fraction of the costs for the services they consume. The parties agree that the uninsured fail to pay for 63% of the health care services they receive, and some 37% (amounting to $43 billion) of all health care costs incurred by the uninsured are uncompensated entirely. States Br. at 30-31; Gov't Reply Br. at 8-9, 11. Congress found that this uncompensated care increases the average insured family's annual insurance premiums by $1000. 42 U.S.C. § 18091(a)(2)(F). This cost-shifting phenomenon simply does not occur in other industries.[21] Even under the majority's

---

[21] Perhaps the closest analog to the individual mandate is a requirement that individuals buy other types of insurance. The district court rejected the government's contention that the failure to buy health insurance is a "financing decision" by reasoning that "this is essentially true of any and all forms of insurance." Florida, 2011 WL

characterization of the regulated conduct as a "decision not to purchase health insurance," Maj. Op. at 164, deciding to self-insure in the health care market, unlike all other "financial decisions of Americans," id. at 115, is a decision to pay for your care if you can afford it or to shift costs onto society if you can't.

In sum, the particular problems riddling the health care industry that Congress sought to address, together with the unique factors that characterize the health care market and its peculiar interconnectedness with the health insurance market, all led Congress to enact the individual mandate as an appropriate means of ameliorating two large national problems. Although these economic factors "are not precise formulations, and in the nature of things they cannot be[,] . . . [I] think they point the way to a correct decision of this case." Lopez, 514 U.S. at 567; see also id. at 579 (Kennedy, J., concurring) ("[A]s the branch whose distinctive duty it is to declare 'what the law is,' we are often called upon to resolve questions of constitutional law not susceptible to the mechanical application of bright and clear lines." (citation omitted) (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803))). Upholding the mandate under the particular circumstances of this case would do little

---

285683, at *28; see also Maj. Op. at 133. But of the examples suggested by the district court -- supplemental income, credit, mortgage guaranty, business interruption, or disability insurance -- none insures against risks or costs that are inevitable, or that will otherwise be subsidized by those with insurance, unlike the relationship between health insurance and health care services.

to pave the way for future congressional mandates that address wholly distinct problems that may arise in powerfully different contexts. While the individual mandate is indeed novel, I cannot accept the charge that it is a "bridge too far." The individual mandate, viewed in light of the larger economic regulatory scheme of the Act as a whole and the truly unique and interrelated nature of both markets, is a legitimate exercise of Congress' power under Art. I, § 8, cl. 3 of the Constitution and is not prone to the slippery slope of hypothetical horrors leading to an unlimited federal Commerce Clause power.

## B.

Finally, implicit in the plaintiffs' Commerce Clause challenge, and providing the subtext to much of the majority's opinion, is the deeply rooted fear that the federal government is infringing upon the individual's right to be left alone -- a fear that is intertwined with a visceral aversion to the government's making us do something we do not want to do (in this case, buy a product we do not wish to purchase). The plaintiffs say that Congress cannot compel unwilling individuals to engage in a private commercial transaction or otherwise pay a penalty. The difficulty, however, is in finding firm constitutional footing for the objection. The plaintiffs suggest that the claim derives, if anywhere, from either of two constitutional provisions: the Fifth Amendment's Due Process Clause or the Tenth Amendment. If derived from the Fifth

Amendment, the objection, fairly stated, is that the mandate violates individual liberty, as protected by the substantive component of the Due Process Clause. In the alternative, if derived from the Tenth Amendment, the objection is that the individual mandate infringes on the powers, or rights, retained by "the people."

At the trial court, the plaintiffs squarely raised a Fifth Amendment substantive due process challenge to the individual mandate, which the district court flatly rejected. Florida ex rel. McCollum v. U.S. Dep't of Health & Human Servs., 716 F. Supp. 2d 1120, 1161-62 (N.D. Fla. 2010). And while the plaintiffs also challenged the individual mandate on Tenth Amendment grounds, the district court addressed this challenge only implicitly in ruling that the mandate exceeded Congress' commerce power. Florida, 2011 WL 285683, at *33.

On appeal, the plaintiffs have expressly disclaimed any substantive due process challenge to the individual mandate, although they appear still to advance a Tenth Amendment challenge. Nevertheless, it is clear that individual liberty concerns lurk just beneath the surface, inflecting the plaintiffs' argument throughout, although largely dressed up in Commerce Clause and Necessary and Proper Clause terms. For example, the state plaintiffs go so far as to say that the individual mandate is "one of the Act's principal threats to individual liberty," States Br. at 16, and that upholding it would "sound the death knell for our constitutional structure and individual

282

liberties," id. at 19. Similarly, the private plaintiffs claim that the individual mandate "exemplifies the threat to individual liberty when Congress exceeds its enumerated powers and attempts to wield a plenary police power." NFIB Br. at 7. Sounding almost entirely in economic substantive due process, the private plaintiffs also assert that "[a]mong the most longstanding and fundamental rights of Americans is their freedom from being forced to give their property to, or contract with, other private parties." Id. at 47. Thus, to the extent the plaintiffs' individual liberty-based challenge to the individual mandate derives from the Fifth and Tenth Amendments, I address each constitutional source in turn.

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Although the Due Process Clause has both a procedural and a substantive component, only its substantive aspect is implicated here. "The substantive component [of the Due Process Clause] protects fundamental rights that are so implicit in the concept of ordered liberty that neither liberty nor justice would exist if they were sacrificed." Doe v. Moore, 410 F.3d 1337, 1342 (11th Cir. 2005) (internal quotation marks omitted). This narrow band of fundamental rights is largely protected from governmental action, regardless of the procedures employed. Id. at 1343. And any law, whether federal or state, that infringes upon these rights will undergo strict

scrutiny review, which means that the law must be "narrowly tailored to serve a compelling state interest." Id. (quoting Reno v. Flores, 507 U.S. 292, 302 (1993)). Today, substantive due process protects only a small class of fundamental rights, including "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion," Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (citations omitted) -- a list the Supreme Court has been "very reluctant to expand," Moore, 410 F.3d at 1343.

In a bygone period known as "the Lochner era,"[22] however, substantive due process was more broadly interpreted as also encompassing and protecting the right, liberty, or freedom of contract. See, e.g., Adkins v. Children's Hosp. of D.C., 261 U.S. 525, 545 (1923); Adair v. United States, 208 U.S. 161, 174-75 (1908). Through this interpretation of the Due Process Clause, the Supreme Court struck down many federal and state laws that sought to regulate business and industrial conditions. See, e.g., Adkins, 261 U.S. 525 (striking down a federal law fixing minimum wages for women and children in the District of Columbia); Jay Burns Baking Co. v. Bryan, 264 U.S. 504 (1924) (striking down a Nebraska law regulating the weight of loaves of bread for

_____

[22] The name refers, of course, to Lochner v. New York, 198 U.S. 45 (1905), where the Supreme Court struck down a New York law setting maximum hours for bakery employees on the ground that it violated the right of contract, as protected by the Fourteenth Amendment's Due Process Clause.

sale).

However, the Supreme Court has long since abandoned the sweeping protection of economic rights through substantive due process.  See, e.g., Ferguson v. Skrupa, 372 U.S. 726, 730 (1963) ("The doctrine that prevailed in Lochner . . . and like cases -- that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely -- has long since been discarded."); Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 488 (1955) ("The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought."); West Coast Hotel Co. v. Parrish, 300 U.S. 379, 391 (1937).  Today, economic regulations are presumed constitutional, Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976), and are subject only to rational basis review, Vesta Fire Ins. Corp. v. Florida, 141 F.3d 1427, 1430 n.5 (11th Cir. 1998).

In substantive due process cases, binding precedent requires that we "carefully formulat[e]" the alleged fundamental right, Glucksberg, 521 U.S. at 722, which must be "defined in reference to the scope of the [statute at issue]," Williams v. Att'y Gen. of Ala., 378 F.3d 1232, 1241 (11th Cir. 2004).  In light of the individual mandate's scope, the carefully formulated right would be the right of non-exempted individuals

to refuse to maintain a minimum level of health insurance. And this right -- whether cast as the freedom to contract, the right to remain uninsured, or, in the words of one commentator, the "right to force a society to pay for your medical care by taking a free ride on the system"[23] -- cannot be characterized as a "fundamental" one receiving heightened protection under the Due Process Clause. The present state of our jurisprudence does not recognize any such right as a "fundamental" one, "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed." Williams, 378 F.3d at 1239 (quoting Glucksberg, 521 U.S. at 720-21).

Since the individual liberty interest asserted by the plaintiffs is not a fundamental right, we are obliged to apply rational basis review, which only asks whether the mandate is rationally related to a legitimate government interest. TRM, Inc. v. United States, 52 F.3d 941, 945 (11th Cir. 1995). Under rational basis review, "legislation must be sustained if there is any conceivable basis for the legislature to believe that the means they have selected will tend to accomplish the desired end." Id. at 945-46 (internal quotation marks omitted); see also Williams v. Morgan, 478 F.3d 1316, 1320 (11th Cir. 2007) ("A statute is constitutional under rational basis

---

[23] See Is the Obama Health Care Reform Constitutional? Fried, Tribe and Barnett Debate the Affordable Care Act, Harvard Law School (Mar. 28, 2011), http://www.law.harvard.edu/news/spotlight/constitutional-law/is-obama-health-care-reform-constitutional.html.

scrutiny so long as 'there is <u>any reasonably conceivable state of facts</u> that could provide a rational basis for the [statute].'" (alteration in original) (quoting <u>FCC v. Beach Commc'ns, Inc.</u>, 508 U.S. 307, 313 (1993))).

Here, Congress rationally found that the individual mandate would address the powerful economic problems associated with cost shifting from the uninsured to the insured and to health care providers, and with the inability of millions of uninsured individuals to obtain health insurance. Thus, to the extent the plaintiffs' individual liberty concerns are rooted in the Fifth Amendment's Due Process Clause, they must fail.

The plaintiffs' more provocative argument is found in the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The plaintiffs do not explicitly flesh out <u>how</u> the mandate violates the Tenth Amendment. The state plaintiffs cite the Tenth Amendment generally, claiming that "[i]f this Court were to uphold [the individual mandate and the Act's Medicaid expansion], there would remain little if any power 'reserved to the States . . . or to the people.'" States Br. at 3 (alteration in original)

(quoting U.S. Const. amend. X).[24]  And the private plaintiffs suggest that the portion of the amendment reserving undelegated power to the people provides the basis for their individual liberty claim.  See NFIB Br. at 46 (reciting "the Tenth Amendment's admonition that the non-enumerated powers 'are reserved to the States respectively, or to the people.'" (quoting U.S. Const. amend. X) (emphasis in original)); see also Brief for Cato Institute as Amicus Curiae Supporting the Plaintiffs at 24 ("[T]he text of the Tenth Amendment protects not just state sovereignty, but also popular sovereignty.").

The Supreme Court, however, has said precious little about the tail end of the Tenth Amendment that reserves power to the people.  Indeed, no case, either from the Supreme Court or from any lower federal court, has ever invoked this portion of the amendment to strike down an act of Congress.  Instead, the Supreme Court's Tenth Amendment cases have grappled almost exclusively with the balance of power between the federal government and the states.[25]

---

[24]  Indeed, when asked at oral argument if the Tenth Amendment had been abandoned on appeal, counsel for the states reiterated that "the Tenth Amendment is still very much in this case," and that "this is both an individual rights case and a Commerce Clause enumerated rights case."

[25]  In Bond v. United States, -- U.S. --, 131 S. Ct. 2355 (2011), the Supreme Court recently held that an individual has prudential standing to "assert injury from governmental action taken in excess of the authority that federalism defines."  Id. at 2363-64.  In other words, Carol Anne Bond had standing to raise federalism-based arguments in challenging the constitutionality of the criminal statute under which she was indicted,

In these cases, the Supreme Court has interpreted the Tenth Amendment's reservation of power to the states to mean that the federal government may not "commandeer[] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." New York, 505 U.S. at 176 (quoting Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. 264, 288 (1981)); see also Printz v. United States, 521 U.S. 898, 935 (1997) ("The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program."). The Court has thus held that federal laws compelling state governments to enact legislation providing for the disposal of radioactive waste, New York, 505 U.S. at 149, and compelling state agents to conduct background checks on prospective handgun purchasers, Printz, 521 U.S. at 902, violate the Tenth Amendment. In so holding, the Supreme Court has explained that the limits the Tenth Amendment imposes on Congress' power come not from the amendment's text, but rather from the principle of federalism, or dual sovereignty, that the Tenth Amendment embodies. See New York, 505 U.S. at 156-57.

But because of the utter lack of Supreme Court (or any other court) precedent,

---

18 U.S.C. § 229 (which prohibits the knowing development, acquisition, possession, or use of chemical weapons). Id. at 2360. It remains true, however, that the Court has never used the "people" prong of the Tenth Amendment to invalidate an act of Congress.

the amendment's "people" prong provides little, if any, support here. It may be that in time the law will come to breathe practical life into the Tenth Amendment's reservation of power to the people, but that day has not yet arrived.

Setting aside the lack of <u>any</u> precedent on point, a Tenth Amendment challenge to the individual mandate fails for an additional, and critical, reason: when a federal law is properly within Congress' delegated power to enact, the Tenth Amendment poses no limit on the exercise of that power. See, e.g., <u>New York</u>, 505 U.S. at 156 ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States . . . ."); <u>Midrash Sephardi, Inc. v. Town of Surfside</u>, 366 F.3d 1214, 1242 (11th Cir. 2004) ("Because [the Religious Land Use and Institutionalized Persons Act] is a proper exercise of Congress's power under § 5 of the Fourteenth Amendment, there is no violation of the Tenth Amendment."); <u>United States v. Williams</u>, 121 F.3d 615, 620 (11th Cir. 1997) ("[T]he [Child Support Recovery Act] is a valid exercise of Congress's power under the Commerce Clause, and Congress's 'valid exercise of authority delegated to it under the Constitution does not violate the Tenth Amendment.'" (quoting <u>Cheffer v. Reno</u>, 55 F.3d 1517, 1519 (11th Cir. 1995))); <u>N. Ala. Express, Inc. v. ICC</u>, 971 F.2d 661, 666 (11th Cir. 1992) ("Because the Tenth Amendment reserves only those powers not already delegated to the federal government, the Tenth Amendment has been violated

only if [the federal law at issue] goes beyond the limits of Congress' power under the Commerce Clause."). Since the individual mandate falls within Congress' commerce power, its enactment is a proper exercise of a power "delegated to the United States by the Constitution." U.S. Const. amend. X. The Tenth Amendment, therefore, has no independent role to play. In short, the plaintiffs' individual liberty claims find little support in the Constitution -- whether pegged to the Fifth Amendment's Due Process Clause or to the Tenth Amendment's reservation of power to the people.

At bottom, Congress rationally concluded that the uninsured's consumption of health care services, in the aggregate, shifts enormous costs onto others and thus substantially affects interstate commerce. The individual mandate directly and unambiguously addresses this cost-shifting problem by regulating the timing and means of payment for the consumption of these services. Congress also fairly determined that the mandate is an essential part of the Act's comprehensive regulation of the health insurance market. I would, therefore, uphold the mandate as constitutional, and I respectfully dissent on this critical point.

# APPENDIX A: OVERALL STRUCTURE OF ACT'S NINE TITLES

The Act's nine Titles are:

I. Quality, Affordable Health Care for All Americans

II. Role of Public Programs

III. Improving the Quality and Efficiency of Health Care

IV. Prevention of Chronic Disease and Improving Public Health

V. Health Care Workforce

VI. Transparency and Program Integrity

VII. Improving Access to Innovative Medical Therapies

VIII. Community Living Assistance Services and Supports

IX. Revenue Provisions[1]

We outline here the structure and many of the key provisions in these nine Titles.

Title I reforms the business and underwriting practices of insurance companies and overhauls their health insurance products. Title I requires that private insurers change their practices and products and offer new and better health insurance policies for consumers. Title I's hefty insurance reforms include: (1) elimination of preexisting

---

[1]There is also a tenth Title dedicated to amendments to these nine Titles. Although the amendments are actually located in Title X, we list the substance of the amendments under the Title being amended.

conditions exclusions for children immediately, Act §§ 1201, 1255 (as re-numbered by §§ 10103(f)), 10103(e));[2] (2) elimination of preexisting conditions for adults in 2014, §§ 1201, 1255 (as re-numbered by § 10103(f)); (3) elimination of annual and lifetime limits on benefits, §§ 1001, 10101(a); (4) required coverage for preventive services, § 1001; (5) immediate extension of dependent coverage up to age 26, § 1001; (6) imposition of a cap on insurers' administrative costs in relation to their claims-payments (the medical loss ratio), §§ 1001, 10101(f); (7) prohibition on excessive waiting periods to obtain coverage, §§ 1251, 10103(b); (8) guaranteed issue of coverage and guaranteed renewability in 2014, §§ 1201, 1255 (as re-numbered by § 10103(f)(1)); (9) prohibition on rescission except on limited grounds, § 1001; (10) prohibition of coverage denial based on health status, medical condition, claims experience, genetic information, or other health-related factors, § 1201; (11) "community-rated" premiums, § 1201; (12) prohibition of discrimination based on salary, §§ 1001, 10101(d); (13) development and utilization of uniform explanation of coverage documents and standardized definitions, § 1001; (14) coverage appeals process, §§ 1001, 10101(g); and (15) insurance offerings for persons who retire before age 65, § 1102.

---

[2]In this Appendix, we provide citations to the sections of the Act. Our opinion's in-depth discussion of the contents of specific provisions, however, cites to the sections of the U.S. Code where each provision is now, or will be, codified.

In addition to requiring insurers to offer new, improved health insurance products, Title I creates new state-run marketplaces for consumers to buy those new products, accompanied by federal tax credits and subsidies. Title I establishes state-administered Health Benefit Exchanges where both individuals and small groups can, and are encouraged to, purchase health insurance plans through non-profits and private insurers. §§ 1301–1421, 10104–10105. The Exchanges allow individuals, families, and small businesses to pool resources together and obtain premium prices competitive with those of large employer group plans. § 1311. The Exchange provisions include: (1) state flexibility to establish basic health programs for low-income individuals not eligible for Medicaid, § 1331; (2) transitional reinsurance program for sellers of insurance in the individual and small group markets in each state, § 1341; (3) establishment of a temporary risk corridor program for plans in individual and small group markets, § 1342; (4) refundable premium-assistance tax credit and reduced cost-sharing for individuals enrolled in qualified health plans, §§ 1401–02; (5) tax credits for small businesses' employee health insurance expenses, § 1421; and (6) streamlining of enrollment procedures through the Exchanges, Medicaid, CHIP, and health subsidy programs, § 1413.

Title I next addresses employers. Title I imposes penalties on certain employers if they do not offer any, or an adequate, health insurance plan to their employees.

iii

§ 1513. Title I contains provisions regarding "automatic enrollment" for employees of large corporations, reporting requirements, informing employees of coverage options, and offering of Exchange-participating health plans through "cafeteria" plans. §§ 1511–1515. Miscellaneous Title I provisions include transparency in government, equity for certain eligible survivors, health information technology enrollment standards and protocols, and prohibition against discrimination on refusal to furnish services or goods used to facilitate assisted suicide. §§ 1552, 1553, 1556, 1561.

Title I contains the individual mandate, which requires individual taxpayers either to purchase health insurance or pay a monetary penalty with their federal tax return. § 1501. Title I includes three exemptions from the mandate and five exceptions to the penalty, which together exclude many uninsured persons from the individual mandate. § 1501.

Title II shifts the Act's focus to publicly-funded programs such as Medicaid, CHIP, and initiatives under the Indian Health Care Improvement Act. As to Medicaid, Title II's provisions: (1) expand Medicaid eligibility to 133% of the federal poverty level, § 2001; (2) provide Medicaid coverage for former foster children, § 2004; (3) rescind the Medicaid Improvement Fund, § 2007; (4) permit hospitals to make presumptive eligibility determinations for all Medicaid-eligible populations, § 2202; (5) extend Medicaid coverage to freestanding birth center services and concurrent care

to children, §§ 2301–02; (6) require premium assistance to Medicaid recipients for employer-sponsored coverage, § 2003; (7) provide a state eligibility option for Medicaid family planning services, § 2303; (8) create a Community First Choice Option for Medicaid, § 2401; (9) remove barriers to providing home- and community-based services through Medicaid, § 2402; (10) reauthorize Medicaid programs aimed at moving beneficiaries out of institutions and into their own homes or other community settings, § 2403; and (11) protect Medicaid recipients of home- and community-based services against spousal impoverishment, § 2404.

As to CHIP, Title II provides enhanced federal support and funding. § 2101. The Act: (1) reauthorizes CHIP through September 2015, § 10203; and (2) from October 2015 through September 2019, increases state matching rates for CHIP by 23 percentage points, up to a 100% cap, § 2101. Title II requires states to maintain CHIP eligibility through September 2019. § 2101.

Title II also amends and extends the Indian Health Care Improvement Act ("IHCIA"). § 10221. The Act's IHCIA amendments, *inter alia*: (1) make the IHCIA's provisions permanent; (2) expand programs to address diseases, such as diabetes, that are prevalent among the Indian population; (3) provide funding and technical assistance for tribal epidemiology centers; (4) establish behavioral health initiatives, especially as to Indian youth suicide prevention; and (5) authorize long-term care and

home- and community-based care for the Indian health system. § 10221; *see* S.1790, 111th Cong. (2009).

Title II's provisions also create, or expand, other new publicly-funded programs that: (1) establish a pregnancy assistance fund for pregnant and parenting teens and women, § 10212; (2) fund expansion of State Aging and Disability Resource Centers, § 2405; (3) fund maternal, infant, and early childhood home visiting programs in order to reduce infant and maternal mortality, § 2951; (4) provide for support, education, and research for postpartum depression, § 2952; (5) support personal responsibility education, § 2953; (6) restore funding for abstinence education, § 2954; and (7) require inclusion of information about the importance of foster-care children designating a health care power of attorney for them as part of their transition planning for aging out of either foster care or other programs, § 2955.

Title III primarily addresses Medicare. Title III establishes new Medicare programs, including: (1) a value-based purchasing program for hospitals that links Medicare payments to quality performance on common, high-cost conditions, § 3001; (2) a Center for Medicare & Medicaid Innovation to research and develop innovative payment and delivery arrangements, § 3021; (3) an Independent Payment Advisory Board to present to Congress proposals to reduce Medicare costs and improve quality, §§ 3403, 10320(b); and (4) a new program to develop community health teams

supporting medical homes to increase access to community-based, coordinated care, §§ 3502, 10321. Title III revises the Medicare Part D prescription drug program and reduces the so-called "donut hole" coverage gap in that program.[3] § 3301. Title III extends a floor on geographic adjustments to the Medicare fee schedule to increase provider fees in rural areas. § 3102.

Other sundry Medicare provisions in Title III include: (1) quality reporting for long-term care hospitals, inpatient rehabilitation hospitals, and hospice programs, § 3004; (2) permitting physician assistants to order post-hospital extended care services, § 3108; (3) exemption of certain pharmacies from accreditation requirements, § 3109; (4) payment for bone density tests, § 3111; (5) extensions of outpatient hold-harmless provisions, the Rural Community Hospital demonstration project, and the Medicare-dependent hospital program, §§ 3121, 3123–24; (6) payment adjustments for home health care, § 3131; (7) hospice reform, § 3132; (8) revision of payment for power-driven wheelchairs, § 3136; (9) payment for biosimilar biological products, § 3139; (10) an HHS study on urban Medicare-dependent hospitals, § 3142; (11) Medicare Part C benefit protection and simplification amendments, § 3202; and (12)

---

[3]The Medicare Part D "donut hole" is the gap in prescription drug coverage, where beneficiaries' prescription drug expenses exceed the initial coverage limit but do not yet reach the catastrophic coverage threshold, meaning beneficiaries must pay 100% of those prescription drug costs. *See* 42 U.S.C. § 1395w-102(b)(3)(A), (b)(4) (2009). In 2006, the donut hole extended to yearly prescription drug expenses between $2,250 and $3,600, with values for later years adjusted by an annual percentage increase. *See id.*

an increase in premium amount for high-income Medicare Part D beneficiaries, § 3308. Title III also includes new federal grants for (1) improving women's health, § 3509; (2) health care delivery system research, § 3501; and (3) medication management services in treatment of chronic diseases, § 3503.

Title IV concentrates on prevention. Title IV creates the National Prevention, Health Promotion, and Public Health Council, and authorizes $15 billion for a new Prevention and Public Health Fund to support initiatives from smoking cessation to fighting obesity. §§ 4001, 4002. Title IV authorizes new publicly-funded programs for (1) an oral healthcare prevention education campaign, § 4102; (2) Medicare coverage for annual wellness visits, § 4103; and (3) the operation and development of school-based health clinics, § 4101. Title IV also: (1) waives Medicare coinsurance requirements and deductibles for most preventive services, § 4104; and (2) provides states with an enhanced funds-match if the state Medicaid program covers certain clinical preventive services and adult immunizations, § 4106. Title IV further provides for: (1) Medicaid coverage of comprehensive tobacco cessation services for pregnant women, § 4107; (2) community transformation grants, § 4201; (3) nutrition labeling of standard menu items at chain restaurants, § 4205; (4) reasonable break time for nursing mothers and a place, other than a bathroom, which may be used, § 4207; (5) research on optimization of public health services delivery, § 4301; (6) CDC and

employer-based wellness programs, § 4303; (7) advancing research and treatment for pain care management, § 4305; (8) epidemiology-laboratory capacity grants, § 4304; and (9) funding for childhood obesity demonstration projects, § 4306.

Title V seeks to increase the supply of health care workers through education loans, training grants, and other spending. Title V: (1) modifies the federal student loan program, § 5201; (2) increases the nursing student loan program, § 5202; and (3) establishes a loan repayment program for pediatric subspecialists, juvenile mental health providers, and public health workers who practice in underserved areas, § 5203. Title V also provides for: (1) state health care workforce development grants, § 5102; (2) a national health care workforce commission, § 5101; (3) nurse-managed health clinics, § 5208; (4) workforce diversity grants, § 5404; (5) training in general, pediatric, and public health dentistry, § 5303; (6) mental and behavioral health education and training grants, § 5306; (7) advanced nursing education grants, § 5309; (8) grants to promote the community health workforce, § 5313; (9) spending for Federally Qualified Health Centers, § 5601; and (10) reauthorization of the Wakefield Emergency Medical Services for Children program, § 5603. Title V addresses: (1) the distribution of additional residency positions, § 5503; and (2) rules for counting resident time for didactic and scholarly activities and in non-provider settings, §§ 5504–05.

Title VI creates new transparency and anti-fraud requirements for physician-owned hospitals participating in Medicare and for nursing facilities under Medicare or Medicaid. Title VI authorizes the HHS Secretary to (1) reduce civil monetary penalties for facilities that self-report and correct deficiencies, § 6111; and (2) establish a nationwide background-check program for employees of certain long-term support and service facilities, § 6201. Title VI also provides: (1) screening of providers and suppliers participating in Medicare, Medicaid, and CHIP, § 6401; and (2) new penalties for false statements on applications or contracts to participate in a federal health care program, § 6408.

Title VI also includes the Elder Justice Act, designed to prevent and eliminate elder abuse, neglect, and exploitation. § 6703. Other Title VI provisions include: (1) dementia and abuse prevention training, § 6121; (2) patient-centered outcomes research funded by a $2 fee on accident or health insurance policies, § 6301; (3) federal coordinating counsel for comparative effectiveness research, § 6302; (4) enhanced Medicare and Medicaid program integrity provisions, § 6402; (5) elimination of duplication between the Healthcare Integrity and Protection Data Bank and the National Practitioner Data Bank, § 6403; (6) reduction of maximum period for submission of Medicare claims to not more than 12 months, § 6404; (7) requirement for physicians to provide documentation on referrals to programs at high risk of waste

and abuse, § 6406; (8) requirement of face-to-face encounter before physicians may certify eligibility for home health services or durable medical equipment under Medicare, § 6407; (9) prohibition on Medicaid payments to institutions or entities outside the United States, § 6505; (10) enablement of the Department of Labor to issue administrative summary cease-and-desist orders and summary seizure orders against plans in financially hazardous condition, § 6605; and (11) mandatory state use of the national correct coding initiative, § 6507.

Title VII extends and expands the drug discounts through the 340B program.[4] § 7101. Title VII establishes a process for FDA licensing of biological products shown to be biosimilar or interchangeable with a licensed biological product. § 7002.

Title VIII establishes a national voluntary long-term care insurance program for purchasing community living assistance services and support by persons with functional limitations. § 8002.

Title IX includes: (1) an excise tax on high-premium employer-sponsored health plans, § 9001; (2) an increase in taxes on distributions from individuals' health savings accounts, § 9004; (3) increases in the employee portion of the FICA hospital insurance

---

[4]Section 340B of the Public Health Service Act, 42 U.S.C. § 256b, establishes a program whereby HHS enters into contracts with manufacturers of certain outpatient drugs under which the manufacturers provide those drugs at discounted prices to "covered entities"— generally, certain enumerated types of federally funded health care facilities serving low-income patients. *Id.*; *see generally Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 439 (D.C. Cir. 1999).

tax for employees with wages over certain threshold amounts, § 9015; (4) an additional tax of 3.8% on investment income above certain thresholds to fund Medicare, §§ 9001, 10901; HCERA § 1402; (5) a $2,500 limitation on individuals' health flexible spending accounts under cafeteria plans, § 9005; (6) imposition of an annual fee on manufacturers and importers of branded prescription drugs, § 9008; (7) elimination of the tax deduction for expenses allocable to the Medicare Part D subsidy, § 9012; (8) a decrease in the itemized tax deduction for medical expenses, § 9013; and (9) an excise tax on indoor tanning services, § 10907. Title IX also provides for: (1) inclusion of the cost of employer-sponsored health coverage on W-2 forms, § 9002; (2) expansion of information-reporting requirements, § 9006; (3) additional requirements for hospitals to receive "charitable" designation and tax status, § 9007; (4) a study and report on the effect of the Act's new fees on drug manufacturers and insurers on veterans' health care, § 9011; (5) prohibition on health insurers' deducting employee compensation over $500,000, § 9014; (6) tax credit for companies with fewer than 250 employees that are engaged in research on qualifying therapeutic discoveries, § 9023; and (7) establishment of simple cafeteria plans for small businesses, § 9022. Title IX assesses an annual fee on health insurance companies, which is apportioned among insurers based on a ratio designed to reflect each insurer's share of the net premiums written in the United States health care market. §§ 9010,

10905; HCERA § 1406.